```
1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                         TAMPA DIVISION

3

4
       GAWKER MEDIA, LLD, et        :
5      al.,                         :
                                    :
6            Plaintiff,             :
                                    : CIVIL   8:15-cv-1202-T-
7      vs.                          : NO.:    24EAJ
                                    :
8                                   : DATE:   July 2, 2015
                                    :
9      FBI, et al.,                 : TIME:   9:00 a.m.
                                    :
10           Defendant.             : PAGES:  1 - 94
       --------------------------- :
11

12

13              TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE SUSAN C. BUCKLEW
14               UNITED STATES DISTRICT JUDGE

15

16

17

18

19
       Court Reporter: Lynann Nicely, RPR, RMR, CRR
20             Official Court Reporter
               801 N. Florida Avenue
21                   Suite 13B
               Tampa, Florida 33602
22
       Proceedings recorded and transcribed by computer-aided
23     stenography.

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3      For the Plaintiff:

 4
                 SETH D. BERLIN, ESQ.
 5               Levine, Sullivan, Koch & Schultz, LLP
                 1800 L. Street NW
 6               Washington, D.C.  20036

 7               RACHEL E. FUGATE, ESQ.
                 Thomas & LoCicero, PL
 8               601 South Boulevard
                 Tampa, Florida  33606

 9

10      For the Defendant:

11
                 ERIK KENNETH STEGEBY, ESQ.
12               U.S. Attorney's Office
                 Suite 3200
13               400 N. Tampa Street
                 Tampa, Florida  33602

14

15      For the Intervenor:

16               CHARLES J. HARDER, ESQ.
                 Harder Mirell & Abrams
17               1925 Century Park East
                 Suite 800
18               Los Angeles, California  90067

19               CHRISTINA K. RAMIREZ, ESQ.
                 Bajo Cuva Cohen Turkel, PA
20               Suite 1900
                 100 N. Tampa Street
21               Tampa, Florida  33602

22

23

24

25
```

P R O C E E D I N G S

1

2          THE COURT:  Good morning.  The matter that is

3    set this morning is Gawker and Gregg Thomas versus

4    the Federal Bureau of Investigation and the

5    Executive Office of the United States Attorney.  If

6    I can ask counsel to state their appearances

7    starting with counsel for the plaintiffs.

8          MR. BERLIN:  Good morning, Your Honor, I'm

9    Seth Berlin with the law firm of Levine, Sullivan,

10   Koch & Schultz in Washington, I represent the

11   plaintiffs.  Seated with me at counsel table are

12   Heather Dietrick, the president and general counsel

13   of plaintiff Gawker Media LLC, and to her left

14   Rachel Fugate of the Thomas and LoCicero firm.

15         MR. STEGEBY:  Good morning, Your Honor,

16   Kenneth Stegeby from the U.S. Attorney's Office.  I

17   represent the FBI and the EOUSA.  Right next to me

18   is my paralegal, senior paralegal, Karen Pipas.

19         THE COURT:  Good morning.  And probably --

20   well, you know the relationship, Ms. Ramirez knows

21   the relationship, but in all honesty I probably

22   should have said before that at one point in history

23   a long time ago she used to work with me.  So in an

24   effort to disclose.  All right.  And who is seated

25   at counsel table behind the government?

1        MR. HARDER:  Good morning, Your Honor, Charles

2   Harder from the law firm of Harder, Mirell & Abrams

3   in Los Angeles.  We represent the intervenor, Terry

4   Gene Bollea, professionally known as Hulk Hogan.

5        MS. RAMIREZ:  Good morning, Your Honor,

6   Christina Ramirez of Bajo Cuva Cohen Turkel, local

7   counsel for Terry Bollea.

8        THE COURT:  Okay.  In an effort of full

9   disclosure again, Ms. Ramirez used to be my law

10   clerk at a point in history.

11        Okay.  Here's how I would see this hearing

12   going again.  And Mr. Stegeby, unfortunately you're

13   probably the person on the hot seat to start with.

14   I have a number of questions and I would like to ask

15   my questions.  After I finished asking my questions,

16   I will give everybody an opportunity to speak if

17   they wish to do so.

18        It is my hope after concluding this hearing

19   that this will be the last hearing regarding FOIA

20   that we have to have in this case, at least prior to

21   the beginning of your trial on July 6th.  I'm

22   assuming, Mr. Berlin, your trial is still beginning

23   on July 6th.

24        MR. BERLIN:  At this time yes, Your Honor.

25        THE COURT:  Obviously you don't have time to

1    be attending hearings on this, so it's my hope this

2    will be the last hearing and I can enter some type

3    of order this afternoon.  That's my hope.

4         I would like to begin by just reiterating what

5    has happened since the last hearing the last time

6    that we were here.  And I'm sure everybody here

7    probably is well aware, but it's helpful for me and

8    it's probably -- it may be helpful for everyone as

9    well.

10        At the time that we adjourned our last

11   hearing, which was June 24, 2015, I entered an order

12   which set certain deadlines for the production of

13   certain things.  Subsequent to my entering that

14   order, the office of -- the Executive Office of the

15   United States Attorneys and the FBI, I'm going to

16   refer you to as the Government, filed an emergency

17   motion for reconsideration and request for extension

18   of time to file certain things.

19        I entered a subsequent order which adjusted

20   the dates and gave slightly different dates for some

21   of the production of some of the documents.

22        In addition to that, there was filed at some

23   point, which was specifically July 1, 2015, a

24   plaintiff's statement regarding defendant agency's

25   implication of newly claimed exemptions and attached

1    to that was also a declaration of Alia L. Smith.

2         In addition to that, there was filed by an

3    intervenor, Terry Bollea, a motion to intervene as

4    well as a motion for Protective Order that was filed

5    on June 30th and I did enter an order on July 1st

6    regarding that.  I know you know what it says, but

7    I'm just going to summarize.  Essentially I granted

8    the motion to intervene so that I could consider the

9    motion for a Protective Order.  And in summary my

10   order was this is an issue for the state court judge

11   to protect her own Protective Order and that I'm not

12   going to order the parties to abide by the state

13   court's Protective Order, that's her job.  So I'm

14   summarizing, but that in essence is the you bottom

15   line of what I ordered.

16        I also ordered that a Vaughn index be filed

17   and declarations be filed and those were filed both

18   by the FBI on June 30, 2015 and by the Executive

19   Office of the United States Attorney on July 30,

20   2015.

21        I have read everything that has been filed.

22   Doesn't mean that I still don't have a number of

23   questions, but I certainly have read everything that

24   has been filed.

25        So I would like to begin, if you don't mind,

1          Mr. Stegeby, by asking you to stand at the podium

2     and I'm going to ask if you could answer some of the

3     questions that I still have as a result.  If you

4     have the Vaughn indexes, would you bring those up

5     there with you.  I'm in a different courtroom, so

6     I'm having to move everything around here.  I wanted

7     to make sure I have the Vaughn indexes.  I've made

8     myself a little cheat sheet here, but I don't know

9     that it's entirely correct.  So let me just ask you,

10    I wrote out here that at issue were 1168 pages of

11    responsive documents, three videos and two audio

12    CDs.  Is that approximately correct?

13          MR. STEGEBY:  Yes, Your Honor.

14          THE COURT:  All right.  Also initially all of

15    the 1168 documents and videos were withheld under a

16    law enforcement exemption.  You have now stated that

17    you are withdrawing the law enforcement exemption

18    7(a), right?

19          MR. STEGEBY:  That's correct, Your Honor.

20          THE COURT:  I realize you've asserted new

21    exemptions.  As of June 24th when we were here last,

22    you had withheld 88 documents based on FOIA

23    exemptions, and I'm talking about the FBI, 88

24    documents based on FOIA exemptions, 285 documents s

25    being duplications, and you have now produced,

1    according to this, and I want you to correct me if

2    I'm wrong, I'm just trying to help you by saying

3    what I found -- produced 795 documents.

4         Now, this number seemed to include some

5    duplications because I couldn't come out to how that

6    was arrived at.

7         You've produced three videos in which you have

8    redacted a third party voice and image, and you

9    produced two audio recordings by way of redacted

10   transcripts.  Again I'm just talking about the FBI.

11   What's right or wrong with what I just said?

12        MR. STEGEBY:  I believe that is correct, Your

13   Honor.  With respect to the number of pages that we

14   may have produced and redacted form, I'm not quite

15   certain that 795 is the exact number, but it's about

16   right.

17        THE COURT:  Pretty close.

18        MR. STEGEBY:  It is close, yes, Your Honor.

19   And we have produced the three DVDs and we also

20   produced audio recordings two CDs with the audio

21   recordings in addition to the transcripts.

22        THE COURT:  When did you do that?

23        MR. STEGEBY:  Yesterday, Your Honor.

24        THE COURT:  All right.  With respect to the

25   Executive Office of the United States Attorney, what

1        I saw last time were three heavily redacted emails

2    and a copy of some sort of internet news story blog,

3    and that there were 59 documents that were withheld

4    and at that time there were privacy exemptions

5    asserted by the Executive Office of the United

6    States Attorney as well as policy internal documents

7    and that kind of thing.

8        So I have a note here that on June 26th the

9    Executive Office of the United States Attorney

10    released 10 pages in full and 12 pages were released

11    in part or redacted.

12        MR. STEGEBY:  That's correct, Your Honor.

13        THE COURT:  Okay.  And as of June 30th, I've

14    got this categorical index, you have stated that

15    there are 38 pages that you're withholding in full,

16    and I'm going to talk about that in a minute, and 12

17    pages that have been released in part as redacted.

18    I really don't know how many pages have ultimately

19    been produced by the Executive Office of the United

20    States Attorney.

21        MR. STEGEBY:  I believe that is correct, Your

22    Honor.  And I think initially we withheld 59

23    documents in full and we produced the three emails

24    that were redacted that Your Honor referenced, and

25    then I believe we've released one document in full.

1          So at this time the EOUSA was working on the

2    redacted emails as well as the documents that were

3    withheld in full.

4          THE COURT:  Say that again.

5          MR. STEGEBY:  So what the EOUSA was working on

6    over -- up until today's hearing was they were

7    reviewing the documents that were withheld in full,

8    the 59 documents, including the -- and as well as

9    the three emails that were redacted.

10         THE COURT:  Are you suggesting now they have

11   made any different determinations?

12         MR. STEGEBY:  No, Your Honor.  I'm just

13   summarizing.  When you were asking me about the

14   documents that hadn't been produced after the last

15   hearing, that is what they were focused on.

16         THE COURT:  All right.  In the declaration

17   that I think I referred to earlier that the

18   plaintiffs filed of Alia L. Smith, attached to that

19   declaration are some exhibits and I just want to

20   talk about two of them right now, Exhibit C and

21   Exhibit D, I believe.

22         Mr. Berlin sent a letter to you, dated

23   June 25th, which in essence he asked you to bring

24   copies of the documents that were being withheld,

25   copies of the documents not produced in full, the

1    unredacted DVDs, and then he wrote you an email and

2    that was June 26th and he says, and I'm just going

3    to read that pertinent part, "Yesterday I wrote to

4    you to request that you bring two complete sets of

5    documents to court on July 2nd so Judge Bucklew can

6    review them and order produced --" whatever I guess

7    I determined should be produced -- "and also that

8    you bring the DVDs.  I have not yet been advised

9    that the government planned to produced DVDs other

10   than in full and it remains our view that all

11   documents and full DVDs need to be produced."

12        So here's my question.  Did you bring any of

13   such documents to court today?

14        MR. STEGEBY:  Your Honor, I have brought

15   unredacted versions of the documents both from the

16   EOUSA as well as the FBI.  I have been unable to get

17   the unredacted versions of the DVD and the audio

18   recordings, but I'm sure we could get that pretty

19   quickly to Your Honor.

20        THE COURT:  Okay.  When you say you've been

21   unable to get them, does that -- what does that

22   mean?  Does that mean they're with the FBI some

23   place out of this area or in this area or what?

24        MR. STEGEBY:  No, it's up in West Virginia,

25   but we have means by which we can transfer it.  We

1    just didn't have enough time to get those DVDs and

2    audio recordings in unredacted form.

3          THE COURT:  Okay.  So you've got the documents

4    but you don't have the DVDs.

5          MR. STEGEBY:  That's correct, Your Honor.

6          THE COURT:  All right.  Could I talk with you

7    just a moment about the Vaughn indexes that were

8    filed?

9          MR. STEGEBY:  Certainly.

10         THE COURT:  Just to make an overall comment,

11    and I'm going to talk about both of them, the index

12    that was filed by the Executive Office of the United

13    States Attorney was a whole lot better than the

14    index that was filed by the FBI.  I can pretty much

15    look at the index filed by the Executive Office of

16    the United States Attorney and tell what the

17    documents are and make at least some type of fairly

18    intelligent decision regarding exemption; not so

19    with the Vaughn index produced by the FBI.  So at

20    any rate, let me just talk about them if you don't

21    mind.

22         I guess I'll start with the FBI one first.

23    No, it's easier to do the Executive Office first, so

24    let me do the easiest one first.  You have

25    withheld -- well, and let me just say that I

1    understand that the burden is on you as far as the

2    exemption is concerned.  It's slightly different

3    with respect to what type of exemption it is,

4    whether it's a statutory exemption, I guess the

5    grand jury would be such an exemption, or whether

6    it's a privacy exemption and then in that interest I

7    think there is a need to weigh the public interest

8    in disclosing.

9         There is also, with respect to product, work

10   product memos and that sort of thing -- well, maybe

11   with respect to almost everything, there is also the

12   issue of have these documents been previously

13   disclosed, are they already a matter of public

14   record, and what does that mean essentially, "public

15   record."  But all of those issues I think are the

16   burden then shifts over to the plaintiffs to say

17   okay, this is a document that's been previously

18   disclosed -- some of which they did in their

19   declaration that was filed by Ms. Smith.  And if

20   there is another -- if it has been previously

21   disclosed some place somehow that's a public record,

22   they've got to tell me that, point it out where and

23   when.  So that's my understanding of the burden and

24   the burden shifts.

25         So with that understanding, I would like to

1    talk about the Executive Office Vaughn index.   I

2    went back and looked and I think Mr. Berlin or

3    whoever filed it, perhaps it was Mr. Thomas, gave me

4    a pretty good definition of what a Vaughn index

5    should contain.   I called it a categorical index

6    which I thought it was a little looser, but you all

7    called it a Vaughn index, so I'm going to assume

8    it's a Vaughn index.   It's a detailed roster of

9    withheld records with particularized explanation for

10   the asserted exemption as to how it applies to that

11   record or category or record.

12         So as I said earlier, I can pretty much tell

13   that by way of what I have from the Executive Office

14   of the United States Attorney, but not from the FBI.

15   So let's just briefly look at this for just a minute

16   and I think I can go through this fairly quickly.

17         The first exemption has to do with 16 pages

18   and it's been described as an external memo created

19   by the Assistant U.S. Attorney, dated February 28,

20   2013, contains the factual background and analysis

21   of the legal issues presented by information

22   gathered during the grand jury investigation

23   involving the matter reported to Mr. Thomas's FOIA

24   request.   And you've stated both of these exemptions

25   are -- well, one is a privacy exemption and one is

1      am attorney work product exemption.

2          It seems to me that this is probably fairly

3      asserted -- and I'll obviously give Mr. Berlin a

4      chance to weigh in -- unless this has been

5      previously turned over, some of this has been

6      previously turned over either through the

7      correspondence with the lawyers for Gawker, for

8      example, or in some other manner has been made

9      public.

10         The email chain between the Assistant United

11     States Attorney and the FBI dated March 2nd and

12     March 4th in which the agent is seeking the AUSA's

13     guidance regarding how to respond to an inquiry

14     regarding the investigation, and it contains

15     handwritten notes by the AUSA regarding steps the

16     AUSA has taken to resolve the issue, you know, I

17     have interpreted that as an Assistant United States

18     Attorney writing on the email chain, notes on the

19     email chain.  Is that correctly interpreted?

20         MR. STEGEBY:  That's correct, Your Honor.

21         THE COURT:  Okay.  Again, it seems to me that

22     that is probably properly withheld under B(7) unless

23     it's been previously disclosed.

24         Then under a single page of handwritten notes

25     dated May 13, 2014 which contains notes regarding

1    the grand jury investigation, contains the grand

2    jury AUSA's thoughts on information that could not

3    be disclosed during the investigation, again even

4    though as Mr. Berlin points out everybody knows who

5    the grand jury AUSA is, any thoughts or any plans or

6    any notes regarding the investigation it would seem

7    to me that it would be covered under B(7) unless

8    it's been previously disclosed.

9         Now, the note also contains the name and

10   telephone number of an individual.  I'm assuming

11   that's an individual who hasn't signed a waiver and

12   some sort of third party and so unless there is some

13   reason that shouldn't remain private, probably the

14   privacy exemption applies.

15        I'm just going through and telling you what my

16   notes are after having read this.  So you may

17   disagree and Mr. Berlin may disagree.

18        The next one is a single page of handwritten

19   notes dated August 21, 2013 regarding the grand jury

20   investigation and the content of the note is the

21   result of a phone call between the AUSA and someone

22   in connection with the investigation.  Again, even

23   though we all know who the AUSA is, the content,

24   unless it's been previously disclosed, is probably a

25   B(5) exemption.

1         The next one is an email between the AUSA and

2    the supervisory AUSA -- again, we know who both of

3    those people are -- dated March 8th, 2013 in which

4    the AUSA is seeking advise from the supervisory AUSA

5    on an issue regarding the investigation.  The

6    information contained in the document contains

7    references to witnesses to the investigation.  The

8    email chain includes an email from an outside source

9    to the assigned AUSA which identifies a witness in

10   the investigation by name and discusses the

11   potential cooperation of the witness with the

12   government.  Again, that seems to fall squarely

13   under B(7) unless it's been previously disclosed.

14        The next is five pages of handwritten notes

15   concerning the grand jury investigation.  These

16   notes are dated December 17, December 20, March 22,

17   and April 5, 2013 -- the December dates are 2012 --

18   notes containing facts that were obtained and

19   developed during the grand jury investigation and

20   the AUSA's impressions.  Again, we know who the AUSA

21   is, but as far as notes seem to fall into the B(7)

22   exemption unless they have been previously

23   disclosed.

24        The next is a draft of an internal memo

25   created by the grand jury AUSA to the U.S. Attorney

1        Chief of the Criminal Division and others, and again

2        contains references to third parties, agree that

3        it's probably a B(7) exemption unless it's been

4        previously disclosed.

5            A single page email from an attorney to the

6        grand jury AUSA and a member of the law enforcement,

7        dated March 8, 2013.  That's a little questionable.

8        I'm assuming, but maybe that's incorrect, I'm

9        assuming that this is an email from an attorney for

10       a witness?

11           MR. STEGEBY:  Your Honor, I would actually

12       have to refer to the document itself to -- I do not

13       remember that.  I'm sorry.

14           THE COURT:  Okay.  That's one that I just -- I

15       probably am just -- I put question marks on that.

16           The author of the email discusses some factual

17       details relating to the grand jury investigation

18       that was taking place at the time and provides the

19       names of several third parties as well as

20       information about them.  I just put a question mark

21       on that and perhaps that's one I need to look at.

22           The next is a two-page letter to an attorney

23       for a witness in the case that was prepared by the

24       grand jury AUSA, dated November 8, 2013.  The letter

25       contains the name and contact information of third

1    parties and it contains items of interest that were

2    evaluated during the grand jury investigation.  Even

3    though you I think said a B(7)(c) exemption, it may

4    be a work product exemption as well.  So that

5    probably -- unless someone can tell me that there is

6    a public interest that outweighs that or has been

7    previously disclosed, it's probably a fair

8    exemption.

9         The next one is a two-page letter that was

10    prepared by the grand jury AUSA on August 8th, 2013

11    to an attorney who represented a witness in the

12    grand jury investigation.  The letter contains the

13    name and/or contact information for third parties,

14    it discusses evidence that was evaluated.  Even

15    though you're just asserting a B(7)(c), it may also

16    be an additional exemption, although it's up to you

17    to assert a B(7) exemption.  But that's probably a

18    fair exemption unless there is some public interest

19    that outweighs it or it's been previously disclosed.

20         On page 7 of the Vaughn index is a two-page

21    email chain between the grand jury AUSA and the

22    attorney for Gawker Media as of November 3, 2013

23    where they discuss the attorney for Gawker's

24    understanding of the FOIA request.  The first page

25    of the document contains the grand jury AUSA's

```
1        identity and notes on the discussions with members

2        of law enforcement about the FOIA request.  And

3        you've said B(7), and I'm assuming that pertains to

4        the notes on the discussion with members of law

5        enforcement.  And then you've said a B(7)(c), I'm

6        not sure why there is -- I don't know.  If this is

7        another situation where the AUSA printed out an

8        email and wrote on it, I don't know why those notes

9        can't be redacted.  And if it's between Gawker, it's

10       been disclosed.  So I'm kind of up in the air about

11       that.  So I guess I would just need to look at it.

12            MR. STEGEBY:  Yes, Your Honor.

13            THE COURT:  All right.  Two-page letter from

14       David Houston to the grand jury AUSA, dated

15       September 3, 2013.  The letter contains the identity

16       of the grand jury AUSA and third parties.  You

17       produced that in part.  I'm assuming that means you

18       redacted the names of the third parties.

19            MR. STEGEBY:  That would be correct, Your

20       Honor.

21            THE COURT:  Okay.  Well, obviously Houston hs

22       signed the release.  So it would seem that unless

23       the third parties have already been produced or it's

24       already been made known or is a matter of public

25       record or there is a public interest that outweighs,
```

1        that would seem probably fair.

2            A single email from the grand jury AUSA to

3     attorney David Houston, dated September 3, 2013,

4     contains the grand jury AUSA's identity and contact

5     information and the identity of a third party.  And

6     you've released it in part.  I'm assuming you will

7     redact out the identity of the grand jury AUSA,

8     which seems sort of senseless at this point.  But at

9     any rate and the identity of the third party?  Or do

10    you know?

11           MR. STEGEBY:  I'm sorry, I was looking at it.

12    I do not know if it contains a third party as well.

13           THE COURT:  Maybe I need to look at that as

14    well.

15           The next is a released in part two-page letter

16    from the grand jury AUSA to attorney David Houston.

17    Letter contains grand jury AUSA's name, contact

18    information, and the name of a third party.  And you

19    have again got a privacy exemption and I'm assuming

20    it's for the third party.

21           The next is a single page letter from the

22    grand jury AUSA to an attorney for Gawker Media,

23    dated March 18th, 2014, in which the AUSA informs

24    the attorney of Gawker Media's status in relation to

25    the grand jury investigation.  Seems to me that

1    that's probably already in the possession of Gawker

2    and frankly that may be one of the documents that I

3    have but I don't know.

4         But I'm not quite sure why that's not already

5    a matter that's been turned over and a matter of

6    public record and why that's been released in part.

7    I'm assuming to -- I'm not sure.

8         MR. STEGEBY:  Your Honor, I would be happy to

9    talk about 7(c) once we're --

10         THE COURT:  All right, let me just finish,

11    I've got two of more.  A two-page letter from grand

12    jury AUSA to attorney David Houston, dated

13    November 8, 2013, and attachment letter contains the

14    grand jury AUSA's identity and the identity of other

15    third parties.  The attachment contains the identity

16    of a third party and information relating to a bank

17    account.

18         First I can understand how information

19    relating to a bank account and third parties might

20    be a privacy issue even though David Houston signed

21    a waiver.  Unless there is some sort of public

22    interest that requires disclosure, they have been

23    otherwise made a matter of public record.

24         A two-page email chain that contains

25    communications between grand jury AUSA and a

1      representative of attorney David Houston's office,

2      contains the identity of the grand jury AUSA, the

3      identity of a third party who relayed Mr. Houston's

4      message to the grand jury AUSA and the identity of a

5      member of law enforcement.  Again, this seems to me

6      that this might be something Gawker has, that was

7      my -- I wrote that note there for some reason.  But

8      you've claimed a privacy exemption.

9           So in summary, some of these appeared -- this

10     is a much better index than the FBI.  Some of these

11     appear to be warranted and perhaps at this point

12     without Mr. Berlin on behalf of Gawker weighing in

13     either on public interest or previously disclosed or

14     something of that sort, some of them -- a couple of

15     them I can't really tell and probably need to take a

16     look at the documents.

17          All right.  Your turn.

18          MR. STEGEBY:  Yes, Your Honor.  It seems like

19     one of the concerns that the court has is whether a

20     document has been produced or a name been made

21     public and that that might defeat the privacy

22     interests of that person.  But there is case law out

23     there that states that even if a document is shown

24     publicly with the names of certain people or they

25     have been published in any other way, that doesn't

```
1        necessarily waive their right to privacy.

2             THE COURT:  There is case law to the contrary,

3        too.

4             MR. STEGEBY:  Oh, certainly, certainly.  But

5        it would be our position that the AUSAs and the

6        third parties involved in this case, even though

7        some people might think they know who they are, some

8        people might know who they are, that doesn't

9        necessarily mean that they have a reduced or

10       nonexistent privacy interest in being identified in

11       this particular case and in these documents that we

12       have withheld.

13            THE COURT:  Okay.  Do you agree that -- you

14       assert the exemption and if it's been previously --

15       if there is a -- let me say this differently.  For

16       example, with the privacy exemption, then the burden

17       shifts over -- the burden is on you to establish the

18       exemption, but then the burden shifts over to the

19       plaintiff to say okay, public interest outweighs

20       that.

21            MR. STEGEBY:  That certainly would be the

22       case, yes, Your Honor.

23            THE COURT:  All right.  And as far as previous

24       disclosure, matter of public record, that's also up

25       to the plaintiffs to say no, no, this has been
```

1      disclosed.

2           MR. STEGEBY:  That is correct, Your Honor, and

3      then it certainly is up to the Court to decide which

4      way to go.

5           THE COURT:  Okay.  Let's talk about the FBI

6      index for just a minute, which is much more

7      troubling.  The FBI index, which they -- you didn't

8      do this, right, the FBI did this.

9           MR. STEGEBY:  That's correct, Your Honor.

10           THE COURT:  Which the FBI states is a

11      categorical Vaughn index.  I am assuming that this

12      is an index of all of those documents that were

13      withheld in full.

14           MR. STEGEBY:  Yes, Your Honor, I believe that

15      is true.

16           THE COURT:  This index contains a description

17      of records categorically denied to the plaintiff.

18      So we don't have any released in part business here;

19      they're all withheld in full.

20           MR. STEGEBY:  Yes, Your Honor, that's my

21      understanding.

22           THE COURT:  Okay.  All right.  Then if you

23      don't mind just take a look at this with me for just

24      a minute.  The first document category, Category 1,

25      is electronic communications, non-internal, non-FBI.

1      And it's a private -- there are three private

2      Twitter account screenshots.  Frankly I didn't even

3      know there was such a thing as a private Twitter

4      account, but I've been informed there is such a

5      thing.  So I'm assuming this is just a screenshot

6      somebody has gotten off of a phone or something like

7      that.

8          MR. STEGEBY:  Your Honor, if I may explain

9      sort of the process we've been through over the past

10     week.  I have received all of these documents from

11     the FBI.  I received them approximately 7 o'clock

12     last night.

13         THE COURT:  Okay, you haven't seen them.

14         MR. STEGEBY:  I have not had a chance to go

15     through the 1200 documents.

16         THE COURT:  All right.  Then let me tell you

17     my thoughts.  All right.  First of all, I don't know

18     why the date is redacted.  You don't say -- the FBI

19     doesn't tell us what the dates of those are; they

20     have just simply said that they're private Twitter

21     account screenshots, they have given us a Bates

22     stamp number, and they have asserted an exemption.

23     These are privacy exemptions.  I don't have enough

24     information to decide what that is or anything about

25     that.  So there is no way I can rule on that without

1       looking at it.

2              MR. STEGEBY:  And Your Honor, I believe the

3       Bates pages listed here are the ones referenced in

4       the documents that were produced to the court via

5       email.

6              THE COURT:  Ah.

7              MR. STEGEBY:  So we certainly could take a

8       look at that.

9              THE COURT:  I didn't think -- see, I

10      misunderstood.  I thought what you filed with the

11      court were those documents turned over to the

12      plaintiffs.

13             MR. STEGEBY:  I believe that is correct, Your

14      Honor.  And we believe that based on the Court's

15      order, we were ordered to submit to the court the

16      same documents that we produced to the plaintiffs to

17      the court.

18             THE COURT:  Because this hasn't been produced.

19             MR. STEGEBY:  I'm sorry?

20             THE COURT:  This hasn't been produced.

21             MR. STEGEBY:  I'm sorry, I misunderstood Your

22      Honor.  I do have the unredacted versions, so this

23      document should be in there.  There may be some

24      issues with respect to corresponding the Bates

25      stamps that are placed here with the Bates stamps I

1    put on the documents last night.  But the documents

2    appear to be in order, so documents that have been

3    withheld are in the unredacted version.  So it

4    should not be too difficult for me to figure out

5    which you document they refer to.

6         THE COURT:  Okay.  So just so we're clear,

7    what you gave me on my chambers email address was

8    what you produced to the plaintiffs.

9         MR. STEGEBY:  Yes, Your Honor.

10        THE COURT:  And the reason I wanted that was I

11   wanted to get some sort of feel for how much

12   redaction there was.  And I mean I sort of scanned

13   through them, but obviously I didn't spend a whole

14   lot of time looking at each one and all that kind of

15   thing.  But my purpose was just to see how much

16   redaction was.  But these documents you didn't file

17   in the chambers email.

18        MR. STEGEBY:  That's correct, Your Honor.

19        THE COURT:  All right.  Okay.  Well, suffice

20   it to say I don't have enough information to make

21   any kind of determination on that.

22        The next is legal memorandum, investigation of

23   review and legal analysis.  I don't know -- I do

24   have a date, 2/28/2013, so I'm assuming this has to

25   do with the grand jury investigation, but I don't

1    know who -- what -- who is doing the investigating,

2    I don't know whether -- who is doing the legal

3    analysis, I don't know if that's something that the

4    United States Attorney's Office was doing, I don't

5    know if it's something the FBI was doing.

6         You said there is an interagency and a privacy

7    exemption.  I don't know why there is a privacy

8    exemption, maybe there is somebody's name in there,

9    but just suffice it to say I don't have enough

10   information.

11        The next one is photographs and images, and

12   here we have two undated, one dated 11/1/12, and it

13   says "photographic image."  I don't know if it's of

14   a witness, I don't know if -- I mean, I just don't

15   have enough description.  I don't know if it's a --

16   what?  Image of a person?  I'm assuming, but I don't

17   know.  You've claimed privacy exemptions.  Is this

18   somebody that hasn't signed a waiver?

19        And then the image of CD containing the

20   apology.  I think somehow my law clerk happened to

21   know what this was, so I think I know what this is,

22   maybe because it's referenced at Gawker 562, but

23   really it's not properly described either.

24        The next one is document category IV, which is

25   correspondence, but I don't know, is this an email

1   correspondence, is this a letter correspondence, I

2   don't know who it's between, I don't know enough to

3   make any kind of intelligent decision regarding any

4   kind of privacy exemption on this.

5          The next one is -- it says database report

6   results print-out.  E agent report.  Law enforcement

7   database results.  What's an E agent report?

8          MR. STEGEBY:  I honestly don't know, Your

9   Honor.

10          THE COURT:  Well, I don't know either.  And

11   the next one is "Received Property Documents."  And

12   it says "check related information."  Again, I have

13   no idea what we're talking about.

14          The next one is "forms regarding consensual

15   monitoring."  It says "FD 759, approval for

16   electronic monitoring not requiring a court order."

17   The date has been redacted, so I don't know what

18   dates these are.  I'm assuming it has something to

19   do with the grand jury, but I don't know that.  I

20   don't know what FD 759 is.  What's that?

21          MR. STEGEBY:  I have not seen it, Your Honor.

22          THE COURT:  Well, this sounds like this may be

23   something that is exempt, but I don't know, I can't

24   tell.  And there are a bunch of those.

25          Then let's go on down to document Category 8,

1      federal grand jury information.  The first one --

2      the dates are all redacted for some reason, I'm not

3      sure why that's the case, but they are.  And then

4      they are described as follows.  First of all there

5      is a cover letter in response to federal grand jury

6      subpoena.  I don't know if it's a cover letter from

7      an attorney, I don't know if it's a cover letter

8      from a witness, I don't know if it's a cover letter

9      that an AUSA wrote.  I don't know.

10          So it's true that there is a statutory

11     exemption for the grand jury, but I'm not sure this

12     falls into that without more information.  And in

13     essence, Mr. Stegeby, my comments are going to be

14     slightly different, but the same with all.

15          The next one is a response to federal grand

16     jury subpoena.  And I don't know from who, is that a

17     witness, I don't know if it's documents, I don't

18     know if it's some sort of letter, is it from an

19     attorney.  And I'm just going to say the same thing

20     over again and again.  The dates are all redacted.

21          So if you'll move over to page 4, it says

22     Sealed Court Records, Redacted.  The date is

23     redacted and it says "sealed court record."  I don't

24     know, are we talking about here in federal court,

25     are we talking about in state court, are we talking

1     about something was filed pursuant to the grand jury

2     investigation and was filed with the overseeing

3     grand jury judge?  I don't know.  I don't know.  So

4     I don't have enough information.

5          The rest are similar thoughts.  There are 285

6     duplicate pages and they have listed those duplicate

7     pages.  I'm assuming that this means -- but you need

8     to correct me -- that the originals were turned

9     over?

10         MR. STEGEBY:  I believe that is the case, Your

11    Honor.  I have not been able to verify that with the

12    FBI.  They sent us a letter yesterday talking about

13    the various documents that they had produced and how

14    many documents and which ones were not produced and

15    so forth.

16         So when they have told us that they had a

17    bunch of duplicate documents, that is what I believe

18    they did.

19         THE COURT:  I understand the duplicates, but

20    then they list them.  So I guess I'm assuming -- but

21    that's my question.  Does that mean they're

22    duplicate documents of documents that have been

23    turned over?

24         MR. STEGEBY:  That would be my belief at

25    least, Your Honor.  But like I said, I have not been

1        able to verify that with the FBI.

2             THE COURT:  All right.  Unfortunately for me

3        this probably means that with respect to most of

4        these documents I'm going to have to take a look at

5        the documents.

6             MR. STEGEBY:  Yes, Your Honor.  And if I may

7        explain the difference between the FBI declaration

8        or index and the EOUSA index.  Typically what

9        happens when we get a FOIA request in, they go

10       through, they do the search, they find the

11       responsive documents, they tell the person, the

12       requester, how much it's going to be and do you

13       accept the charges.  And once they do, they process

14       the various documents.  They assert certain

15       exemptions if applicable.  And in most of the FOIA

16       cases that I have been involved with, they create a

17       Vaughn index which is a page by page, line by line,

18       like the EOUSA did.  The number of documents they

19       had were obviously a lot smaller than for the FBI.

20            The FBI, when they assert a 7(a) exemption, it

21       is sufficient with a categorical declaration, which

22       takes a lot less time than -- because it's document

23       by document as opposed to page by page.

24            Normally when an agency goes through documents

25       to redact them, they do that first and then they

1    create an index after and a declaration afterwards.

2    In this case the FBI simply didn't have time enough

3    to go through page by page and then create an index.

4    So what they -- it appears to me, I have not

5    verified this either with them.  It appears to me

6    that they went through, they focused first and

7    foremost on the documents themselves to go through

8    and redact them and they were going to go back and

9    do an index if so ordered to create a more detailed

10   Vaughn index as opposed to a categorical one.

11         So that's why we received a categorical index

12   from them as well as a declaration that was a little

13   bit more detailed than prior declarations from

14   Mr. Hardy.  So that is why there is not more

15   information in this categorical index.

16         THE COURT:  Let me ask you another question.

17   In the declaration of Alia Smith that was filed,

18   they have given us in Exhibit B some examples and

19   one such example is an email string, one involving

20   Jason Shearn and David Houston.  Another is a letter

21   written to Mr. Houston by Sara Sweeney.  Another

22   is -- well, those are the two documents they have

23   shown.  These are documents that they have.  These

24   are documents -- in fact, the letter from Assistant

25   United States Attorney Sara Sweeney to Mr. Houston

1      is attached in full.  Yet when it was turned over,

2      we have Sara Sweeney's name blanked out; we have the

3      type of investigation blanked out even though it

4      says the Davidson investigation on the one that's

5      already been disclosed; we have the content or the

6      name of Sara Sweeney blanked out, and it just --

7      this just seems sort of senseless.

8            MR. STEGEBY:  Yes, Your Honor.  Again, like I

9      mentioned before, just because your name has been

10     disclosed before doesn't mean that you lose the

11     right to assert that privacy right in future FOIA

12     litigation or FOIA administrative proceedings.

13           Second of all, I believe that the documents

14     that Your Honor is referring to were part of the

15     exhibit that we submitted --

16           THE COURT:  They were in the declaration.

17           MR. STEGEBY:  Yes, Your Honor.  And when I

18     looked at those documents, I believe that those

19     documents are part of an exhibit or a part of a

20     declaration by Mr. Berlin in state court in support

21     of their fifth motion to compel Mr. Hogan or

22     Mr. Bollea to release the information that he

23     wanted.

24           So it's actually not our office, as far as I

25     could tell based on the sequence of the documents,

1     that produced it; in fact it was Mr. Berlin instead.

2     Maybe he has an explanation for it, maybe I'm

3     incorrect because the affidavit by Mr. Berlin

4     references Exhibit A and B, and A is not attached; B

5     is attached.  It looks disjointed.  So I don't know

6     if all the documents were included in it.

7          But the bottom line is that it appears that it

8     was not us who actually published that, although we

9     attached it to our response to their summary

10    judgement motion.

11         THE COURT:  Okay.  All right.  Just a couple

12    comments on the July 1st filing by Gawker objecting

13    to the newly claimed exemptions, and I'll talk about

14    that with Mr. Berlin.  But it was somewhat

15    disconcerting to me that -- we talked about this at

16    the last hearing because at that time you told us

17    that even though the only exemption that had been

18    asserted was a law enforcement exemption, that that

19    didn't mean that there were not other exemptions

20    that were not going to be asserted, that -- I'm

21    summarizing -- it's just easier if there is a law

22    enforcement exemption to say okay, it's a law

23    enforcement exemption, and then you don't have to

24    worry about going through and asserting the other

25    exemptions.

1            But it is somewhat disconcerting, it seems

2       like we're doing what I said that I didn't want to

3       do, that okay, let's look at this exemption; if that

4       doesn't work, let's go over to this exemption and

5       see if that works.  Which although perhaps

6       disconcerting, distressing and something that just

7       seems to me sort of a waste of time, in the long run

8       I'm going to come down and I'm not going to say you

9       can't assert it, so that's just my thought.

10           I also wanted to say that I see my job here as

11      simply trying to address the FOIA requests, the

12      exemptions, and determining what else should be

13      disclosed.  And even though in their most recent

14      filing Gawker has said that there may be a public

15      interest short and aside from the fact they need

16      these documents for the litigation beginning

17      July 6th, they need the documents for the

18      litigation.  And certainly we have been on some sort

19      of expedited schedule based on that understanding.

20           It would seem to me that I see my job as

21      trying to make that decision as quickly as possible

22      and then we'll deal with the summary judgment and so

23      on later, at least not today.

24           You mentioned -- no, maybe it was in the

25      declaration, Mr. Stegeby, and this is sort of a

1    question I was going to ask at the end, but I might

2    as well ask it now.  The declaration indicated that

3    the government -- the FBI was going to file some

4    sort of motion for summary judgment.  Plaintiffs had

5    filed a motion for summary judgment, but that the

6    FBI was going to file a motion for summary judgment.

7    But nobody said that in the response; that was just

8    in the declaration.

9         Is that something the FBI intends to do?

10        MR. STEGEBY:  Ordinarily we would absolutely

11   file a motion for summary judgment and we have

12   spoken about it in some detail.  Based on the very

13   condensed schedule here, we didn't think it was

14   feasible.  If we would have filed it yesterday, the

15   plaintiff would not have had a chance to respond and

16   the Court wouldn't have a chance to consider it, so

17   we chose not to.  If Your Honor wants us to do it,

18   we can do it in relatively quickly.

19        THE COURT:  I was just wondering what you

20   intend to do.  Okay.  Can I talk to Mr. Berlin for

21   just a moment?

22        MR. STEGEBY:  Your Honor, may I address a

23   couple of issues first that you mentioned?

24        THE COURT:  Sure.

25        MR. STEGEBY:  It seems like Your Honor has

1    some concern about the waiver of underlying

2    exemptions.   I just wanted to mention that I read

3    plaintiff's submission with respect to the possible

4    waivers.   They cited two different cases that shows

5    that a waiver may occur.   Those cases are very

6    different from the current case and in fact there is

7    a case from the Middle District here that

8    distinguishes the first case that they cite, the

9    first one --

10        THE COURT:   Are we talking now though -- be a

11   little bit more specific.   Are you talking about

12   grand jury or are you talking about public domain,

13   what are you talking about?

14        MR. STEGEBY:   Well, Your Honor, one of the

15   cases they relied upon was Ray.   That's the first

16   case they cited.   And that case dealt with, I

17   believe, exemption B(6).   And after they had

18   litigated it for about two years, the court denied

19   the exemption for the government.   Then at that

20   point once they got a bad ruling, the government

21   asserted I believe it was 7(c) and it could have

22   been another exemption.   And the court denied it

23   based on the untimeliness of the assertion of the

24   underlying case.   It was years too late.

25        Then the other case I think is called Mydok or

1     Mydak.  That case involved an assertion of

2     additional exemptions on appeal after they had

3     litigated in district court.  So the untimeliness

4     that plaintiff is attempting to rely upon with

5     respect to a potential waiver of our now current

6     exemptions simply doesn't apply.

7          We informed the court, we informed plaintiffs

8     that there were possible underlying exemptions.  We

9     had discussions about bifurcating --

10         THE COURT:  Well, at the last hearing you did.

11         MR. STEGEBY:  Yes, and I had been in touch

12     with plaintiffs before about that when we were

13     looking to -- seeking an extension of time to

14     respond to them.  Obviously we realize and are

15     mindful of plaintiff's situation with respect to the

16     trial that's coming up.

17          So in the end it didn't turn out that we filed

18     a motion for bifurcation, it was part of the

19     declaration that we attached to one of our filings.

20          But nevertheless, we have not raised the

21     underlying exemptions in an untimely manner.  We

22     have done that as quickly as we could.

23         THE COURT:  Okay.  I think I said that's --

24     things are all in the eyes of the beholder, but I

25     understand your argument.

1         MR. STEGEBY:  Thank you, Your Honor.

2         THE COURT:  Thank you.

3         Mr. Berlin, I asked Mr. Stegeby to tell me

4    what had been turned over and when.  I went through

5    my list that I had put together, compiled, and let

6    me just ask -- I don't want to go through each thing

7    with you again, but let me just ask you what you

8    received and when you received it.

9         MR. BERLIN:  Very well, Your Honor, thank you.

10   First we received -- well, first on Monday there

11   were some DVDs sent of the videos sent to Judge

12   Campbell that originally supposed to go -- Judge

13   Case is away in Montana, so they went to Judge

14   Campbell.  I'll come back to this in a minute.

15        Judge Campbell called in counsel for the

16   parties yesterday -- sorry, Tuesday, and had us

17   review those materials, which I want to come back

18   to.

19        Then we received, when you received them on

20   the court docket, we received the indexes and the

21   affidavits.  And then lastly we received yesterday

22   afternoon, probably about 2 or 3 o'clock in the

23   afternoon, an electronic file of the documents.

24   Apparently they were Fed Exed from somewhere in

25   Virginia or West Virginia where the FBI's document

1    folks are, to us.  The Fed Ex didn't arrive or was

2    sent for afternoon delivery so it missed the noon

3    deadline, and to his credit Mr. Stegeby got them to

4    electronically transmit a copy and made them

5    available on disk.  And we also got two audio -- two

6    disks of audio files --

7         THE COURT:  And transcripts.

8         MR. BERLIN:  And transcripts.  Those were

9    among the documents.  Just as a housekeeping matter,

10   I don't know that it matters hugely, you did ask

11   whether or not we were provided with the duplicates.

12   Curiously, because it probably takes more time than

13   just copying them, we didn't get the duplicates and

14   each time a duplicate was in the stack, there is a

15   form that the government fills out that says this is

16   a duplicate of earlier pages, which may explain

17   things like that I was always wondering about how it

18   would take 66 hours a week and some additional

19   weekday shifts to go through 1100 pages, but I've

20   learned a lot.

21        So that's what we got.  And I think that's

22   should be it.  We did get -- that's the FBI.

23        From the EOUSA we got the 24 pages, I think it

24   was, on Friday, plus the ones that had been produced

25   previously, the three mostly redacted emails and the

1    one news article that we had gotten previously.  We

2    got no more documents from the EOUSA, just the

3    Vaughn index log that Your Honor saw.  We got an

4    explanation of why we hadn't gotten more, but we got

5    no more pages.

6        THE COURT:  Okay.  Let me -- an overall

7    question that's occurred to me the whole time I've

8    been looking at this.  A lot of these documents you

9    have.  A lot of these redacted names you know.  It

10   seems almost an exercise that we're all spending a

11   great deal of time, effort, in attempt to get this

12   done before the trial starts on July 6th, when a lot

13   of it you already have, a lot of it you already

14   know, a lot of the redactions you're fully aware of

15   who it is.

16       MR. BERLIN:  Well, Your Honor, let me try and

17   answer that.  We have a much, much smaller set of

18   documents.  So in the state court litigation, after

19   some motions practice that went on for a while, the

20   plaintiff there, Mr. Bollea, was ordered to give us

21   his communications with the government.  That's a

22   portion of what we have.  And we've been able to

23   pick from that as examples, hey, here's a document

24   we already have, here's a document we gave to you,

25   here's a document that you attached to Mr. Hardy's

1    declaration and filed in open court; why is this a

2    secret?  We're giving you those as examples.

3         But I will say and it's fair to say, Your

4    Honor, that I will say that having gotten the

5    documents, I was in court all day yesterday in state

6    court in pretrial proceedings for this trial that's

7    starting Monday and when I got back to my hotel late

8    last night, had a chance to go through some but not

9    all of these documents, and there is a lot of

10   information in there that was new to us.  And the

11   redactions -- in many instances you can sort of

12   guess who it is, but the document is a lot less

13   useful in that context if it's got a big white box

14   there.  The documents --

15        THE COURT:  Why?  If you can guess who it is.

16   You know, I don't know what you intend to do with

17   these documents.  I don't know if this is just

18   simply for your educational purposes for trial, if

19   you intend to introduce these documents, and

20   obviously it would seem to me that may be a problem

21   in light of the state court judge's discovery

22   deadline.  But why is that problematic if you aren't

23   going to actually introduce those documents in

24   court?

25        MR. BERLIN:  Well, we would very much like to

1     introduce those documents in court and ask witnesses

2     about them and we're not -- it's very difficult to

3     ask a witness about a document, tell me about what

4     -- this document seems to say blank did

5     such-and-such on blank date -- it's just -- it's

6     very difficult to ask the witness questions like

7     that.  And in this instance, so, for example, we

8     have documents, this is a -- none of this is a

9     secret, we put this in our papers, this is a

10    situation where Mr. Bollea had sexual encounters

11    with Mrs. Clem with Mr. Clem's blessing.

12         Mr. Clem has talked about this on the radio,

13    there's been news reports.  The third page, it's

14    Gawker number 5, is a newspaper article that says

15    that, that the FBI had in its file and yet the FBI

16    says well, you know, he has a privacy interest to

17    assert and it's just -- it reminds me, there was

18    that old film with Robin Williams, *Good Morning,*

19    *Vietnam*, Adrian Cronauer, and there were these two

20    guys who sat outside where the news came in and they

21    blacked out everything and everybody around knew

22    that it was true but it was just this fiction.  And

23    that's what we're dealing with.

24         THE COURT:  I see your point, but I also

25    think, why do you care?  You know who it is.

1          MR. BERLIN:  Because -- this is in all

2      seriousness, Your Honor.  Let me try and answer this

3      question.  The same thing is true with the names of

4      the agents, which is interesting and I want to come

5      back to the names of the agents because there is an

6      issue with this production that's more serious than

7      some of the things that we've talked about so far.

8          We also know, because the government has

9      disclosed it, that the person that they were looking

10     at in this investigation is this person Keith

11     Davidson.  That's also in -- now in the public court

12     file and was the subject of news reporting.  This is

13     not private in any reasonable -- you know,

14     Mr. Stegeby's argument is that things get disclosed

15     and they're still private.  I mean, that's like

16     *Through the Looking Glass*.

17         Why do I want to know?  Let me tell you about

18     this, Your Honor.  I have to pause for a minute

19     because I'm under, as Your Honor knows, I'm under an

20     order in the state court and the state court order

21     says that these documents are to be treated as

22     confidential and given to Mr. Bollea for 30 days.

23     So I'm limited in what I can say in open court, so

24     I'm going to try and proceed judiciously.

25         I don't know if Your Honor had a chance to

1       look at the documents or the substance --

2               THE COURT:  No.  You're talking about the ones

3       that were turned over?

4               MR. BERLIN:  Yes.  Not that you should, I just

5       -- but --

6               THE COURT:  No, I didn't.

7               MR. BERLIN:  But what these documents show,

8       and then I'll come back and I can talk a little bit

9       about the exemptions and the indexes, but let me

10      tell you what our concern is, Your Honor.  So in

11      this investigation what we know is that

12      Mr. Bollea -- this is not -- I'm not treading on

13      secret ground here.  What we know is that Mr. Bollea

14      came with his lawyer, Mr. Houston, to the FBI and

15      asked for an investigation, which they conducted.

16      And what we know from Mr. Hardy's last declaration

17      is that part of this investigation yielded three

18      DVDs that have encounters involving the three key

19      participants in this -- Mrs. Clem, Mr. Bollea, and

20      for portions of it Mr. Clem.

21              Each of those people has testified

22      differently, they have all said different things

23      about what actually happened, when it happened, how

24      often it happened, whether -- what was known.

25              And so one of the reasons why we said we would

```
1       like to get -- we started by just saying look, we

2       thought we would find, which we eventually got in

3       yesterday's stack, statements by Mr. Bollea and his

4       lawyer, and to see whether what he was saying to the

5       FBI matched what he is saying in our lawsuit.

6               Turns out, without getting into the specifics,

7       they don't, that we have essentially under oath

8       testimony to the FBI and we have under oath

9       testimony in our case directly at odds with one

10      another.  So we have a situation -- and it's very

11      unfortunate that this is two days or one business

12      day before we're supposed to start a trial on this

13      matter, but we have a situation where the key

14      participant, the plaintiff, is telling us one thing

15      under oath and telling the FBI something else.

16              So this is why we're asking -- and you can't

17      use that document to impeach a person if there is a

18      bunch of blanks in it that somebody is saying well,

19      that's private even though it's already public.

20              So that's the documents.  But then we have the

21      DVDs.  So we went and in this instance one of the

22      documents that Mr. Bollea produced to us was a

23      document in which Mr. Davidson had prepared a

24      summary transcript of what was on these DVDs.  And

25      we've been looking at it and we've been saying look,
```

1    this would appear to be reliable because

2    Mr. Davidson did this presumably in his own

3    interests, there was another witness who produced a

4    different summary transcript that had different

5    things where the two matched.  So we looked at the

6    transcript and said geez, we'd really like to be

7    able to authenticate this because it has some very

8    interesting things that are useful to our case and

9    to understand why Mr. Bollea was bringing the case

10   and whether his claims that he was damaged by what

11   Gawker did, which was publishing a minute and

12   41 seconds of a video, in fact caused the damage

13   that he was claiming in the case.

14        So we said let's try and add that to the FOIA

15   request.  So we had both of these things, we wanted

16   his statements, the documents, and we wanted these,

17   if they had them, these videos.

18        So then as Your Honor knows, and I just said,

19   we went to the court on Tuesday to look at the

20   videos and --

21        THE COURT:  The state court.

22        MR. BERLIN:  The state court, yes, thank you

23   for clarifying.  We went to the state court to look

24   at the videos.  And I went with a couple of lawyers

25   from my team, Mr. Harder was there with Mr. Houston

1      and Mr. Turkel.

2           THE COURT:  Who are the lawyers for Terry

3      Bollea?

4           MR. BERLIN:  Yes, who are the lawyers for

5      Mr. Bollea.  Sorry.  So we were escorted with the

6      disks into a room and so the first disk -- I want to

7      take these out of order if I could.

8           One of the disks we looked at and the FBI, as

9      you may recall, Mr. Hardy had an affidavit in which

10     he described three disks with three -- on each disk

11     there was a sexual encounter.  So one disk had a

12     minute and 14 seconds of footage showing -- and I

13     don't think I'm violating any confidences by saying

14     it had no people it in, right, it was just a shot of

15     a room, bedroom with a bed, and it was a minute and

16     14 seconds.

17          So when we came back I contacted Mr. Stegeby

18     -- who has been trying, as I think is obvious, he's

19     not the person who is with the documents, he's been

20     trying to get the information -- to say look, this

21     does not match what this affidavit says.

22          Now, I asked Mr. Stegeby about it this

23     morning; he said that he was able to get some

24     clarification and that may have been some redaction

25     issues.  He actually had to talk to Judge Campbell

1    to get confirmation that it was okay to release the

2    disks in the manner that was agreed upon, which I

3    think he was trying to be careful, and he

4    represented there was a problem with one of the

5    disks.  So there appears to be a problem.

6         For purposes of our case and whether this

7    production s complete -- which is really what I'm

8    trying to tell you the background, but as you said

9    your role in this process is to figure out whether

10   this production was properly made or not.  Key

11   documentary evidence appears to be missing.  And

12   that's was interesting, but not the most interesting

13   part.

14        Then we watched another disk, it's about

15   45 minutes, and we take out this transcript -- I

16   take out this transcript that's been prepared by

17   Mr. Davidson and I'm reading along and I'm watching

18   what's going on in the tape and there is a

19   description.  Sometimes it's description of things

20   that are happening, sometimes it's description of

21   conversation.

22        THE COURT:  I'm not following you.  And

23   perhaps I just don't know enough about it.  Are we

24   talking -- it was my -- are we talking about the CDs

25   or are we talking about the DVDs?

1          MR. BERLIN:  DVDs.  So this is video footage.

2     There are three DVDs.  I've already talked about one

3     which I think is complete.  So we watched the second

4     one and I'm watching it with Mr. Davidson's

5     transcript which describes in some instances

6     activities and in some instances conversation, and

7     it's got time codes periodically, and we're going

8     along, and I'm saying okay, check, check, and it

9     matches, everything that I'm seeing matches what's

10    on the transcript.

11          Then I watch the last of the disks which we

12    watched.  The last of the disks, the first 15

13    minutes matches the transcript of Mr. Davidson

14    exactly.  Then at approximately 15 minutes through

15    the transcript, the audio shifts.  The video

16    continues to match.  So I watch the rest and what's

17    described as happening matches perfectly, but the

18    audio is the audio that is from a portion of the

19    prior disk.

20          So there has been a situation where we have

21    audio that's been put on the disk and it appears to

22    be incomplete.  And Mr. Harder and Mr. Turkel,

23    Mr. Houston, who as you can see in the documents was

24    -- we talked about this earlier, was involved in the

25    contact with the FBI, sort of shrugged and said

1    well, that's interesting.  And it turns out that

2    there is some -- that on the transcript, right, for

3    the portion, there is something that is particularly

4    of sensitive and of interest to us in the case and

5    that is the portion that has been overdubbed, if you

6    will, with the audio from the earlier CDs.  So we

7    have two CDs with two different video and for a

8    portion of it the audio is the same.  So we were

9    left --

10         THE COURT:  Why is that their problem, if they

11   have turned over to you what they have?

12         MR. BERLIN:  Well, maybe it is what they have

13   and maybe it isn't what they have.  So if I can

14   finish my tale and I'm sorry to -- if you'll indulge

15   me, I will try and tie this up.

16         THE COURT:  Go ahead.

17         MR. BERLIN:  So this is perplexing to us

18   because we believed, until we watched them, that

19   these DVDs were going to match these transcripts.

20   And the third one, which we're missing, appeared to

21   be -- although we can't tell because we didn't get

22   it, the third one with the minute and 14 seconds,

23   the one that was missing appears to be, based on the

24   transcript, matches a version of what Gawker got.

25   Gawker got one DVD from which it made this minute

1   and 41 seconds of excerpts, and that one matched.

2   So we've now seen at some point two and a half DVDs

3   that match this transcript.  So we're sort of saying

4   well, this is interesting.

5        So then we go back to our -- I go back to my

6   hotel and there is these audio tapes.  And one of

7   the audio tapes is of a session in which -- I'm only

8   going to talk about the part that is relevant to the

9   production here because I don't want to violate the

10  state court order in any way.  One of them is an

11  audio tape of a meeting in which Mr. Davidson is

12  present and Mr. Bollea is present and Mr. Houston is

13  present, about these DVDs.

14       THE COURT:  I think that was something that

15  was turned over and something I glanced through, so.

16       MR. BERLIN:  So in this meeting --

17       THE COURT:  Of course I didn't read it for any

18  content and I don't have any idea about what value

19  it has.

20       MR. BERLIN:  It is our understanding that at

21  the end of this meeting the government took

22  possession of the three DVDs that we're talking

23  about.  And in this meeting where you can hear the

24  audio, you can hear the audio of Mr. Bollea and

25  Mr. Houston and Mr. Davidson watching these DVDs

1          including the audio that is matching the transcript

2          but doesn't match the audio that we heard yesterday.

3                  So when you say to me what does it matter if

4          they gave you what they had, I want to understand

5          how it is that between that moment when the FBI took

6          possession of those DVDs and when I saw those tapes

7          in Judge Campbell's anteroom on Tuesday, that audio

8          got changed.

9                  When you ask me -- I know you're going to ask

10          me at some point in this argument, "What is the

11          public interest beyond your litigation?"  Your

12          Honor, this thing is -- it smells like bad fish.

13          Right.  And I've got a situation where I have been

14          trying for 18 months to get documents, not only to

15          defend my client and also to understand what

16          happened.  And now I have a situation where when I

17          finally get them, I'm missing one, I've got a second

18          one where the audio doesn't match, and the audio

19          doesn't match at a key moment.  And then I have the

20          audio -- I have a video where the audio doesn't

21          match at a key moment, and then I have an audio for

22          the last minute that anybody besides the government

23          had these where there is different audio that you

24          can hear on the tape.  Right?

25                  THE COURT:  Well, I'm not sure what you're

```
1          suggesting.  Are you suggesting the government

2          altered the tapes or deleted --

3               MR. BERLIN:  I don't know, Your Honor, but let

4          me tell you this.  When the government comes and

5          says I don't want to tell you who any of the agents

6          are and I don't want to tell you anything about this

7          and I want to white out everything, right, there is

8          a problem here.

9               What I'm going to ask you for, just so we're

10         clear about this, is that the audio -- we have a

11         problem.  We have documents where the integrity of

12         the document is now called into question.  And your

13         job, right, as you articulate it -- I don't want to

14         tell you your job; you tell me your job.  But as you

15         articulate it, Your Honor, is to make sure that we

16         get a proper production from the government of what

17         we're entitled to and we don't get what we're not

18         entitled to.  That's the -- you're the one that

19         adjudicates that.

20              What I am trying to say in this proceeding --

21         and I want to come back, this is -- there are issues

22         with exemptions and some of those specific documents

23         that you addressed.  But my biggest concern now is

24         that I have a situation where there is a document

25         that has been produced to me that is representing
```

1    this is the video, and there is a different document

2    that has been produced to me this is the audio of us

3    listening to the video, that are different.

4           And I'm not suggesting -- look, I don't want

5    to impugn anybody at the FBI or in the U.S.

6    Attorney's Office or in Winchester, Virginia where

7    they review them, or anywhere else, right --

8           THE COURT:  You are.

9           MR. BERLIN:  Well, I'm not trying to do that

10    deliberately, I'm just trying to say that at the end

11    of the day we were not getting -- there's a question

12    about the integrity of the documents that we got.

13    And it is over a key portion of audio footage that

14    if you were to review the documents that were

15    provided to you in your chambers, you would see is

16    something that in my judgment Mr. Bollea has used

17    the arms of the federal grand jury to try and

18    suppress, and that I didn't know -- I didn't know

19    that the FBI was in the business of doing that.

20           THE COURT:  Of doing what?

21           MR. BERLIN:  Of trying to -- of essentially

22    trying to use arms of the federal government to help

23    people -- you know, we've all done or said things

24    that we wished we hadn't.  But I didn't know you

25    could down to your local FBI office and say hey, can

1   you prosecute this or investigate this to try and

2   keep that from coming out.  And that is what I think

3   is going on here and that is wrong.

4       THE COURT:  Well, I would be very surprised if

5   that's what's going on here.  I realize why it's in

6   your best interests to say something like that, but

7   I would be very surprised to say that's going on.

8       MR. BERLIN:  Look, all I know, right, and some

9   of this requires some review of the records to be

10  able to say more than I can say in court because the

11  substance of this is I've got my hands tied so I'm

12  dancing a little bit here.

13      But the bottom line is it was very concerning

14  to me and to Gawker to get a DVD -- to get three

15  DVDs produced where one was supposed to have an

16  encounter on it and only had a minute and 14 seconds

17  of empty bed, and one had an audio track that was

18  duplicated from another video at a key moment, and

19  then third to get an audio CD where you can hear

20  that same DVD with a different audio and they're

21  listening to it.  Coupled with, right, testimony in

22  our state court case where both Mr. Bollea and

23  Mr. Houston denied ever having looked at those

24  videos.

25      So this is really like I don't -- what I'm

1      going to ask you for, I started to say this, what

2      I'm going to ask you for, and I know Your Honor was

3      hoping to end this today, but in FOIA cases, it

4      doesn't usually happen, but in FOIA cases, because

5      usually you can just resolve these things on the

6      exemptions, but where they are fact issues, parties

7      are entitled to discovery and this seems like we've

8      got to do a little discovery to find out what

9      happened to my --

10          THE COURT:  All right.  We're not going there,

11     we're not doing that.  So I'm going to have to take

12     about a 10-minute break because I've got to go

13     cancel my dentist appointment at 11 o'clock, which I

14     have good and bad feelings about it, frankly; I hate

15     going to the dentist.

16          MR. BERLIN:  Then you're welcome.

17          THE COURT:  So give me about 10 minutes and

18     let's come back and talk about what we're really

19     here for.  So we're in recess until 10:30.

20          (Recess was taken from 10:21 until 10:29 a.m.)

21          MR. BERLIN:  I tried to let your assistant

22     know.  I wasn't sure, given your apparent

23     ambivalence for going to the dentist, whether that

24     would be good news or bad news, but I did want to

25     let you know that the Second District Court of

1       Appeal -- with plenty of notice before Monday's

2       trial, I might add -- has vacated the trial judge's

3       trial order and there will be no trial commencing on

4       Monday.  If that helps you get to the dentist, I'm

5       happy to come back at a different time.

6               THE COURT:  I already cancelled.

7               MR. BERLIN:  I apologize for their and our

8       unfortunate timing.

9               THE COURT:  Okay.  So there is no trial date.

10              MR. BERLIN:  As far as I can tell there is no

11      trial date.  And for what it's worth, Your Honor,

12      the opinion is something like 14 pages and I haven't

13      read it, I just read to the bottom, so I don't

14      actually know what the directions are about what to

15      happen next and we'll have to wade through that and

16      sort that out.

17              THE COURT:  All right.  Let me just go back to

18      Mr. Stegeby for a minute.

19              Mr. Stegeby, have you looked at -- I feel like

20      I can breathe a sigh of relief here as far as

21      timing.  Have you looked at the DVDs, have you

22      listened to the CDs and -- have you done any of

23      that?

24              MR. STEGEBY:  Your Honor, what I've done is

25      when I received the DVDs, the videos, I opened them

1    to make sure that they were properly openable before

2    we produced them to plaintiffs, and when I opened it

3    I also clicked, fast forward through it, every 10,

4    15 seconds or so.  So I haven't watched the entire

5    video is the bottom line, but I understand what the

6    content of it is.

7         THE COURT:  Okay.  Do you understand what

8    Mr. Berlin is saying with regard to the concerns

9    that he has about either they have been altered or

10   something has happened maybe in the redaction or

11   there is some problem?

12        MR. STEGEBY:  Your Honor, my understanding is

13   that the FBI has -- there are two different types of

14   files, video files, different formats.  Two of them

15   the software that the FBI had was able to redact

16   whatever needed to be redacted.  The third file was

17   of a format that could not be redacted properly in

18   the way that Mr. Berlin had asked me to convey to

19   them that he wanted, which means blurring out the

20   face and minimize the redactions of the audio

21   related to the video.  And that was possible with

22   two of them.

23        I didn't listen to the audio, so I don't know

24   how that works, whether they just bleeped it out or

25   cut it out, but they did blur out the face of the

1    third parties.

2         With respect to the last video, their software

3    could not do that.  Their only option was to redact

4    both the video and the audio and that is why the FBI

5    left one minute and I believe 14, 15 seconds or so,

6    and it's only of the bed, there are no people there.

7         THE COURT:  Okay.  So they redacted the entire

8    thing.

9         MR. STEGEBY:  Yes, Your Honor, except for the

10   first one minute and 14 seconds or thereabouts.  We

11   have inquired of the FBI for more information about

12   it, so we're pushing hard to figure out what's going

13   on with this.

14        THE COURT:  Okay.  All right.  Mr. Berlin,

15   this seems like something we can now, because of the

16   time, we can work out.

17        MR. BERLIN:  I would agree, Your Honor.  Look,

18   one of the things that I have -- when you have key

19   documentary evidence, right, you have three

20   participants in the underlying events, we're not one

21   of them, and you have key documentary evidence, you

22   want the documentary evidence so you can find out

23   what happened.

24        I will say that my understanding again from

25   the audio of the participants watching this, we have

```
 1        an audio disk of them watching it, there is watching

 2        a tape which at the end they say oh, this must be

 3        the one that Gawker has.  And I will say that if the

 4        third tape with the minute and 14 seconds is, as I

 5        would suspect, the one that ultimately was provided

 6        to Gawker -- not by the government obviously, but

 7        was ultimately provided to Gawker -- that one should

 8        have been able to have been produced with much more

 9        fulsomeness because for the bulk of that recording

10        there are only two people in it and they have both

11        provided waivers.  So there is an issue there which

12        is something we could probably sort out.

13             And I will say this, I said this last week

14        when I was before you, Mr. Stegeby in his office,

15        Mr. Flynn, they have been great to deal with, they

16        have been very responsive, it is quite clear to me

17        that they are not the ones in the driver's seat in

18        terms of how this production is being made or making

19        these indexes, and I don't want to in any way -- I

20        want to express my appreciation on my behalf for

21        their efforts.  And I believe that now that the time

22        pressure is off, that maybe it makes sense to try

23        and get to the bottom of what -- with their help, of

24        what happened with these two disks that are -- over

25        which there are questions.
```

1          And I want to be clear, Your Honor, I'm not --

2     and I really mean this.  This is suspicious, but I'm

3     not intending to malign anybody.  I'm just saying

4     hey, this is suspicious.  I hear Mr. Harder laughing

5     behind me.  But that's the reality, right, we've got

6     a tape, transcript, an audio; things don't match;

7     you say to yourself these things ought to match, can

8     we try to get to the bottom of that.  That's what

9     lawyers do, we try and get to the bottom and get to

10    the truth of things.  And that's part of this

11    process.

12         And for your purposes your job I think is just

13    to make sure that we have get the proper production.

14    And if it's not proper, to make sure that that

15    happens, and that's why we've brought this

16    proceeding.

17         THE COURT:  I agree.  Let me ask you a couple

18    of other questions.  And what I think how I'm going

19    to resolve the DVD/CD controversy now that we have

20    more than a day or an afternoon, is to have

21    Mr. Stegeby look at it and see what the problem is

22    and maybe that can be resolved short of court

23    intervention here.

24         MR. STEGEBY:  Your Honor, if I may, as I

25    mentioned earlier, I don't believe we have the

1    actual raw DVD yet, but we will get it as quickly as

2    possible and I will review it and work with the FBI

3    to find out what happened.

4         I just wanted to let the court know we have

5    tried to produce information in this case as quickly

6    as possible.

7         THE COURT:  I know you have.

8         MR. STEGEBY:  And my understanding is that

9    this is simply a technical glitch, we'll get to the

10   bottom of it.

11        THE COURT:  Okay.  I want to go back,

12   Mr. Berlin, to a couple of things.  I think you

13   correctly pointed out in one of your filings as far

14   as the privacy exemptions that the Court has to

15   weigh the public interest in disclosure against the

16   privacy exemption request.

17        But it's up to you to tell me what the

18   privacy -- I mean what the public interest is.  And

19   I realize that without the documents, that may be

20   somewhat difficult.  But generally what is the

21   public interest in the disclosure of these allegedly

22   privileged because of privacy documents?

23        MR. BERLIN:  Well, Your Honor, when you asked

24   Mr. Stegeby this and laid out the test -- and I'll

25   put aside the waiver issue which I'll talk about for

1        a moment in a minute -- the first question before

2        you get to the public interest is is it private,

3        right.  So the first thing that we're saying -- and

4        most of what other focus has been in the paper, the

5        papers that we submitted yesterday, and we submitted

6        those prior to having any documents, so it was just

7        to talk in general terms about what the issues are.

8        But there are redactions of people's names who are

9        well known who have talked about this on the radio

10       in the case of Mr. Clem, where there is many, many

11       news reports.  There are in the case of Mr. Davidson

12       that's been put in the court record in this case and

13       has been the subject of news reporting.

14            THE COURT:  In this case?

15            MR. BERLIN:  In this case, yes, Your Honor.

16       Mr. Hardy's first declaration attached a letter

17       which described Mr. Davidson as the target of the

18       investigation, gave the investigation number, and

19       that was one of the examples we gave you.

20            When you asked me essentially why are we

21       bothering you for this if you already have the

22       information.  There is a great deal of information

23       we just got.  So it was -- it was not stuff that we

24       had in any significant respects.  But --

25            THE COURT:  Yeah, but see the problem is that

1          I don't know all of that.  You know it; I don't know

2     it.  So short of us going through each document and

3     you telling me that, I have no idea.

4          MR. BERLIN:  Here's the -- you asked about the

5     test, Your Honor.  The exemption in the first

6     instance is to be applied by the government and then

7     of course as reviewed de novo by you.  Unlike an

8     exemption 3, which is a statutory exemption,

9     something for grand jury materials, which I'll come

10    back to in a moment.

11          The privacy exemption is supposed to be done

12    by the government.  What the government has done

13    here is taken the position that is contrary to the

14    statute which is to say any time a person's name

15    appears for any reason in any context -- there is a

16    page on which my name is redacted, Your Honor, okay.

17          THE COURT:  Anybody that hasn't signed a

18    waiver.

19          MR. BERLIN:  Anybody that hasn't signed a

20    waiver, their name gets redacted.  That's basically

21    the approach that the operation in Winchester,

22    Virginia, or West Virginia, wherever they are, has

23    taken.

24          I would respectfully submit that that is not

25    what is contemplated by the statute because there is

1    -- if you have in your own file a news report where

2    Bubba Clem is talking about his involvement in this,

3    you can't just simply say there is a name we don't

4    have a waiver, that's the end of it, right?  You

5    have to ask the question, which we would ask you to

6    make now, but they're in the first instance obliged

7    to do this, to say is this private and is there

8    public interest.

9         In every single example, for 1168 pages or

10   whatever the production was, and in every single

11   assertion of this in Mr. Hardy's declaration, the

12   answer has been this is private and this is not

13   public interest.  And they have not done any actual

14   balancing.  They have basically taken a blanket

15   position that if there is a name and we don't have a

16   waiver, we're cutting that out.  I'm saying to

17   you --

18        THE COURT:  Is it their job to do the

19   balancing or is it your job to point it out and then

20   my job to do the balancing?

21        MR. BERLIN:  In the first instance the statute

22   requires them to do that balancing.  At this point

23   they have done it; with apologies for dumping it on

24   your desk, it's now your job.

25        But I want to say to you that the starting

```
 1      point where we were when we got these documents,

 2      which is there is a box around every person's name,

 3      you know, look, there are people where I say okay,

 4      here is a person who didn't sign a waiver, there is

 5      sensitive information, it's something that is

 6      actually private, right, but that's the deal.

 7            Now, let me give you another example.  So we

 8      talked about Mr. Davidson, we talked about Bubba the

 9      Love Sponge Clem.  You've got the names of agents,

10      U.S. attorneys, right?  The notion that -- I mean

11      this in a respectful way to you as a government

12      official, to Mr. Stegeby, to everybody who is a

13      government official.  The performance of a

14      government official's job in their work is generally

15      not something in which they have -- the statute

16      refers to personal privacy, in which they have a

17      personal privacy interest, right?  So if you --

18            THE COURT:  Not even a law enforcement officer

19      who is doing an investigation?

20            MR. BERLIN:  Certainly if you have an

21      undercover agent, you have a clandestine spy.  But a

22      routine investigation that's over, right -- and

23      look, if you said to -- it depends on the

24      circumstances, of course.  If this were an

25      investigation into a gang that murders law
```

1    enforcement agents, you could say all right, yeah.

2    But this is an investigation into a sex tape.   And

3    the motion that there is a personal privacy interest

4    in protecting that doesn't make any sense to begin

5    with and it particularly doesn't make sense in a

6    context where the names of the people involved have

7    already been disclosed.   Mr. Shearn is in the court

8    record courtesy of Mr. Hardy.   Ms. Sweeney is in the

9    court record courtesy --

10         THE COURT:   And I agree.

11         MR. BERLIN:   In the balancing of this -- and I

12   will say to you, this part I would put off.   If my

13   suspicions about these DVDs turn out to be more than

14   a technical problem -- and I have some suspicions

15   but I'll leave it be -- then who is involved has a

16   different issue, but we can reserve on that until we

17   get to the bottom of that.   But the primary thing is

18   we have a situation where we have the government

19   saying we're going to do an investigation into

20   Mr. Davidson at the behest of Mr. Bollea, doing that

21   investigation.   Apparently we know now there may

22   have been grand jury proceedings, we don't know what

23   they were, but they're asserting grand jury

24   protection, so I'm assuming some proceedings.   There

25   are references to subpoenas by the grand jury and so

1    forth, so we've used that process.  And then at some

2    point there is no prosecution.  At some point we

3    know from last week there is now another

4    investigation by a state agency which last week was

5    grounds for asserting a law enforcement exemption,

6    this week it wasn't.

7         You know, there are a number of things here

8    where -- and even apart from Gawker's interest as a

9    litigant, Gawker's interest as a news organization,

10   having spent a lot of money to get to this point,

11   has an interest in understanding, okay, how is the

12   government operating.  And that's what the point of

13   the public interest part of this --

14       THE COURT:  Say that again.  Because I was

15   going to ask you to please tell me what the public

16   interest is again.  What do you -- what are you

17   saying is the public interest?

18       MR. BERLIN:  The public interest -- in general

19   in the cases when you get to this point, putting

20   aside -- I'm making you the first point that a lot

21   of this is not private, right, so there is a privacy

22   balance against that.

23       But when we get to the public interest prong,

24   right, the main point of FOIA is to allow the public

25   to understand how the government is operating.

1          THE COURT:  I agree with that.  But that's not

2     your reason for doing it.

3          MR. BERLIN:  There is a difference between why

4     we originally came here and what we're ultimately

5     trying to find out.  When I came here 18 months ago

6     when I filed FOIA request or had Mr. Thomas file a

7     FOIA request, it was to get statements by Mr. Bollea

8     and if there was any documentary evidence to get

9     that.  Right.  This is basic discovery for a

10    lawsuit.

11         We now have a situation where over the course

12    of that time we now have a situation where we know a

13    lot about it and we -- at least Gawker as a news

14    organization is left scratching its head saying how

15    is this that the government is operating.  And maybe

16    there is good and valid reasons, but the whole point

17    of this statute is to be able to scrutinize those

18    reasons.

19         THE COURT:  I realize that and I realize what

20    FOIA is and I realize the purpose of the statute and

21    I think I said when we were here last, that's really

22    not your purpose and I'm not sure that it's my job

23    at this point to evaluate why you make a FOIA

24    request.  So I really -- the government raised the

25    fact you're doing it for litigation purposes, but

1      I'm not considering that.

2          Let me ask -- I want to change subjects a

3      minute.  I want to leave the privacy and the public

4      interest behind for just a moment.  When we get to

5      the cases that the information is already in the

6      public domain, I think that your understanding and

7      my understanding perhaps may be different as far as

8      what that means being already in the public domain.

9      Because if something has been in a news report, I'm

10     not sure -- or something has been blogged about or

11     tweeted about or something, I don't know that I

12     would consider that under what I've looked at as far

13     as the case law is concerned as being in the public

14     domain.

15         So I would like to hear what your thoughts are

16     regarding public domain.  And let me just -- I made

17     some notes, so let me just go back and be a little

18     more specific.

19         I pulled this from one of the cases.  Publicly

20     disclosed information that has been specifically

21     officially acknowledged, made public through an

22     official document disclosure or something like that.

23     It's not something that somebody may have --

24     somebody may have written about in a newspaper story

25     somewhere.  Anyway, I don't even know how the

1          government would know something like that.

2              It has to be -- maybe something filed in

3      court.  Maybe the information filed with the

4      declaration, for example.  But I would like to hear

5      what your understanding is of public domain, the

6      public domain doctrine.

7              MR. BERLIN:  Sure.  I think it's -- in many

8      respects the public domain -- the name of the

9      doctrine is a bit of a misnomer because you have to

10     go back to the statute.  The statute is saying we

11     protect interests and personal privacy.  They have

12     asserted exemption 6 as a catch-all, but that's

13     basically on the language for medical records and

14     other similar records and I don't think we have

15     anything in this case that is exemption 6 unless

16     you're going to take the position that that applies

17     to everything that names a person, which I think is

18     an overreach based on the language of the statute.

19     You don't have to go any further than that.

20             But if we talk about exemption 7(c), the

21     question is does a person have a personal privacy

22     interest in this information, right.  And maybe the

23     government says okay, prophylactically we'll take

24     the position that any time a person's name is

25     mentioned.  But when it gets to the point of

1    litigation and it's in front of a judge, obviously

2    there is a greater level of sensitivity that you can

3    bring to that question than perhaps somebody in the

4    records division at the FBI.  And the question is

5    does the person have a personal privacy interest in

6    this information.

7        And I would say to you two things:  One is

8    that the personal privacy interest that a person has

9    of saying, you know -- let's use Bubba Clem, for

10   example.  Having a personal privacy interest in

11   saying I was somehow connected to this thing with my

12   now ex-wife and Mr. Bollea.  If you're on the radio

13   talking about that day after day after day, and the

14   government has in its records reports that tell you

15   that, it is hard to say that that person has a

16   personal privacy interest in being linked to those

17   events, right.

18       I mean, you think about this -- you know, we

19   just prosecuted the Boston Marathon bomber, right.

20   I mean, that's a much greater example.  But the

21   people involved in that, there were some people who

22   were prosecuted and you may remember there was

23   another student who was somehow connected that they

24   went to Rhode Island to fetch.  Sort of a bit

25   player, right?  At some point you lose your personal

1       privacy interest in this even if it turned out that

2       you got the wrong person or whatever, right?  So

3       that's the first piece of this, which is if it's

4       known widely, it's not -- there is no longer a

5       personal privacy interest.  And then the

6       government's motion of well, even if it's widely

7       known, somehow we can put that back in the bottle

8       and we still don't have to disclose it -- it's

9       counterintuitive, doesn't make any sense.

10          The second is a more narrow subset of that,

11      which is has the government disclosed this.  And in

12      this instance we have disclosures by the government

13      with respect to Mr. Davidson, with respect to

14      Ms. Sweeney --

15          THE COURT:  I agree with that --

16          MR. BERLIN:  So that's the narrower version,

17      but the larger version is if it's not private, you

18      can't --

19          THE COURT:  My concern that I struggle with --

20      and I don't disagree with if it's been with filing

21      or it's a part of the court record or something of

22      that sort.

23          My concern is your analogy to Mr. Clem talking

24      about it on his radio show.  I don't know that.  Or

25      the fact that somebody -- it may have been in some

1       newspaper story somewhere someplace or some, you

2       know, on the internet sometimes someplace.

3           MR. BERLIN:  Let me make a suggestion, Your

4       Honor, because we're now operating in a different

5       posture than we were when we walked in this morning,

6       which is, you know, we got these documents at

7       3 o'clock yesterday and we had to come in and say --

8       and make some showings, right.  And in our statement

9       yesterday we were literally giving examples without

10      even knowing what there was, but just having seen a

11      few redacted documents from the EOUSA.

12          What I would propose -- and you're right,

13      you're not -- you're not necessarily supposed to

14      know.  Your clerks may know about a certain thing,

15      you had mentioned the apology, right, that's another

16      example of being on the air talking about this.  But

17      you're not supposed to know necessarily.  And now

18      that we have a bit more time, for the ones that are

19      not released by the government directly, we should

20      be -- we're happy to come in and make a showing and

21      give you that information so that you can make a

22      proper decision without having to take my word for

23      it that Bubba Clem is a radio DJ who has talked

24      about this a lot.  You know, I can bring you

25      transcripts and audio and you can make a

1    determination about whether or not that's truly

2    private or not.

3           THE COURT:   Okay.   Let's do this, let's talk

4    about where we go from here now.   And you're right

5    -- and I'm going to ask you, Mr. Stegeby, the same

6    thing.   Things have changed because I already had

7    dates and a timeframe worked out about how we were

8    going to -- how I was going to deal with in this

9    light of the trial starting on July 6th.   But now

10   it's not starting on July 6th.

11          So what would you propose?   He has copies of

12   the documents.   They're clearly -- I think I need to

13   look at those documents and I'm hoping he'll give me

14   those documents to look at this morning.   And

15   Mr. Stegeby has indicated he's going to go back and

16   look at the DVDs and the CDs and the transcripts and

17   see if he can figure out why it doesn't match and if

18   it's something that they can resolve.   So it would

19   appear to me that those two things can definitely

20   occur.

21          You also have now the luxury, Mr. Berlin, of

22   looking at whatever has been disclosed and

23   determining whether there is any concern regarding

24   the redactions, which you haven't had before.   So

25   how would you suggest we proceed?

1          MR. BERLIN:  Well, at some point, as Your

2     Honor knows, Mr. Stegeby called before filing his

3     motion for reconsideration and for an extension and

4     asked me for an extension, and I said, which I will

5     reveal in this court, that I'm always the kind of a

6     lawyer that would work out a reasonable schedule

7     except that I have no choice here because I have a

8     trial in a week.

9          So I'm happy to work out a reasonable schedule

10    with Mr. Stegeby for having him get the DVDs and

11    look at them, get you the documents if there is

12    documents you're going to look at, to be able to

13    look at them, and let's look at the redactions, have

14    us make a showing if there are things where our

15    position is these things are not private not because

16    they have been released in a court record, which you

17    would have, but for other reasons which you might

18    not have before you so we can make that showing.

19    And to get all that done and to come up with a

20    reasonable schedule for doing that.

21         The only footnote about this is that my

22    understanding -- and again, I haven't read the full

23    14-page order -- is that the Second District Court

24    of Appeals order directing the rescinding of the

25    trial order does not specify when -- at least the

1    part I read didn't catch my eye about when it needed

2    to be reset.  And if it gets reset -- if it gets

3    reset 30 days from now, that's going to affect the

4    schedule.  If it gets reset for several months from

5    now, that's going to be a different timetable and

6    that will I think get sorted out reasonably soon.

7         So the only thing I would say is I would like

8    to give Mr. Stegeby and the court a reasonable time

9    so nobody is working at breakneck speed, but I would

10   like not to have it extend so far so that if it

11   turns out that the trial is set soon, we're not in

12   this situation again at the eleventh hour because

13   that seems like a problem.

14        THE COURT:  Mr. Stegeby?

15        MR. STEGEBY:  Your Honor, it sounds reasonable

16   what he says.  My goal in working with him on a

17   schedule would be to ensure that we follow normal

18   FOIA procedures and this --

19        THE COURT:  Has not been normal.

20        MR. STEGEBY:  Yeah.  Normally we have a little

21   bit more time than this.  But I understand his

22   concerns about the trial being rescheduled within a

23   relatively short period of time.  So we'll work --

24        THE COURT:  If I were the judge, I would want

25   to reschedule it in a short period of time.  But.

1          MR. BERLIN:  And that may happen.  So, you

2     know, I would ask -- for example, if Mr. Stegeby,

3     he's got to look at these three DVDs, assuming he

4     could get them early next week and look at them at

5     some point next week, that would seem -- over the

6     course of the week, it would seem like by the end of

7     next week we ought to be able to do that.

8          And I think for my purposes by the end of next

9     week we ought to be able to look at the documents we

10    have and get you something.  If he wanted to go into

11    the following week, we would certainly have no

12    objection to that.  But that seems like -- and you

13    already have -- he needs to just get you the

14    redacted documents, is that what you're asking the

15    third thing was?

16         THE COURT:  No, I'm asking him to give me --

17    both, withheld and redacted.  I wanted the ones that

18    are in the Vaughn index that weren't turned over

19    that he said he brought today.  And if he brought

20    them, might as well just give them to me and I can

21    go ahead and look at them.

22         MR. STEGEBY:  On that point, Your Honor, I

23    just want to say in open court that we will provide

24    the documents to you for in camera review and we

25    would object to any production directly to --

1          THE COURT:  Well, it was my understanding you

2     would give them to me.

3          MR. STEGEBY:  Yes.

4          THE COURT:  Okay.  Mr. Stegeby, estimate for

5     me how long you think it's going to take you to get

6     with the FBI, look at the tapes, figure out if there

7     is a problem or that's the way it was intended or --

8     give me a timeframe.

9          MR. STEGEBY:  A week.

10          THE COURT:  Okay.  All right.  Then what I'm

11     going to do is I'm going to adjourn the hearing, I'm

12     going to ask you to give me copies of the documents

13     for an in camera review.  I'm going to ask you to

14     take a look at the DVDs and the CDs to see if it's

15     something that occurred when the FBI redacted or if

16     that is what it is.

17          And then why don't you all give me just a

18     proposed schedule for anything else that you think

19     as far as asserting any kind of objections to the

20     exemptions.

21          MR. STEGEBY:  Certainly.  And one more point

22     about the unredacted documents.  The FBI informed us

23     that they have withheld the grand jury documents.  I

24     just wanted to let the Court know that.  What I saw

25     was some inserts where it says "withheld grand jury

```
 1       documents."  So there are some records --

 2            THE COURT:  Okay, well, give me what you have

 3       and then I will be able to make sense out of it.

 4            MR. STEGEBY:  Yes, Your Honor.

 5            THE COURT:  Okay.  Thank you.

 6            Mr. Harder?

 7            MR. HARDER:  Yes, Your Honor, may I be heard?

 8            MR. BERLIN:  Before we get to that, can I just

 9       ask a follow-up question about the scheduling on a

10       housekeeping matter?

11            THE COURT:  Yes.

12            MR. BERLIN:  Did you want to -- are we going

13       to come back here or will you just set a hearing if

14       you need to hear from us?

15            THE COURT:  I'm probably going to have to set

16       a hearing, but I would like to see what I have

17       first.  And after I hear from you.

18            MR. BERLIN:  Okay, very well.

19            THE COURT:  I mean, obviously if your trial

20       schedule changes, that may adjust everything.

21            MR. BERLIN:  Right.  Before I sit down, Your

22       Honor, if I just may address one last thing about

23       the documents that you went through this morning.

24       We understand that there is grand jury protections

25       and there is protections in legal memoranda written
```

1     by an Assistant U.S. Attorney, and the only thing

2     that we would really ask for in that is that in some

3     of those instances what we'll really interested in

4     -- I'm not interested in what the Assistant U.S.

5     Attorney is thinking, that's the deliberative

6     process part of this.  What I am interested in are

7     facts.  And oftentimes a memo may start with the

8     fact section and say here are the facts.  Like I'm

9     interested in facts.  So if there is factual

10    disclosures that can be made as you're reviewing

11    those documents, if I might plant a seed in your

12    head about that, that would be the kind of thing

13    that we would like.

14         And in some instances -- in a couple of

15    instances Your Honor raised the question of whether

16    certain things were protected as work product but

17    they were correspondence to third parties and

18    there's a question in that regard about whether

19    those things are private at this point or protected

20    work product.  If I send somebody a letter, I think

21    I no longer have any work product protection in

22    that, and I just wanted to raise both of those

23    things.

24         So I appreciate that before I sit down and

25    we'll try and get our part and Mr. Stegeby's part

1    done hopefully over the next week or so.  And would

2    you like a report or something from us to tell you

3    what happened?

4         THE COURT:  Yeah.  What I would like, if you

5    do a -- you can call it a notice of filing or

6    whatever you would like, and tell me the agreed to

7    dates, if you have agreed to dates.  And if you want

8    to address that issue or if you want me to conduct a

9    hearing, you can address it orally, just let me know

10   what you want to do.

11        MR. BERLIN:  Thank you very much, Your Honor.

12        MR. STEGEBY:  Just one more thing.  I just

13   wanted to let Your Honor know that we plan on filing

14   a motion for summary judgment.

15        MR. BERLIN:  There had to be some cost of

16   having an extension of the trial.  That's it right

17   there.

18        THE COURT:  Thank you.  Mr. Harder?

19        MR. HARDER:  Thank you, Your Honor.  Very

20   briefly, I just wanted to address a few points.  The

21   first one is that -- and I wrote the quote

22   Mr. Berlin said:  "Mr. Bollea has used the arms of

23   the federal government to suppress."

24        THE COURT:  I ignored it.

25        MR. HARDER:  I didn't, Your Honor.  Nothing

1     could -- I take it personally.  My client would take

2     it personally once he hears this --

3          THE COURT:  You're sort of grandstanding.  We

4     don't need that kind of thing.  It doesn't have any

5     effect on me whatsoever.

6          MR. HARDER:  I understand, Your Honor, but we

7     also have members of the press in the audience and I

8     can't let this go unaddressed.

9          Nothing could be further from the truth and I

10    think it's shameful for someone to make a statement

11    like that and I've never heard in 18 years of

12    practicing law anyone make such a statement.

13         The second thing, Your Honor, is I just want

14    to address the issue of the DVDs that went to Judge

15    Campbell.  Judge Campbell reviewed those DVDs,

16    counsel reviewed the DVDs, we had a motion in limine

17    yesterday and she granted the motion and those DVDs

18    are out of trial.  I just wanted to make that clear

19    because this whole lawsuit is about getting

20    discovery for purposes of the trial in the state

21    court.  Well, those DVDs are out.  The judge found

22    that there is massive problems with the DVDs and

23    they're just not relevant to the case because the

24    case doesn't pertain to the content that's on those.

25         THE COURT:  Well, that's certainly her

1    decision.

2         MR. HARDER:  Also, Your Honor, Mr. Berlin

3    talked about that he's trying to -- he's doing all

4    this discovery in order to get to the bottom of why

5    Mr. Bollea really brought the lawsuit.  Well, we had

6    a motion in limine on that issue, namely what his

7    motives or alleged motives were for bringing a

8    lawsuit.  The judge granted that motion in limine as

9    well; that's not allowed to be heard.

10        So the point is from our perspective and we

11   recognize that a lot has been done and a lot is

12   going to be done and we're not standing in the way

13   of that.  But from our perspective a lot of this is

14   really is a side show.  It's a lot of -- it's much

15   ado about nothing.

16        But when you look at the underlying -- there

17   are two underlying matters.  One is that Gawker

18   played a one minute 41 second excerpt of my client

19   naked and having sex.  The second is that separately

20   my client was the target of an extortion.  And so he

21   had a few options at that point.  The option he

22   decided to take was to go to the FBI and seek

23   prosecution of the extortionist.

24        The FBI had Mr. Houston communicate with the

25   extortionist and set up a sting and that's what

1   these audio CDs are and that's where these DVDs come

2   from and that's where these alleged transcripts come

3   from.

4        Mr. Berlin is saying, well, these DVDs aren't

5   reliable and these DVDs have problems with them and

6   the audio is all over, and then he accuses the FBI

7   and my client of having something to do with it,

8   which couldn't be further from the truth.

9        These DVDs came from an extortionist, someone

10  who is trying to get money out of saying these DVDs

11  contains certain content, a content that you're

12  going to want to make go away with a big check.

13  Well, none of that is reliable.

14        So I'm just adding just some context here

15  because I feel like some of it is either not being

16  addressed or is being glossed over.

17        Two other things, Your Honor.  One is

18  apparently the government produced a big chunk of

19  materials to the other side at 2 or 3 p.m.

20  yesterday.  We haven't gotten any of that.

21        THE COURT:  You're not a party to this

22  lawsuit.

23        MR. HARDER:  Well, actually, Your Honor, the

24  protocol that is called for under the state court

25  action is --

1          THE COURT:  That's fine, you take it up with

2     the state court judge.

3          MR. HARDER:  Well, Your Honor, it's that

4     materials that get -- well, I thought Your Honor

5     entered an order that you're going to be following

6     that protocol such that when DVDs get produced --

7          THE COURT:  Yeah, I did, we did that.  With

8     the DVDs that's -- and actually that was at

9     Mr. Berlin's request or Mr. Thomas's that they be

10    turned over to Jim Case or I guess if he wasn't

11    available, to the judge.  And certainly we'll do

12    that, yes.

13         MR. HARDER:  Yes.  And that also calls for my

14    office and my side getting a copy of whatever gets

15    produced because up until a few minutes ago we were

16    one day away from a trial.  Mr. Berlin is receiving

17    700 pages of documents and audio CDs that he says is

18    all relevant to our lawsuit, but we were about to go

19    to trial without having gotten any of that

20    information.  And the protocol that was agreed to by

21    the parties and entered by the court was -- and this

22    court as well --

23         THE COURT:  No, the state court.

24         MR. HARDER:  The state court.  Is that we were

25    to get a copy.  So I would request if it's not too

1    much trouble, Your Honor, that we are an intervenor,

2    we would like to receive a copy of documents and

3    materials that come from the FBI and go to the

4    Gawker parties.

5         THE COURT:  Mr. Stegeby?

6         MR. STEGEBY:  Your Honor, I would take the

7    position that Mr. Bollea can use the state court

8    system to get copies of whatever we produced to

9    Gawker rather than Your Honor ordering us to submit

10   materials to a third party.

11        THE COURT:  Yeah, that's my thought, too.  You

12   take it up with the state court judge.  If she

13   orders them to produce it, they have to produce it.

14   That's her problem.

15        MR. HARDER:  That's fine, Your Honor.  One

16   final thing, Your Honor, is the reason we're

17   intervening is because of the privacy aspects of the

18   content that's at issue.  Both the DVDs which have

19   video and audio, as well as the audio CDs which

20   Mr. Berlin was saying -- I haven't heard them

21   myself, but he was saying that there was audio from

22   the secret recordings in a bedroom that were on the

23   audio CDs of the meeting with Mr. Davidson.

24        My point is, Your Honor, this is all highly,

25   highly private information, it was a secret filming,

1    and there has been interest among the members of the

2    press to get access to that information.  We would

3    request that the court do whatever means it has

4    available to ensure that information being disclosed

5    from the government to the Gawker parties does not

6    find its way into -- at least with regard to the

7    recordings, does not find its way into the public

8    domain because that would be a disaster from our

9    point of view and it's what our whole state court

10   lawsuit is all about and it would be unfortunate if

11   a party in a state court lawsuit is able to bring a

12   federal court lawsuit and undo that when we are

13   seeking in the state court action which is a

14   permanent injunction from the video and audio and

15   all aspects of the secret recording to ever be shown

16   to the public.

17          THE COURT:  Well, I said this in my order, but

18   I suggest you take that up with the state court

19   judge.  The items that I am ordering produced or

20   that they have produced were pursuant to a FOIA

21   request and that's what FOIA is, it's something the

22   public "is entitled to."

23          If that violates the state court judge's

24   Protective Order, you need to take that up with the

25   state court and she can certainly -- she has

1    jurisdiction over Gawker and they're a party in her

2    lawsuit and she can certainly tell them what to do

3    or not do.

4         MR. HARDER:  I understand, Your Honor.  The

5    state court judge doesn't have jurisdiction over the

6    press making inquiries with the federal court,

7    though; that's why I was bringing this up with you.

8         THE COURT:  Well, if you're concerned about

9    them making inquiries with me, I'm not going to talk

10   with them about it.

11        MR. HARDER:  Well, I mean, with the federal

12   court to try to -- or with the FBI to try to obtain

13   these same materials.

14        THE COURT:  That's between the FBI and the

15   press.

16        MR. HARDER:  Okay.  Thank you, Your Honor.

17        THE COURT:  Thank you.  Okay.  I'll enter a

18   short order after we are adjourned.  And

19   Mr. Stegeby, could you give me what you have?

20   Copies?

21        MR. STEGEBY:  Yes, Your Honor.

22        THE COURT:  And actually you can just give

23   them to my law clerk, Ms. Kirkwood, over here.

24        MR. STEGEBY:  Your Honor, they're Bates

25   stamped and there are three binders that is from the

1        FBI.   Then I have a small manila folder from the

2        EOUSA.

3               THE COURT:   Okay.   Thank you very much.   All

4        right.   We're adjourned.

5               (The proceedings adjourned at 11:10 a.m.)

```
 1              C E R T I F I C A T E

 2

 3    STATE OF FLORIDA            )

 4    COUNTY OF HILLSBOROUGH   )

 5       I, Lynann Nicely, RMR, CRR, Official Court

 6   Reporter for the United States District Court, Middle

 7   District, Tampa Division,

 8       DO HEREBY CERTIFY, that I was authorized to and

 9   did, through use of Computer Aided Transcription,

10   report in machine shorthand the proceedings and

11   evidence in the above-styled cause, as stated in the

12   caption hereto, and that the foregoing pages,

13   numbered 1 through 94, inclusive, constitute a true

14   and correct transcription of my machine shorthand

15   report of said proceedings and evidence.

16       IN WITNESS WHEREOF, I have hereunto set my hand in

17   the City of Tampa, County of Hillsborough, State of

18   Florida, July 6, 2015.

19

20

21           /s/ Lynann Nicely
             Lynann Nicely, RMR, CRR,
22           Official Court Reporter

23

24

25
```