# EXHIBIT 25

to the

## DECLARATION OF GREGG D. THOMAS
## IN SUPPORT OF PLAINTIFFS' OBJECTIONS

IN THE SUPREME COURT OF FLORIDA

THE FLORIDA BAR,

     Complainant,

v.

STEPHEN CHRISTOPHER DIACO,

     Respondent.

_____/

Supreme Court Case
No. SC-

The Florida Bar File
No. 2013-10,735 (13F)

## COMPLAINT

The Florida Bar, complainant, files this Complaint against Stephen Christopher Diaco, respondent, pursuant to the Rules Regulating The Florida Bar and alleges:

1.     Respondent is, and at all times mentioned in the complaint was, a member of The Florida Bar, admitted on April 25, 1994, and is subject to the jurisdiction of the Supreme Court of Florida.

2.     The Thirteenth Judicial Circuit Grievance Committee "F" found probable cause to file this complaint pursuant to Rule 3-7.4, of the Rules Regulating The Florida Bar, and this complaint has been approved by the presiding member of that committee.

## **BACKGROUND**

3.     At all times material and relevant hereto, Robert D. Adams (Adams),

Joseph Francis Diaco, Jr. (Joseph Diaco), and Stephen Christopher Diaco (Diaco)

were law partners at Adams & Diaco, P.A.

4.     The firm's office is located at the Bank of America building at 101

East Kennedy Boulevard, Suite 2175, in Tampa, Florida.

5.     At all times material and relevant hereto, Adam Robert Filthaut

(Filthaut) was employed as an associate attorney at Adams & Diaco, P.A.

6.     At all times material and relevant hereto Brian Philip Motroni

(Motroni) was employed as an associate attorney at Adams & Diaco, P.A.

7.     At all times material and relevant hereto, Melissa Personius

(Personius) was employed as a paralegal at Adams & Diaco, P.A.

8.     Personius primarily worked for Adams.

9.     At all times material and relevant hereto, Vanessa Fykes (Fykes) was

a former employee of Adams & Diaco, P.A.

10.     At all times material and relevant hereto, Sgt. Raymond Fernandez

(Sgt. Fernandez) was an 18 year veteran of the Tampa Police Department and head

of the traffic enforcement and DUI unit.

11.     At all times material and relevant hereto, Filthaut was a close,

personal friend of Sgt. Fernandez.

12.     On prior occasions, Filthaut reported tips about drunk drivers to Sgt. Fernandez.

13.     At all times material and relevant hereto, Officer Joseph Sustek (Ofc. Sustek) was a police officer with the Tampa Police Department.

14.     At all times material and relevant hereto, Officer Tim McGinnis (Ofc. McGinnis) was a police officer with the Tampa Police Department.

15.     At all times material and relevant hereto, the law offices of Shumaker, Loop & Kendrick, L.L.P. were located in the Bank of America building at 101 East Kennedy Boulevard, Suite 2800, in Tampa, Florida.

16.     Beginning in 2008, C. Phillip Campbell, Jr. (Campbell) and Jonathan Joseph Ellis (Ellis) of Shumaker, Loop & Kendrick, L.L. P. represented Todd Schnitt, a radio disc jockey, and his wife, Michelle Schnitt, in a defamation suit against Cox Radio, Inc., Bubba Radio Network, Inc., and Bubba Clem in *Schnitt v. Cox Radio, et al*., Thirteenth Circuit Case No. 08-CA-005738.

17.     Joseph Diaco of Adams & Diaco, P.A. and Gregory Alan Hearing of Thompson, Sizemore, Gonzalez & Hearing, P.A. defended Bubba Clem in the above referenced action.

18.     The case was heavily contested over five (5) years and received a high degree of media coverage.

19.     Throughout the litigation, Joseph Diaco and Hearing filed motions to have Campbell removed from representing the Schnitts; however all the motions and one appeal to the second District Court of Appeal were denied.

20.     In December 2012, Filthaut called Sgt. Fernandez and reported his suspicion that Campbell drove while intoxicated.

21.     Filthaut told Sgt. Fernandez that Campbell worked in his building and drove home after drinking at Malio's.

22.     Filthaut told Sgt. Fernandez that Campbell drove a black BMW.

23.     Sgt. Fernandez sent an officer to investigate but the tip did not lead to an arrest.

24.     In January 2013, the Honorable James David Arnold presided over a two-week trial in the *Schnitt* case in Tampa, Hillsborough County.

## FACTS
## JANUARY 23, 2013

25.     On January 23, 2013, after the trial was in recess for the day, Campbell and Ellis returned to Shumaker, Loop & Kendrick's office in the Bank of America building.

26.     From there Campbell and Ellis walked about three (3) blocks to a nearby restaurant, Malio's, for a drink and dinner.

27.     Malio's is located in the Rivergate Tower building at 400 N. Ashley Drive in downtown Tampa.

28.     At all times material and relevant hereto, Campbell lived at SkyPoint, a condominium located in downtown Tampa at 777 N. Ashley Drive.

29.     SkyPoint is about three (3) blocks from Malio's.

30.     Campbell brought his trial briefcase with him to Malio's.

31.     Campbell planned to walk home after dinner.

32.     Campbell's trial briefcase contained his materials for the preparation of Mrs. Schnitt's trial testimony the next morning.

33.     At approximately 5:15 p.m., Campbell and Ellis arrived at Malio's and ordered food and a drink.

34.     Around the same time, Personius met her friend, Fykes, for a drink at Malio's.

35.     Personius and Fykes each drove cars to Malio's and parked in the parking garage.

36.     Personius and Fykes each ordered a glass of wine, which they finished within 20 to 30 minutes.

37.     At about 6:15 p.m., Personius and Fykes decided to leave Malio's and go to Fly Bar, another downtown establishment.

38.     As they were leaving, Personius saw Campbell at the bar.

39.    Personius recognized Campbell, and knew that he represented the Schnitts in the ongoing trial.

40.    Fykes and Personius drove to Fly Bar, which is on Franklin Street, about six (6) blocks from Malio's.

41.    Personius sent a text to Adams advising him that she had just seen Campbell at the bar at Malio's.

42.    Beginning at 6:29 p.m., Personius and Adams had a 41-second phone call and exchanged several text messages.

43.    Adams asked Personius how many drinks Campbell had consumed.

44.    Adams asked Personius other probing questions about Campbell.

45.    Personius offered to return to Malio's to gather additional information for Adams.

46.    Adams relayed the information about Campbell's presence at Malio's to Filthaut.

47.    At 6:30 p.m., Diaco and Filthaut had a 7-second phone call.

48.    At 6:31 p.m., Adams sent a text message to Diaco.

49.    At 6:31 p.m., Filthaut called Sgt. Fernandez's personal cell phone to report his suspicion that Campbell was going to drive while intoxicated.

50.    At 6:32 p.m., Filthaut sent a text message to Sgt. Fernandez asking if he was working.

51.    At 6:32 p.m., Diaco and Filthaut had a 32-second phone call.

52.    At 6:35 p.m., Personius sent a text message to Adams.

53.    At 6:39 p.m., Adams and Diaco had a 68-second phone call.

54.    At 6:40 p.m., Adams and Personius had a 37-second phone call.

55.    At 6:40 and 6:41 p.m., Diaco and Adams exchanged text messages.

56.    At 6:43 p.m., Filthaut and Sgt. Fernandez had a 111-second phone call.

57.    Filthaut told Sgt. Fernandez that Campbell was drinking at Malio's.

58.    Sgt. Fernandez told Filthaut "We didn't get him last time…we'll sit on him again."

59.    Sgt. Fernandez relayed Campbell's name, car description, and location at the Bank of America building to Ofc. Sustek.

60.    Sgt. Fernandez sent Ofc. Sustek to stake out the Bank of America building.

61.    At around 6:45 p.m., Personius told Fykes she wanted to go back to Malio's

62.    Personius told Fykes she thought she saw someone she knew at Malio's.

63.    Personius told Fykes the name of the person she wanted to see was Phillip Campbell.

64.     Personius offered to pay for Fykes' valet parking at Malio's.

65.     Fykes and Personius each drove their cars and parked with the valet.

66.     At 6:51 p.m., Filthaut and Personius had a 95-second phone call.

67.     At 6:55 and 6:59 p.m., Adams and Personius exchanged text messages.

68.     At 6:58 p.m., Filthaut and Diaco had a 152-second phone call.

69.     At around 7:00 p.m., Personius and Fykes arrived back at Malio's.

70.     At the bar, Personius or Fykes asked two (2) people to move down a seat, which created two (2) empty seats next to Ellis and Campbell.

71.     Personius and Fykes sat down next to Ellis and Campbell at the bar.

72.     Ellis ordered a glass of water from the bartender.

73.     Personius commented to Ellis that it was easier for him to order water than for her to order a drink.

74.     Campbell overheard Personius and asked Personius what she was drinking.

75.     Campbell asked the bartender to get Personius a glass of wine.

76.     While sitting next to Ellis and Campbell, Personius relayed information to Adams, Diaco, and Filthaut by texts and/or phone calls about what was transpiring at Malio's.

77.     Filthaut and Personius exchanged text messages at 7:04 and 7:07 p.m.

8

78.   At 7:06 p.m., Personius and Adams had a 28-second phone call.

79.   Sgt. Fernandez and Filthaut exchanged text messages at 7:05 and 7:06 p.m.

80.   At 7:07 p.m., Adams and Diaco had a 21-second phone call.

81.   At 7:07 p.m., Diaco and Filthaut had a 7-second phone call.

82.   At 7:07 p.m., Filthaut and Sgt. Fernandez had an 8-second phone call.

83.   At 7:09 p.m., Diaco and Adams had a 58-second phone call.

84.   Filthaut and Personius exchanged text messages at 7:09 and 7:10 p.m.

85.   Sgt. Fernandez and Filthaut exchanged text messages at 7:10 p.m., 7:11 p.m., and 7:15 p.m.

86.   At 7:14 p.m., Adams sent a text message to Diaco.

87.   Filthaut and Personius had at 30-second phone call at 7:15 p.m., a 34-second phone call at 7:16 p.m., and two (2) short phone calls at around 7:17 p.m. and 7:18 p.m.

88.   At 7:17 p.m., Filthaut and Adams had a 30-second phone call and a 22-second phone call.

89.   At 7:17 p.m., Diaco sent a text message to Personius.

90.   Sgt. Fernandez and Filthaut exchanged text messages at 7:16 and 7:20 p.m.

91.    Filthaut and Personius exchanged text messages at 7:18 p.m., 7:19 p.m., and 7:20 p.m.

92.    At 7:19 p.m., Personius sent a text message to Diaco.

93.    At 7:19 p.m., Personius opened up a bar tab at Malio's.

94.    Personius acted overly friendly toward Campbell.

95.    Personius introduced herself to Campbell and Ellis as "Melissa."

96.    At 7:21 p.m., Filthaut and Diaco had a 53-second phone call.

97.    At 7:21 and 7:23 p.m., Diaco and Personius exchanged text messages.

98.    By engaging in communication with Personius about Campbell, Diaco ratified Personius' conduct.

99.    At 7:22 p.m., Adams sent a text message to Personius, Filthaut, and Diaco.

100.   At 7:23 p.m., Personius and Filthaut had a 44-second phone call.

101.   Sgt. Fernandez and Filthaut exchanged text messages at 7:21 p.m., 7:24 p.m., 7:25 p.m., 7:57 p.m., 7:58 p.m., 8:00 p.m., 8:01 p.m., 8:29 p.m., and 8:30 p.m.

102.   Filthaut and Adams exchanged text messages at 7:22 p.m., 7:23 p.m., 7:25 p.m., and 7:26 p.m.

103.   Adams and Diaco exchanged text messages at 7:25 p.m., 7:26 p.m., 7:27 p.m., 7:28 p.m., 7:29 p.m., 7:42 p.m., 8:20 p.m., 8:21 p.m., 8:22 p.m., 8:24 p.m., and 8:25 p.m.

104.   Adams and Personius exchanged text messages at 7:23 p.m., 7:27 p.m., 7:39 p.m., 7:58 p.m., 7:59 p.m., 8:19 p.m., and 8:21 p.m.

105.   Personius and Diaco exchanged text messages at 7:50 and 8:01 p.m.

106.   At 7:52 p.m., Filthaut sent a text message to Personius.

107.   Between 8:00 p.m. and 8:15 p.m., Michael Trentalange, a local attorney, arrived at Malio's.

108.   Trentalange saw Campbell at the bar and went to talk to him.

109.   Trentalange stood at the bar for a long period of time talking to Campbell.

110.   Personius failed to reveal to Campbell, Ellis or Trentalange that she worked for Adams & Diaco, P.A.

111.   Instead, Personius told Campbell, Ellis, and Trentalange that she worked at Trenam Kemker with Nate Carney (Nathan Adam Carney).

112.   Fykes and Trentalange characterized Personius' interest in Campbell as "overly flirtatious" and "unusual."

113.   Trentalange said Personius acted as if she and Campbell had known each other for a long time.

11

114.    Campbell and Ellis told Personius that Campbell was trial counsel in the *Schnitt v. Clem* case.

115.    Trentalange and Campbell talked about the *Schnitt v. Clem* case and traded war stories in Personius' presence.

116.    Campbell saw himself on television and said to Personius "there we are."

117.    Personius stated to Campbell "Oh, isn't that you?" when she saw him on TV.

118.    Over the next two (2) hours at Malio's, Personius had at least three (3) glasses of wine, in addition to the two (2) glasses of wine she had earlier in the night at Malio's and Fly Bar.

119.    Personius also ordered two (2) shots of Southern Comfort and she and Campbell each drank one (1).

120.    Around 8:30 p.m., Fykes left Malio's.

121.    When Fykes left, Personius was intoxicated.

122.    Fykes told Personius to be careful and to call a cab.

123.    Ellis also left Malio's around 8:30 p.m.

124.    Trentalange took Ellis' seat at the bar.

125.    Campbell told Trentalange that he needed to be in bed by 10:00 p.m. in order to get up early in the morning to prep for witnesses.

126.   Campbell told Trentalange that he was walking home.

127.   Filthaut and Sgt. Fernandez exchanged text messages at 8:46 p.m., 8:47 p.m., 8:55 p.m., and 8:59 p.m.

128.   At around 9:00 p.m., Ofc. Sustek was relieved in the stake out by Ofc. McGinnis, a Master Patrol Officer in the DUI unit, who reported to Sgt. Fernandez.

129.   Sgt. Fernandez told Ofc. McGinnis that he was looking for an older white male named Phil Campbell who drove a black BMW that was parked in the Bank of America parking garage.

130.   Ofc. McGinnis waited near the Bank of America parking garage.

131.   At 9:10 p.m., Ofc. Sustek sent a message to Sgt. Fernandez that said "I hope we get him."

132.   Sgt. Fernandez responded "prior was reschke…," referring to the arresting officer in Campbell's prior DUI.

133.   Ofc. Sustek responded, "I hope we get him or he doesn't pass out walking to his car."

134.   Ofc. Sustek stated, "I think that was the one bubba the love sponge put on his show."

135.   Sgt. Fernandez responded "no clue."

136.   Filthaut and Sgt. Fernandez exchanged text messages at 9:09 p.m., 9:10 p.m., 9:11 p.m., and 9:12 p.m.

13

137.   Adams and Diaco exchanged text messages at 9:12 p.m.

138.   At 9:13 p.m., Diaco sent a text message to Personius.

139.   Adams and Diaco exchanged several text messages at 9:17 p.m., 9:18 p.m., and 9:20 p.m.

140.   While Personius was socializing and drinking with Campbell at Malio's, Filthaut facilitated the DUI stakeout by relaying information from Personius to Sgt. Fernandez.

141.   Filthaut sent updates throughout the evening to Sgt. Fernandez via texts and phone calls regarding Campbell's conduct.

142.   Filthaut sent a text to Sgt. Fernandez which said "he's drinking more."

143.   Filthaut sent another text to Sgt. Fernandez which said "he is ordering a round of another drinks for everybody.  He's with a bunch of girls."

144.   Filthaut and Sgt. Fernandez exchanged text messages at 9:22 p.m., 9:23 p.m., 9:26 p.m., 9:27 p.m., and 9:28 p.m.

145.   At 9:28 p.m., Personius sent a text message to Diaco.

146.   At 9:28 p.m., Diaco and Filthaut had a 14-second phone call.

147.   At around 9:30 p.m., Campbell and Personius began to discuss leaving Malio's.

148.   At 9:29 p.m., Personius sent a text to Filthaut and in turn, Filthaut sent a text to Sgt. Fernandez.

149.    Personius and Filthaut exchanged text messages at 9:29 and 9:30 p.m.

150.    Filthaut and Sgt. Fernandez exchanged text messages at 9:29 and 9:31 p.m.

151.    At 9:29 p.m., Sgt. Fernandez sent a message to Ofc. McGinnis which said "leaving bar now."

152.    Ofc. McGinnis responded "black convertible?"

153.    Sgt. Fernandez responded "bmw…yes."

154.    Campbell told Personius he lived nearby and was walking home.

155.    Personius relayed the information to Adams, Diaco, and/or Filthaut.

156.    Sgt. Fernandez received information that Campbell might walk home.

157.    Campbell told Personius she had had too much to drink to drive.

158.    Campbell offered to buy Personius a cab.

159.    Campbell tried to call a car service but did not get an answer.

160.    Campbell went to the valet stand to see if Personius could leave her car overnight.

161.    The valet attendant told Campbell the car could be left overnight.

162.    Campbell went to the ATM machine at the Rivergate Tower and withdrew money to pay for a cab for Personius.

163.    Campbell told Personius she could leave her car at Malio's overnight.

164.   Personius repeatedly told Campbell that she needed to have access to her car in a "secured public parking lot."

165.   At 9:30 p.m., Adams and Diaco had an 89-second phone call.

166.   Filthaut and Personius exchanged text messages at 9:30 p.m., 9:32 p.m., 9:36 p.m., 9:37 p.m., 9:39 p.m., and 9:42 p.m.

167.   At 9:35 p.m., Diaco sent a text message to Personius.

168.   Sgt. Fernandez and Filthaut exchanged text messages at 9:35 p.m., 9:36 p.m., 9:37 p.m., 9:38 p.m., 9:39 p.m., 9:40 p.m., and 9:41 p.m.

169.   At 9:38 p.m., security camera video shows Campbell in the hallway at the Rivergate Tower, returning to Malio's.

170.   At 9:39 p.m., Sgt. Fernandez sent a message to Ofc. McGinnis which said "may live at skypoint."

171.   At 9:42 p.m., Personius called Filthaut and had a 47-second phone call.

172.   At 9:43 p.m., Personius called Filthaut again and had a 49-second phone call.

173.   Security camera video shows Campbell and Personius outside Malio's at the valet stand at around 9:44 p.m.

174.   Filthaut and Personius exchanged text messages at 9:44 and 9:45 p.m.

16

175.   At 9:45 p.m., Personius called Filthaut and had a 45-second phone call.

176.   Filthaut and Sgt. Fernandez exchanged text messages at 9:46 and 9:47 p.m.

177.   At the valet stand, Campbell and Personius discussed what to do with her car.

178.   After several minutes of discussion with Personius, Campbell gave the valet ticket to the attendant.

179.   While the valet retrieved the car, Campbell and Personius discussed whether she should drive.

180.   Personius told Campbell that she needed to move her car a few blocks away.

181.   Personius repeatedly told Campbell that she needed access to her car in a "secured public parking lot."

182.   Campbell advised Personius to leave her car at Malio's overnight and pick it up in the morning; however she refused.

183.   Eventually, Campbell became frustrated with Personius' insistence that she needed access to her car.

184.   Campbell thought Personius was too drunk to drive, but he wasn't, so he drove the car.

185.    At 9:48 p.m., the valet attendant returned with Personius' car, a silver Nissan.

186.    The valet attendant talked to Campbell.

187.    According to the valet attendant, Campbell did not appear intoxicated and did not slur his speech.

188.    The valet attendant heard Personius repeatedly state that she needed access to her car.

189.    At 9:48 p.m., Adams sent a text message to Personius.

190.    At 9:49 p.m., Personius called Adams and had a 44-second phone call.

191.    At 9:50 p.m., the valet attendant moved Personius' car out of the way so he could retrieve other cars.

192.    At 9:50 p.m., Adams and Diaco had a 20-second phone call.

193.    Filthaut and Sgt. Fernandez exchanged text messages at 9:49 p.m., 9:50 p.m., 9:52 p.m., and 9:53 p.m.

194.    During this time, Sgt. Fernandez received information from Filthaut that Campbell maybe driving a silver Nissan.

195.    Sgt. Fernandez asked Ofc. McGinnis to drive-by Malio's to look for a silver Nissan.

196.   At 9:51 p.m., Sgt. Fernandez sent a message to Ofc. McGinnis that said: "dark Nissan…valet Malios" and asked Ofc. McGinnis to "drive by and see if you see it."

197.   Ofc. McGinnis drove by Malio's parking garage and saw a silver Nissan.

198.   At 9:52 p.m., Campbell and Personius walked towards the Nissan.

199.   Campbell opened the passenger door for Personius; however, she walked to the driver's side and got something out of the driver's seat.  Then, Personius got in the front passenger seat.

200.   Campbell put his trial briefcase in the back seat and got into the driver's seat.

201.   Adams and Personius exchanged text messages at 9:52 p.m., 9:54 p.m., and 9:55 p.m.

202.   Filthaut and Personius exchanged text messages at 9:53 and 9:54 p.m.

203.   At 9:54 p.m., Diaco sent a text message to Personius.

204.   At 9:54 p.m., Campbell pulled away from the valet area.

205.   At 9:54 p.m., Ofc. McGinnis sent a message to Sgt. Fernandez which said "female driving."

206.   At 9:56 p.m., Sgt. Fernandez sent a message to Ofc. McGinnis that said "got it."

207.   Sgt. Fernandez drove by Malio's parking lot and waited for Campbell to leave.

208.   Adams and Diaco exchanged text messages at 9:55 p.m. and 9:56 p.m.

209.   At 9:56 p.m., Adams and Diaco had an 11-second phone call and a 19-second phone call.

210.   At 9:56 p.m., Diaco and Filthaut had a 33-second phone call.

211.   At 9:56 p.m., Filthaut sent two (2) text messages to Sgt. Fernandez.

212.   At 9:57 p.m., Sgt. Fernandez pulled Campbell over at the corner of Cass Street and Tampa Street, approximately three (3) blocks from Malio's.

213.   Sgt. Fernandez alleged Campbell violated the right of way of another car when he crossed two (2) lanes to make a right turn from Ashley Street.

214.   Sgt. Fernandez did not have a dash camera in his patrol vehicle to record the stop.

215.   Sgt. Fernandez alleged Campbell was unsteady and he asked to see Campbell's driver's license.

216.   Sgt. Fernandez alleged he smelled alcohol and that Campbell had glassy, blood shot eyes.

217.   Sgt. Fernandez asked Campbell how much he had to drink.

218.   Campbell said "zero," which was not true.

219.   Sgt. Fernandez called Ofc. McGinnis for a DUI unit.

20

220.   Ofc. McGinnis received Sgt. Fernandez's message and heard on the radio that Sgt. Fernandez had made a traffic stop at the corner of Cass and Tampa Street.

221.   Ofc. McGinnis reported to the scene as a DUI officer.

222.   Sgt. Fernandez gave Ofc. McGinnis the stop information and got back in his patrol car.

223.   At 9:57 p.m., while Campbell was out of the car with the police, Personius called Adams and had a 20-second phone call.

224.   Also at 9:57 p.m., Filthaut and Diaco had a 28-second phone call.

225.   At 9:58 p.m., Adams and Diaco had a 57-second phone call.

226.   Also at 9:58 p.m., Personius and Fykes had a 105-second phone call.

227.   Filthaut and Sgt. Fernandez exchanged several text messages at 9:58 p.m., 9:59 p.m., and 10:00 p.m.

228.   Sgt. Fernandez told Filthaut that Campbell was being arrested.

229.   The text messages between Filthaut and Sgt. Fernandez referred to Personius as Filthaut's "CI" or Confidential Informant.

230.   At 10:00 p.m., Ofc. McGinnis activated his dashboard camera and began field-sobriety exercises with Campbell.

231.   At 10:01 p.m., Personius and Adams had a 262-second phone call.

232.   Then, Adams called Personius back and they spoke for 152-seconds.

233. At 10:01 p.m., Filthaut called Diaco and had a 69-second phone call.

234. Sgt. Fernandez and Filthaut exchanged text messages at 10:02 p.m., 10:03 p.m., 10:04 p.m., 10:06 p.m., 10:08 p.m., 10:09 p.m., 10:10 p.m., 10:12 p.m., 10:13 p.m. and 10:14 p.m.

235. At 10:05 p.m., Adams and Personius had a 24-second phone call.

236. At 10:08 p.m., Ofc. McGinnis arrested Campbell for DUI and handcuffed him.

237. At 10:11 p.m., Ofc. McGinnis advised the TPD dispatcher that he was on his way to booking with a prisoner.

238. At 10:11 p.m., Adams and Personius had a 24-second phone call.

239. At 10:12 p.m., Adams and Personius had a 42-second phone call.

240. At 10:13 p.m., Stephen Diaco called Clem and had a 31-second phone call.

241. During the traffic stop, Sgt. Fernandez told Personius that she was drunk, that her license was suspended, and the car was not registered to her.

242. Sgt. Fernandez told Personius to call someone to come and get the car or he would impound it.

243. At 10:13 p.m., Personius called Brian Motroni, an associate at Adams & Diaco, P.A., and asked him for a ride.

244. At 10:15 p.m., Personius and Adams had a 95-second phone call.

245.   At 10:17 p.m., Personius and Motroni had a 191-second phone call.

246.   At 10:17 p.m., Filthaut and Sgt. Fernandez had a 499-second phone call.

247.   At 10:20 p.m., Personius and Adams had a 105-second phone call.

248.   At 10:22 p.m., Motroni and Diaco had a 212-second phone call.

249.   At 10:22 p.m., Filthaut and Diaco had a 211-second phone call.

250.   At 10:25 p.m., Personius and Diaco had a 123-second phone call.

251.   Adams and Diaco exchanged text messages at 10:25 p.m., 10:27 p.m., and 10:28 p.m.

252.   At 10:27 p.m., Diaco and Filthaut had a 29-second phone call.

253.   At 10:27 p.m., Diaco and Motroni had a 27-second phone call.

254.   At 10:31 p.m., Motroni and Diaco had a 251-second phone call.

255.   Motroni picked up Personius and her car and drove her home to Brandon.

256.   Filthaut and Sgt. Fernandez exchanged text messages at 10:35 p.m. and 10:39 p.m.

257.   Sgt. Fernandez told Filthaut that Motroni had picked up Personius.

258.   Adams sent a text message to Personius at 10:50 p.m. and 10:54 p.m.

259.   At 10:55 p.m., Personius and Adams had a 50-second phone call.

260.   At 11:10 p.m., Motroni and Diaco had a 20-second phone call.

261.   At 11:12 p.m., Personius sent a text message to Adams.

262.   At 11:12 p.m., Motroni had a 1046-second phone call with Diaco.

263.   Motroni dropped off Personius and her car at her home in Brandon and took a cab back to his house.

264.   While Sgt. Fernandez and his officers staked out Malio's, waiting for Campbell to leave, they elected not to pursue a jeep observed traveling the wrong way on a downtown street.

265.   Campbell's DUI arrest report does not mention any contact with Filthaut or that Sgt. Fernandez had received a tip about the DUI.

266.   Campbell's DUI arrest report does not mention Personius was a passenger in the vehicle.

## JANUARY 24, 2013

267.   On January 24, 2013, Motroni and Diaco exchanged several text messages at 12:16 a.m., 12:18 a.m., 12:20 a.m., 12:22 a.m., 12:23 a.m., 12:27 a.m., 12:28 a.m., 12:32 a.m., and 12:35 a.m.

268.   Before 6:00 a.m., Campbell called Ellis to pick him up from jail.

269.   After Ellis picked up Campbell, Campbell told Ellis that he had left his trial briefcase in the back of "Melissa's" car.

270.   At this time, Ellis and Campbell did not know "Melissa" had lied about her identity.

271.   Ellis dropped Campbell off at home to get ready for Mrs. Schnitt's testimony scheduled for that morning.

272.   Adams and Diaco exchanged text messages at 6:47 a.m., 6:50 a.m., 6:54 a.m., 6:55 a.m., 6:56 a.m., 6:58 a.m., 6:59 a.m., 7:22 a.m., 7:29 a.m., and 7:30 a.m.

273.   Filthaut and Sgt. Fernandez exchanged several text messages at 7:07 a.m., 7:10 a.m., and 7:11 a.m.

274.   At 7:18 a.m., Filthaut and Sgt. Fernandez had a 590-second phone call.

275.   Adams and Personius exchanged text messages at 7:33 a.m., 7:38 a.m., 7:40 a.m., 7:42 a.m., 8:08 a.m., 8:09 a.m., 8:11 a.m., 8:12 a.m., 8:35 a.m., 8:36 a.m., and 8:42 a.m.

276.   Ellis went to his office and contacted the law office of Trenam Kemker, and asked for Nate Carney's assistant, "Melissa."

277.   Ellis discovered "Melissa" was not Nate Carney's assistant.

278.   Ellis called several other people at Trenam Kemker to try to locate "Melissa."

279.   At 9:02 and 9:03 a.m., Adams and Diaco exchanged text messages.

280.   On the morning of January 24, 2013, the parties appeared before Judge Arnold and Campbell's arrest was discussed.

281.    Rather than continue the trial, Judge Arnold ordered the parties to work on jury instructions.

282.    The parties stipulated to the jury having the day off.

283.    After the hearing, Campbell and Ellis returned to their office at the Bank of America building.

284.    After the hearing, Diaco issued a public statement to the news media.

285.    On January 24, 2013, Fox 13 News reported Diaco say he was "[s]hocked that this case has been continued" and "[h]e felt sorry for the jury that had been sequestered from their jobs."

286.    Diaco told Fox 13 News: "We were prepared for today…we were working last night in preparation for the trial.  And now we have to wait, the jury has to wait to see how this plays out. I don't see how his other partners who have been in there every day of this trial can't continue this case. We are disappointed, but this is out of my control."

287.    Diaco said, in his opinion, the trial should have continued without Campbell.

288.    Diaco told Fox 13 News: "This is front page news now. And you know…This is the guy…this is Bubba's former lawyer. This is his second time. This whole thing makes me embarrassed to be an attorney. And I'm ashamed of how this whole process has continued to be a mockery of the system. But we

believe in the system. We believe in the jury. And we're going to let Bubba's peers decide this case. This hasn't won or lost our case. This is Phil Campbell's personal actions and he'll be responsible for this. This has nothing to do with the name calling case that we're defending five-plus years in a court of law and two-plus weeks now it's going to be of trial over name calling. A case where MJ has made a living over name calling and now we have to defend this. This has been very difficult for me."

289.   On January 24, 2013, Bay News 9 reported Diaco say "His [Campbell's] last DUI was almost twice the legal limit, he didn't learn his lesson. Maybe this time he will. I hope he [Campbell] gets help. My partner [Joseph Diaco] and Greg Hearing were working hard on preparing this case last night. He doesn't seem to be doing the same, and now we're getting penalized for that."

290.   Stephen Diaco did not personally represent Clem in the litigation.

291.   Diaco's brother and law partner, Joseph Diaco, served as lead trial counsel in the matter.

292.   Adams and Personius exchanged text messages at 9:36 a.m., 9:41 a.m., 9:48 a.m., 10:46 a.m., 10:49 a.m., 11:02 a.m., 11:08 a.m., and 11:09 a.m.

293.   Adams and Diaco exchanged text messages at 11:08 a.m.

294.   At 11:53 a.m., Stephen Diaco called Ellis.

295. Diaco left a message for Ellis stating "we all need to sit down and talk."

296. Diaco wanted Campbell to be included in the discussion.

297. Personius alleges she discovered Campbell's "briefcase" in the backseat of her car on January 24, 2013.

298. Personius contacted Adams and asked what she should do about the "briefcase."

299. In turn, Adams contacted Diaco.

300. Diaco instructed Motroni to go to Personius' house in Brandon to pick up the briefcase.

301. At around 1:45 p.m., Motroni left Adams & Diaco P.A.'s office at the Bank of America building carrying a trial briefcase.

302. Motroni arrived at Personius' house and discovered that the "briefcase" Personius found was Campbell's trial briefcase.

303. While at Personius' house, Motroni called Diaco.

304. Diaco instructed Motroni to retrieve the trial briefcase from Personius.

305. At 2:19 p.m., Motroni returned to the Bank of America parking garage with Campbell's trial briefcase in his car.

306. At 2:26 p.m., Motroni walked through the Bank of America building carrying a trial briefcase.

28

307.   Motroni contends that the trial briefcase he was carrying was his own, and that Campbell's trial briefcase remained in his car.

308.   At 2:46 p.m., Stephen Diaco's access card was used to enter to the Bank of America parking garage.

309.   At 2:51 p.m., Stephen Diaco entered the Bank of America building talking on his cell phone.

310.   Diaco decided that he and Motroni would return Campbell's trial briefcase to Personius in Brandon.

311.   At 3:21 p.m., video surveillance shows Diaco and Motroni leaving the 3rd floor of the Bank of America building.

312.   Diaco and Motroni were not carrying anything.

313.   At 3:23 p.m., Diaco and Motroni exited the Bank of America parking garage.

314.   At about 3:25 p.m., Ellis and Diaco had a phone conversation about settlement.

315.   Diaco suggested getting the parties together with Campbell to try to settle the case.

316.   At the time the conversation occurred, Diaco was in possession of Campbell's trial briefcase.

317.   Diaco failed to advise Ellis he was in possession of Campbell's trial briefcase.

318.   When Motroni and Diaco arrived at Personius' house in Brandon, Motroni put the trial briefcase back in Personius' car.

319.   Diaco had a conversation with Personius while at her house.

320.   Personius denied opening the briefcase while it was in her possession.

321.   Diaco directed Personius to take a taxicab back to the Bank of America building to drop off the trial briefcase at the security office or at Campbell's firm.

322.   At around 4:21 p.m., Motroni and Diaco returned to the Bank of America building.

323.   Around this time, Ellis learned that "Melissa" Personius worked for Adams & Diaco, P.A.

324.   At about 5:04 p.m., Ellis called Diaco.

325.   Ellis told Diaco that he thought Personius had Campbell's trial briefcase.

326.   Diaco acknowledged Personius had the trial briefcase.

327.   Diaco told Ellis they were in the process of returning the trial briefcase.

328.   Ellis asked Diaco if they could bring it up to his office.

329.   Diaco told Ellis he would have the trial briefcase dropped off at the building.

330.   Diaco did not tell Ellis that the trial briefcase had been in Diaco's possession earlier in the day or that he had returned the trial briefcase to Personius in Brandon.

331.   As instructed by Diaco, Personius took a taxicab to the Bank of America building in downtown Tampa.

332.   Personius instructed the driver to return the trial briefcase to the security officer at the Bank of American building.

333.   The driver attempted to deliver the trial briefcase; however, the security officer refused to accept it.

334.   Surveillance video shows Personius entering the building talking on her cell phone.

335.   At around 5:15 p.m., the driver delivered Campbell's trial briefcase to Shumaker, Loop & Kendrick's office and left it at the front desk.

336.   Lori Nelson, a paralegal at Shumaker, Loop & Kendrick, took possession of the trial briefcase and inventoried its contents.

337.   On January 24, 2013, after Ellis and his colleagues discovered that Personius had been involved in Campbell's DUI arrest and had been in possession of his trial briefcase, they filed a motion for mistrial on behalf of the Schnitts.

338.   The motion for mistrial alleged Adams, Diaco, and Filthaut and Personius engaged in misconduct  which prejudiced the jury and tainted the trial.

339.   In conjunction with the motion, Ellis issued a subpoena to Diaco to bring his cell phone to a hearing scheduled on January 25, 2013, at 9:00 a.m.

## JANUARY 25, 2013

340.   On the morning of January 25, 2013, Judge Arnold conducted a hearing to address whether any of the jurors had seen any of the media coverage involving Campbell's arrest.

341.   The following  individuals were present at the hearing: Campbell; Ellis; Mindi Marie Richter (Richter) from Shumaker, Loop & Kendrick, L.L.P.; Joseph Diaco; Gregory Hearing; Donald Lee Pitisci (Pitisci), from The Law Offices of Pitisci Dowell Markovitz & Murphy; Mr. and Mrs. Schnitt; Bubba Clem; and Jake Hanson, the court staff attorney.

342.   Pitisci represented Stephen Diaco and objected to Ellis' subpoena for Diaco's phone.

343.   The court instructed Pitisci to have his client, Stephen Diaco, in the courtroom for sworn testimony later that afternoon.

344.   Ellis requested that Diaco bring his phone to the afternoon hearing.

345.   Pitisci objected to production of Diaco's phone based on attorney-client privilege and work-product.

346.   Judge Arnold did not rule on Pitisci's objection to the subpoena for Diaco's phone.

347.   Judge Arnold said "We're going to deal with one thing at a time...And first thing we're going to deal with is the jury."

348.   Judge Arnold interviewed each juror individually under oath.

349.   One juror admitted to hearing information about Campbell's DUI arrest during the previous day's recess.

350.   Judge Arnold determined the jury had not been compromised by the media coverage and allowed the case to proceed.

351.   The trial resumed with the examination of Mrs. Schnitt.

352.   From 2:30 to 5:30 p.m., Judge Arnold conducted an evidentiary hearing on the Schnitts' motion for mistrial.

353.   The following plaintiffs' attorneys were present at the hearing: Ellis; Richter; Jeffrey B. Fabian (Fabian); and Jaime Austrich (Austrich), from Shumaker, Loop & Kendrick, L.L.P.

354.   The following defense attorneys were present at the hearing: Joseph Diaco; Hearing; and Benjamin W. Bard (Bard) from Thompson, Sizemore, Gonzalez & Hearing, P.A.

355.    Mr. and Mrs. Schnitt; Bubba Clem; Norman Salvatore Cannella, Sr.; Norman S. Cannella, Jr.; Pitisci; and Jake Hanson, the court staff attorney, were also present at the hearing.

356.    Norman Salvatore Cannella, Sr. appeared as counsel for Stephen Diaco.

357.    Norman S. Cannella, Jr., Esquire appeared as counsel for Personius.

358.    The following witnesses provided testimony: Ellis; Personius; Stephen Diaco; Sgt. Fernandez; Motroni; and Trentalange.

359.    Diaco failed to bring his cell phone to the hearing pursuant to Ellis' subpoena.

360.    Diaco testified at the hearing that the subpoena asked for the phone to be produced at 9:00 a.m. that morning.

361.    Diaco testified he forgot to bring his phone to the afternoon hearing.

362.    When asked for the name of his cell phone provider, Diaco testified that he could not recall.

363.    In response to a question by Austrich about contact with the Tampa Police Department, Diaco invoked the Fifth Amendment.

364.    Diaco testified that he could not recall if he spoke with Personius at any time during the evening of January 23, 2013.

365.   Diaco testified that he could not recall if he spoke with Filthaut about Campbell on January 23, 2013.

366.   Personius selectively invoked the Fifth Amendment and refused to testify about much of the events of January 23 and 24, other than about Campbell's trial briefcase.

367.   Personius refused to testify about any of the events at Malio's or her communications with Adams, Diaco, and Filthaut.

368.   Personius refused to disclose her cell phone number, cell phone carrier, and home address.

369.   Motroni testified at the hearing about the trial briefcase and did not invoke the Fifth Amendment.

370.   Filthaut did not testify.

371.   During the afternoon hearing on January 25, 2013, Joseph Diaco stated on the record, as an officer of the court, that he first learned about the briefcase incident after it had been returned.

372.   Judge Arnold denied the Schnitts' motion for mistrial and the case proceeded.

373.   The jury returned a verdict in favor of the defendant, Clem.

## SUBSEQUENT TO JANUARY 25, 2013

374. The Schnitts moved for a new trial based on the misconduct alleged to have occurred during the trial.

375. On February 4, 2013, Judge Arnold lifted a protective order on discovery related to the misconduct and informed the parties he was going to defer ruling on the motion for new trial until "there has been complete discovery" on the litigation misconduct.

376. In opposition to the motion for new trial, the defendants filed an affidavit by Stephen Diaco dated March 4, 2013.

377. In the affidavit, Diaco said that during the evening of January 23, he became aware of a report made to the Tampa Police Department of Campbell's potential to drink and drive, and thereafter, Diaco responded to requests for information from the Tampa Police Department.

378. Diaco stated that he never instructed or suggested to Personius to lie about where she worked to Campbell or anyone else.

379. Diaco stated he never instructed or suggested to Personius to obtain any confidential information from Campbell.

380. Daico stated he never instructed Personius to get in a vehicle with Campbell.

381.   Diaco stated that to his knowledge, nobody from his firm or Greg Hearing's firm gained access to any confidential information.

382.   Diaco stated that the briefcase was never in the possession of Joseph Diaco, Greg Hearing or anyone from Hearing's firm.

383.   Diaco's affidavit fails to disclose the fact that Diaco was in communication with Personius while she was at Malio's.

384.   Diaco's affidavit fails to disclose the full nature of his involvement in the events that occurred between January 23 and 25, 2013.

385.   Adams deleted the text messages and voice mail messages described in this complaint from his phone.

386.   Diaco deleted the text messages and voice mail messages described in this complaint from his phone.

387.   Filthaut deleted the text messages and voice mail messages described in this complaint from his phone.

388.   Sgt. Fernandez testified that he deleted all the text messages on his phone on January 24.

389.   Personius testified that she replaced her cell phone and no longer has the text messages.

390.   On January 25, 2013, Ellis filed a motion for new trial in the *Schnitt v. Clem* case.

391.    The motion for new trial put all of the parties on notice of the importance of the phone and text communications.

392.    Ellis served a subpoena on Diaco to produce his cell phone at the hearing on January 25, but Diaco objected and failed to comply.

393.    As a result, the Schnitts filed a motion for contempt sanctions against Diaco.

394.    By letters dated January 30, 2013, the Shumaker firm sent evidence preservation letters to: Adams; Joseph Diaco; Adams & Diaco, P.A.; Krysta Diaco; Filthaut; Brent L. Hatley; Motroni; Fykes; Hearing; Chandler Irvin; Bubba Clem; Bubba Radio Network, Inc.; Norman Salvatore Cannella, Sr.; and Norman S. Cannella, Jr.

395.    Adams has failed to undertake any effort to recover the text message or voicemail data he deleted.

396.    Diaco has failed to undertake any effort to recover the text message or voicemail data he deleted.

397.    Filthaut has failed to undertake any effort to recover the text message or voicemail data he deleted.

398.    On or about March 14, 2013, a post-trial mediation conference was held wherein a confidential settlement agreement was reached between Mr. and Mrs. Schnitt, and Bubba Clem and Bubba Radio Network, Inc.

38

399.   Pursuant to the settlement, the Schnitts filed a Notice of Voluntary Dismissal with Prejudice on March 19, 2013, which disposed of all post-trial motions and pending issues in the case.

400.   Campbell and his firm were discharged by the Schnitts.

401.   The Schnitts retained Wilfried Hermann Florin to represent them going forward.

402.   The Shumaker firm sued the Schnitts for unpaid legal fees and the Schnitts filed a counterclaim against Campbell and his firm for malpractice as a result of this incident.

403.   The Hillsborough County State Attorney was unable to investigate Campbell's DUI because of a conflict.

404.   The Governor appointed the Pinellas County State Attorney to investigate the case.

405.   On July 29, 2013, the Pinellas County State Attorney concluded its investigation and determined that based upon the circumstances surrounding Campbell's arrest, they would "be unable to sustain a successful prosecution and as a result a *Nolle Prosse* was entered terminating the charges."

406.   Sgt. Fernandez was removed from the DUI unit in July 2013 and fired from the Tampa Police Department on September 27, 2013.

407.   Sgt. Fernandez is contesting his termination.

408.    As a result of Sgt. Fernandez's conduct, as many as 12 other DUI cases where Sgt. Fernandez may have been a witness were dismissed, and as many as 40 other cases were reviewed by the State Attorney's office.

## **ALLEGATIONS**

409.    Paragraphs 1 through 408 are re-alleged as if fully set forth herein.

410.    As a partner of Adams & Diaco, P. A. and supervisor of Personius, Adams had a duty to make reasonable efforts to ensure that his employees' conduct was compatible with the lawyer's professional obligations.

411.    Adams failed to discourage or specifically prohibit Personius from returning to Malio's to spy on Campbell.

412.    Adams failed to discourage or specifically prohibit Personius from socializing with Campbell at Malio's and relaying information to Adams. Diaco, and/or Filthaut.

413.    Adams failed to discourage or specifically prohibit Filthaut from relaying information about Campbell to Sgt. Fernandez.

414.    As a partner of Adams & Diaco, P.A., Diaco had a duty to make reasonable efforts to ensure that his employees' conduct was compatible with the lawyer's professional obligations.

415.    Diaco failed to discourage or specifically prohibit Personius from returning to Malio's to spy on Campbell.

416.   Diaco failed to discourage or specifically prohibit Personius from socializing with Campbell at Malio's and relaying information to Adams, Diaco, and/or Filthaut.

417.   Diaco failed to discourage or specifically prohibit Filthaut from relaying information about Campbell to Sgt. Fernandez.

418.   By providing information to law enforcement about Campbell, Adams participated in presenting criminal charges against Campbell solely to obtain an advantage in the civil matter.

419.   By providing information to law enforcement about Campbell, Diaco participated in presenting criminal charges against Campbell solely to obtain an advantage in the civil matter.

420.   By providing information to law enforcement about Campbell, Filthaut participated in presenting criminal charges against Campbell solely to obtain an advantage in the civil matter.

421.   By telling the media that he did not agree to the one-day suspension of testimony when, in fact, all parties had agreed to it, Diaco knowingly made a false statement of material fact to a third person.

422.   Diaco knew or reasonably should have known that his extrajudicial statements to the media about the continuance and its effect on the jury had a

substantial likelihood of materially prejudicing an adjudicative proceeding due to its creation of an imminent and substantial detrimental effect on that proceeding.

423.   Diaco knew or reasonably should have known that his extrajudicial statements to the media about Campbell's DUI arrest and prior DUI, and that Campbell did not seem to be working on the case as hard as Diaco's partner and Hearing had a substantial likelihood of materially prejudicing an adjudicative proceeding due to its creation of an imminent and substantial detrimental effect on that proceeding.

424.   For a period of at least several hours, Adams and Diaco were aware that they or employees of their firm were in possession of Campbell's trial briefcase.

425.   Adams failed to promptly notify Campbell or any member of Campbell's firm that Campbell's trial briefcase was in the possession of Adams, Diaco, Motroni, and/or Personius.

426.   Diaco failed to promptly notify Campbell or any member of Campbell's firm that Campbell's trial briefcase was in the possession of Adams, Diaco, Motroni, and/or Personius.

427.   Adams unlawfully obstructed or concealed Campbell's access to his trial briefcase.

428.   Diaco unlawfully obstructed or concealed Campbell's access to his trial briefcase.

429.   By encouraging, ratifying, or participating in Personius' and Filthaut's conduct, Adams engaged in conduct intended to disrupt a tribunal.

430.   By encouraging, ratifying, or participating in Personius' and Filthaut's conduct, Diaco engaged in conduct intended to disrupt a tribunal.

431.   By relaying information to TPD, Filthaut engaged in conduct intended to disrupt a tribunal.

432.   By failing to produce his phone or information about his account, Diaco unlawfully obstructed another party's access to evidence or concealed information that the lawyer knows or reasonably should know is relevant to a pending or a reasonably foreseeable proceeding.

433.   Diaco engaged in conduct intended to disrupt a tribunal, through his comments to the media.

434.   By erasing the data on his phone and failing to bring it to the hearing, Diaco unlawfully obstructed another party's access to evidence or otherwise unlawfully altered, destroyed, or concealed a document or other material that the lawyer knows or reasonably should know is relevant to a pending or a reasonably foreseeable proceeding.

435.   By erasing the data on his cell phone, Adams unlawfully obstructed another party's access to evidence or otherwise unlawfully altered, destroyed, or concealed a document or other material that the lawyer knows or reasonably should know is relevant to a pending or a reasonably foreseeable proceeding.

436.   By reason of the foregoing, respondent has violated the following Rules Regulating The Florida Bar: **Rule 3-4.3** (Misconduct and Minor Misconduct); **Rule 4-3.4** (Fairness to Opposing Party and Counsel: A lawyer shall not **(a)** unlawfully obstruct another party's access to evidence or otherwise unlawfully alter, destroy, or conceal a document or other material that the lawyer knows or reasonably should know is relevant to a pending or a reasonably foreseeable proceeding;  nor counsel or assist another person to do any such act; **(g)**  present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter); **Rule 4-3.5(c)** (Impartiality and Decorum of the Tribunal; Disruption of Tribunal: A lawyer shall not engage in conduct intended to disrupt a tribunal); **Rule 4-3.6(a)** (Trial Publicity; Prejudicial Extrajudicial Statements Prohibited: A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding due to its creation of an imminent and substantial detrimental effect on that

proceeding); **Rule 4-4.1(a)** (Truthfulness in Statements to Others: In the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third party); **Rule 4-4.4** (Respect for Rights of Third Persons: **(a)** In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person or knowingly use methods of obtaining evidence that violate the legal rights of such a person; **(b)** A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender); **Rule 4-5.1(c)** (Responsibilities of Partners, Managers, and Supervisory Lawyers; Responsibility for Rules Violations: A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if: (1) the lawyer orders the specific conduct or with knowledge thereof, ratifies the conduct involved; or (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action); **Rule 4-5.3** (Responsibilities Regarding Nonlawyer Assistants: **(a)** Use of Titles by Nonlawyer Assistants. A Person who uses the title of paralegal, legal assistant, or other similar term when offering or providing services to the public must work for or under the direction or

supervision of a lawyer or law firm; **(b)** Supervisory Responsibility. With respect to a nonlawyer employed or retained by or associated with a lawyer or an authorized business entity as defined elsewhere in these Rules Regulating The Florida Bar: (1) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer; (2) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and (3) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (A) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or (B) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action; **(c)** Ultimate Responsibility of Lawyer. Although paralegals or legal assistants may perform the duties delegated to them by the lawyer without the presence or active involvement of the lawyer, the lawyer shall review and be responsible for the work product of the

paralegals or legal assistants); and **Rule 4-8.4** (Misconduct: A lawyer shall not **(a)** violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; **(c)** engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, except that it shall not be professional misconduct for a lawyer for a criminal law enforcement agency or regulatory agency to advise others about or to supervise another in an undercover investigation, unless prohibited by law or rule, and it shall not be professional misconduct for a lawyer employed in a capacity other than as a lawyer by a criminal law enforcement agency or regulatory agency to participate in an undercover investigation, unless prohibited by law or rule; **(d)** engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, jurors, witnesses, court personnel, or other lawyers on any basis, including, but not limited to, on account of race, ethnicity, gender, religion, national origin, disability, marital status, sexual orientation, age, socioeconomic status, employment, or physical characteristic).

WHEREFORE, The Florida Bar prays respondent will be appropriately disciplined in accordance with the provisions of the Rules Regulating The Florida Bar as amended.

*Jodi A. Thompson*

Jodi Anderson Thompson, Bar Counsel
The Florida Bar
Tampa Branch Office
4200 George J. Bean Parkway, Suite 2580
Tampa, Florida 33607-1496
(813) 875-9821
Florida Bar No. 930180
jthompso@flabar.org
drouse@flabar.org
tampaoffice@flabar.org

*Adria E. Quintela*

ADRIA E. QUINTELA
Staff Counsel
The Florida Bar
Lakeshore Plaza II, Suite 130
1300 Concord Terrace
Sunrise, Florida 33323
(954) 835-0233
Florida Bar No. 897000
aquintel@flabar.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document has been E-filed with The Honorable John A. Tomasino, Clerk of the Supreme Court of Florida, using the E-Filing Portal and that a copy has been furnished by United States Mail via certified mail No. 7102 3460 0001 1362 7869, return receipt requested to Joseph A. Corsmeier, Esq., Counsel for Respondent, at Law Office of Joseph A. Corsmeier, P.A., 2454 N. McMullen Booth Road; Suite 431, Clearwater, Florida 33759-1339 and via electronic mail to jcorsmeier@jac-law.com; with a copy by electronic mail to Jodi Anderson Thompson, Bar Counsel, jthompso@flabar.org , on this 2nd day of June, 2014.

*Adria E. Quintela*

ADRIA E. QUINTELA
Staff Counsel

## <u>NOTICE OF TRIAL COUNSEL AND DESIGNATION OF PRIMARY EMAIL ADDRESS</u>

PLEASE TAKE NOTICE that the trial counsel in this matter is Jodi Anderson Thompson, Bar Counsel, whose address, telephone number, and primary and secondary email addresses are The Florida Bar, Tampa Branch Office, 4200 George J. Bean Parkway, Suite 2580, Tampa, Florida 33607-1496, (813) 875-9821, and jthompso@flabar.org; drouse@flabar.org; and tampaoffice@flabar.org. Respondent need not address pleadings, correspondence, etc. in this matter to anyone other than trial counsel and to Adria E. Quintela, Staff Counsel, The Florida Bar, Lakeshore Plaza II, Suite 130, 1300 Concord Terrace, Sunrise, Florida 33323, aquintel@flabar.org.

## <u>MANDATORY ANSWER NOTICE</u>

RULE 3-7.6(h)(2), RULES OF DISCIPLINE, EFFECTIVE MAY 20, 2004, PROVIDES THAT A RESPONDENT SHALL ANSWER A COMPLAINT.