```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION


 3


 4
        GAWKER MEDIA, LLC, et        :
 5      al.,                         :
                                     :
 6           Plaintiff,              :
                                     :  CIVIL    8:15-cv-1202-T-
 7      vs.                          :  NO.:     24EAJ
                                     :
 8                                   :  DATE:    October 29, 2015
                                     :
 9      FBI, et al.,                 :  TIME:    9:00 a.m.
                                     :
10           Defendant.              :  PAGES:   1 - 134
        --------------------------   :
11


12


13              TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE SUSAN C. BUCKLEW
14               UNITED STATES DISTRICT JUDGE


15


16


17


18


19


20


21
        Court Reporter: Lynann Nicely, RPR, RMR, CRR
22              Official Court Reporter
                801 N. Florida Avenue
23                   Suite 13B
                Tampa, Florida 33602
24
        Proceedings recorded and transcribed by computer-aided
25      stenography.
```

```
 1                    A P P E A R A N C E S

 2

 3        For the Plaintiff:

 4
                    SETH D. BERLIN, ESQ.
 5                  Levine, Sullivan, Koch & Schultz, LLP
                    1800 L. Street NW
 6                  Washington, D.C.  20036

 7                  GREGG DARROW THOMAS, ESQ.
                    Thomas & LoCicero, PL
 8                  601 South Boulevard
                    Tampa, Florida  33606
 9

10        For the Defendant:

11
                    ERIK KENNETH STEGEBY, ESQ.
12                  U.S. Attorney's Office
                    Suite 3200
13                  400 N. Tampa Street
                    Tampa, Florida  33602
14

15        For the Intervenor:

16                  CHRISTINA K. RAMIREZ, ESQ.
                    SHANE VOGT, ESQ.
17                  Bajo, Cuva, Cohen & Turkel, PA
                    Suite 1900
18                  100 N. Tampa Street
                    Tampa, Florida  33602
19
          ALSO PRESENT:
20             Heather Dietrick

21

22

23

24

25
```

<pre>
1                    P R O C E E D I N G S

2              THE COURT:   The matter that is set this

3        morning and set for hearing is -- the style of the

4        case is Gawker vs. The FBI and the United States

5        Attorney and this is a civil case 15-1202.   If I

6        could get counsel to state their appearances,

7        please, and we'll start with counsel for Gawker.

8              MR. BERLIN:   Good morning, Seth Berlin of the

9        law firm Levine, Sullivan, Koch & Schultz in

10       Washington.   Seated with me at the counsel table is

11       my client Heather Dietrick, the president and

12       general counsel of Gawker Media.

13             MR. THOMAS:   Your Honor, Greg Thomas on behalf

14       of Gawker.

15             THE COURT:   Mr. Thomas, this is the first time

16       I've seen you at one of the hearings.   You filed

17       everything, but I haven't seen you at a hearing.

18             MR. THOMAS:   Your Honor, I had a little heart

19       problem in March and everything is wonderful now,

20       but I missed being here.

21             THE COURT:   All right.   Mr. Stegeby?

22             MR. STEGEBY:   I'm Kenneth Stegeby for the FBI

23       and the EOUSA.

24             THE COURT:   Good morning.   Could I get those

25       persons seated behind you to identify themselves,
</pre>

1          please.

2               MS. RAMIREZ:  Your Honor, Christina Ramirez

3     and my partner Shane Vogt with Bajo, Cuva, Cohen &

4     Turkel, representing intervenor Terry Bollea.

5               THE COURT:  And in an abundance of caution --

6     I'm sure I said this last time -- Ms. Ramirez was a

7     law clerk of mine for many years.

8               All right.  I'd like to suggest how this

9     hearing should proceed and frankly I'm open to

10    suggestions if you all have talked about a way that

11    you think it might better proceed.  I think, like

12    the last hearing, I have a number of questions and

13    I'd like to start with my questions and perhaps some

14    comments and then after I have finished, we could

15    proceed in one of two ways.  We could start with

16    Gawker's objections and then the government can

17    respond and perhaps argue their motion for summary

18    judgment since they're sort of overlapping and then

19    Gawker can respond to the government's motion.  Or

20    we could just start with the government's motion for

21    summary judgment which really incorporates a lot of

22    the responses to the objections, and then have

23    Gawker respond to the motion for summary judgment.

24    And I don't know, maybe you all have thought of how

25    we should proceed with this hearing.  Mr. Berlin?

1          MR. BERLIN:  I'm open to doing whatever the

2     court wants.  I think the first of those two

3     suggestions might make a little bit more sense

4     because that's the way the thing has played out, so

5     if we could sort of go through it in an orderly

6     fashion.

7          THE COURT:  Well, that's why I suggested it

8     first because that was my first choice, but I

9     thought maybe you might have had a discussion.

10     Mr. Stegeby?

11          MR. BERLIN:  We have not and that would be

12     fine with us, Your Honor.

13          THE COURT:  Mr. Stegeby?

14          MR. STEGEBY:  Your Honor, either way is fine

15     with the government.  I think in the end this case

16     is probably going to pivot around the privacy

17     interests, so -- but we'll get to that argument at

18     some point and that is going to affect, I believe,

19     depending on Your Honor's ruling, how we're going to

20     proceed with the objections.

21          THE COURT:  Well, just remain standing for

22     just a minute.  I've read everything, so I come into

23     this thinking there are parts of your summary

24     judgment I will grant, parts I won't grant.  So

25     where does that leave us?  Because -- and then I've

1    got Gawker's motion which I need to talk to them

2    about in just a few minutes.  But my initial thought

3    is that Gawker's motion, and he may not agree, but

4    Gawker's motion is moot because their motion was

5    based on law enforcement exemption.  But suppose I

6    end up in that posture; where does that leave us?

7         MR. BERLIN:  Your Honor, I have sort of

8    anticipated that you would grant portions of my

9    motion but also deny portions of it based upon

10   privacy grounds.

11        Obviously Gawker -- they have argued that

12   everybody should be mentioned.  If we have redacted

13   special agents or an AUSA's name or his or her

14   supervisor, everything should be unredacted.  Our

15   position obviously is that --

16        THE COURT:  And we'll get to that in a minute.

17   My question really goes to procedurally where does

18   that leave us?  I've got part of the case remaining

19   because I haven't granted your summary judgment

20   motion in its entirety.  Where does that leave us?

21        MR. STEGEBY:  Your Honor, if you decide to

22   deny portions of our summary judgment motion, I

23   would like to have at least a brief recess before we

24   turn over the documents.  There is a possibility

25   that the FBI in particular would like to look into

1       the possibility of an appeal of any unredactions

2       that the Court might order.  So I would need some

3       time to speak with the FBI and see where they are.

4            THE COURT:  Okay.  Suppose you don't appeal;

5       where does that leave us?

6            MR. STEGEBY:  Then, Your Honor, we are

7       obviously going to unredact whatever portions that

8       the Court orders us to unredact and then produce

9       those documents to Gawker.

10           THE COURT:  And then what does that do with

11      the case?  We still have an open case.

12           MR. STEGEBY:  To the extent that Your Honor

13      grants our summary judgment motion, then that

14      portion of the case will be over --

15           THE COURT:  I understand that.

16           MR. STEGEBY:  -- and to the extent that you

17      deny it, we will produce the documents in that

18      unredacted version or form and I think the rest of

19      the case is moot and the case is over.

20           THE COURT:  All right, Mr. Berlin, same

21      question to you, and I guess I should start with --

22      do you have something else before I --

23           MR. STEGEBY:  No.

24           THE COURT:  You can have a seat.  Same

25      question to you, and first of all, my assumption is

1    that Gawker's motion for summary judgment is now

2    moot because it was based on law enforcement

3    exemption.  Do you agree with that or don't agree

4    with that?

5         MR. BERLIN:  Respectfully, Your Honor, I would

6    disagree with that for this reason, but I hope it

7    will help answer the other portion of your question.

8    The summary judgment motion that we filed basically

9    said that we are entitled to the documents and it

10   addressed that what was at that time the only

11   exemption that had been asserted by the government

12   which was exemption 7(a).  But the premise of the

13   motion was that we were entitled under FOIA to the

14   documents, and then we went on and addressed that

15   exemption.

16        THE COURT:  And I don't disagree that that was

17   the posture of the case at the time.  But where --

18   why --

19        MR. BERLIN:  Having asked for documents, the

20   motion basically says we're entitled to these

21   documents.  And I think --

22        THE COURT:  You're entitled to the documents

23   where they claim the law enforcement exemption.

24        MR. BERLIN:  No, I actually think what we were

25   saying is we're entitled to the documents under the

1    statute, and to address the only exemption they have

2    asserted, we've addressed that.  They have then come

3    back and asserted additional exemptions which we've

4    addressed through our objections and in their motion

5    for summary judgment.

6         Where I think the procedural posture of the

7    case stands is that you essentially have pending

8    cross motions for summary judgment.  This case --

9    unless you find a fact issue, this case can be

10   resolved on those cross motions and effectively what

11   will happen, I think, is that if you find that the

12   exemptions are validly asserted, you will grant that

13   portion as to Mr. Stegeby's motion and I deny it as

14   to us, and the same is true -- the opposite is true,

15   sorry, with respect to documents that you find we

16   are entitled to which is that you would grant our

17   summary judgment and deny his and that that would

18   resolve the case at that point unless you of course

19   find a fact issue which precludes the entry of

20   summary judgment, which I think is unlikely.

21        THE COURT:  Okay.  Thank you.  Then we will

22   proceed as follows.  Let me ask my questions.  I do

23   again have questions for both of you and maybe in

24   some respects observations that might help you

25   tailor whatever argument you want to make.  And then

1    I'll start with Gawker's objections and I think

2    that's probably better as well.  We'll start with

3    Gawker's objections and we'll move over to the

4    government.  And actually your response to the

5    objections are essentially consistent with your

6    argument and motion for summary judgment, so I'll

7    let you make that argument and then, Mr. Berlin,

8    we'll come back to you for any additional argument

9    and response you would like to make.  So that's how

10   we will proceed.  Hopefully we won't be here all

11   morning even though I set aside the morning for the

12   argument.

13       All right.  Let me start with the government

14   and ask some questions regarding just some general

15   overall questions that I had that might help us as

16   far as how we're going to proceed.

17       Mr. Stegeby -- and I don't know if you're

18   going to know this off the top of your head, maybe

19   you will, you might need something to answer these

20   questions.  I'm pretty clear on the Executive Office

21   of the U.S. Attorney as far as how many documents,

22   how many documents were turned over, and how many

23   documents were withheld, but I would like to go

24   through that, if you don't mind, with you, just

25   briefly.  Okay?

1          MR. STEGEBY:  Yes, Your Honor.

2          THE COURT:  It's my understanding that -- and

3     I'm going to start at the end first -- there are 54

4     documents that you have withheld in their entirety;

5     is that correct?

6          MR. STEGEBY:  Yes, Your Honor.

7          THE COURT:  Okay.  And how many documents have

8     you turned over or has the Executive Office of the

9     U.S. Attorney turned over, redacted or not?  How

10    many have they turned over?

11         MR. STEGEBY:  I don't know that off the top of

12    my head.  I would have to look that up.

13         THE COURT:  All right.  Now, here's the second

14    question or the follow-up question.  Fifty-four

15    documents, and I asked you, I think, to give me

16    those documents so that I might look at those

17    documents, the ones that have been withheld in their

18    entirety, and you gave me a set of documents, but I

19    don't have 54 documents.

20         MR. STEGEBY:  Your Honor, I have been going

21    over the documents myself and I believe we've turned

22    over two sets of documents.  Initially it was some

23    10 or 12 documents, and then we turned over some

24    other documents and I can't remember how many we

25    turned over in the second round.  I have looked

1    through all our records as well, trying to look for

2    it and there are certain documents that I could not

3    find on my own in my own file and on the computer

4    that we simply haven't gotten from them.

5        I was able to -- initially we turned over some

6    documents that were not Bates stamped, so you

7    couldn't really find out which documents were which.

8    I went through them visually and I was able to find

9    one additional document.  So I have notes when it

10   comes to which documents that I know we have turned

11   over in unredacted form.  There are still a couple

12   documents that I could not locate.

13       THE COURT:  All right.  I have July 9, 2015,

14   you turned over 39 pages, including document

15   dividers, that the Executive Office of the U.S.

16   Attorney is presently withholding from plaintiffs in

17   full.  You say at some other time you turned over

18   additional documents?

19       MR. STEGEBY:  I believe, Your Honor, that we

20   turned over some 10 documents during the July 2nd

21   hearing, together with documents for the FBI.

22       THE COURT:  Do you know how many?

23       MR. STEGEBY:  I think it was approximately 10

24   to 12 documents, as far as I remember.

25       THE COURT:  At the July 2nd hearing?

1           MR. STEGEBY:  I believe so, Your Honor.

2           THE COURT:  Okay.  All right.  Well, suffice

3    it to say if you did, we have no idea where they

4    are.  Would they have been -- I mean, how is it you

5    would have turned them over in an adversarial

6    hearing?

7           MR. STEGEBY:  I believe, Your Honor,

8    Mr. Berlin and I had spoken prior to the hearing and

9    he -- at this point we obviously still had the trial

10   pending on July 6th and he was concerned that if you

11   ruled on the spot or if you had to look at certain

12   documents, he wanted me to have a complete set of

13   unredacted documents with me here in court.  So I

14   had two or three binders of documents from the FBI

15   that were unredacted and that was before the

16   supplemental production that we made.  And I think

17   that is when I also had a manila folder of 10 or 12

18   documents.  I could be wrong, Your Honor, but that

19   is my recollection.

20          And then I spoke with the EOUSA after the

21   hearing because I obviously heard from Your Honor

22   that you wanted to have all of the unredacted

23   documents and that is when I got what I believe is

24   the second batch of unredacted documents from EOUSA.

25          THE COURT:  Well, we have a little bit of a

1    problem in the light of the fact that I have no idea

2    where those documents were that you turned over.

3         Susan, do we have any pieces of evidence that

4    were received or anything of that sort from that

5    hearing?

6         COURTROOM DEPUTY CLERK:  No, Your Honor.

7         THE COURT:  Mr. Stegeby, frankly I don't

8    remember that, but that doesn't mean anything.  So

9    suffice it to say that I have looked at 37 -- the 37

10   that you have turned over.  So even if you say there

11   are 10 or 12 more that you have, that puts us up to

12   49 or 51, so we're still missing some documents.

13        MR. STEGEBY:  Yes, Your Honor, and like I

14   said, when I reviewed all the documents that I have,

15   I'm missing a couple of documents as well.  So they

16   may be the missing documents between 49 or 51 and

17   the 54 documents.

18        THE COURT:  Okay.  It's really hard for me to

19   rule with any kind of certainty if we can't be -- I

20   mean, this isn't even a large number.  When we get

21   to the FBI, it's even a larger number and perhaps

22   more difficult.  But without having all the

23   documents or at least having some certainty as to

24   what was turned over and what wasn't turned over so

25   that I can look at them, I mean --

```
 1            MR. STEGEBY:  Yes, Your Honor, I absolutely

 2    understand and I've been speaking with Mr. Berlin

 3    about various productions that we have made.  We

 4    haven't had many issues with the EOUSA's production

 5    except for these missing documents, but it's been --

 6            THE COURT:  So how many documents do you think

 7    are missing?

 8            MR. STEGEBY:  May I go and look at my notes,

 9    Your Honor?

10            THE COURT:  Uh-huh.

11            MR. STEGEBY:  Your Honor, I believe that

12    document number 8 --

13            THE COURT:  Just tell me total.

14            MR. STEGEBY:  Document 8, 10, and 16, although

15    I did find 16 in the non-Bates stamped pile that

16    they provided us with.

17            THE COURT:  Okay.  So if there are three

18    missing documents, even though you say you found

19    one, and you did somehow have 12 more documents that

20    I still -- you think you might have turned over but

21    I don't recall that and I don't have them, that

22    would mean there are 54 documents.  If there are 10

23    other documents, then we're still missing two.  So

24    we've got to resolve this before I can rule on this.

25            MR. STEGEBY:  Yes, Your Honor.
```

1          THE COURT:  All right.  So the best of all

2      circumstances for the government is that you have 12

3      documents that you know you have and you thought

4      you'd turned over but you didn't turn over or at

5      least I don't have them, and then you have another

6      document that you have found and then you've got two

7      missing documents.

8          MR. STEGEBY:  Yes, Your Honor.

9          THE COURT:  Can we identify those in some way

10     off of the Vaughn index?

11         MR. STEGEBY:  Yes.  The additional document

12     that I found, if you look at Exhibit 23-1.

13         THE COURT:  Hold on.  I have multiple exhibits

14     up here.  What is 23-1?

15         MR. STEGEBY:  I believe it's an exhibit

16     attached to one of our filings.

17         THE COURT:  Why can't I look at the Vaughn

18     index?

19         MR. STEGEBY:  If you look at the EOUSA's

20     Vaughn index, it is a little bit different than what

21     you normally see in a FOIA case because they have

22     not Bates stamped them.  So the way you can look at

23     -- in their index it is a document number which is

24     the furthest to the left column number 16.

25         THE COURT:  Okay.  This is the single-page

1      letter from the grand jury AUSA to Gawker -- to the

2      attorney for Gawker Media, dated March 18th.

3          MR. STEGEBY:  Correct, Your Honor.  And I

4      looked through all of the files I had on my computer

5      including 23-1, the exhibit, and I did searches on

6      the date and matched up the GJ AUSA and Gawker Media

7      and it seemed to match the description in the Vaughn

8      index.  So even though it's not Bates stamped, I

9      believe that is the correct one.

10         THE COURT:  Okay.  So let me go back and ask

11     the question again with respect to the U.S. attorney

12     documents.  I asked before, I said there are 54

13     withheld documents.  The Vaughn index indicates, as

14     I see it, 36 withheld in full documents and 12

15     redacted in part documents.  So really when you say

16     54 have been withheld, that's not correct?

17         MR. STEGEBY:  The information I have received

18     is that the 54 documents have been withheld in full.

19     When you look at the Vaughn index, it does say that

20     some of them have been redacted in part.  I tried to

21     compare without Bates stamp numbers the redacted

22     documents to the unredacted documents and there are

23     some inconsistencies there.

24         THE COURT:  Okay.  Well, so at this point I

25     don't really know how many documents were withheld

1    in full.

2         MR. STEGEBY:  Yes, Your Honor.

3         THE COURT:  Okay.  And I don't know how many

4    of those I have.

5         MR. STEGEBY:  I believe you mentioned that you

6    had 37 documents, but we don't know what happened to

7    the other documents up to number 54.

8         THE COURT:  Well, I said -- you say in your

9    cover letter, and we counted at one point but I

10   can't remember whether we agreed or not, but you say

11   in your cover letter that enclosed are 39 pages.

12   And we're talking about documents -- we should

13   really be talking at pages.  39 pages, including

14   document dividers.

15        MR. STEGEBY:  Yes, Your Honor.

16        THE COURT:  So when I say 54 documents, I'm

17   really talking about 54 pages, right?

18        MR. STEGEBY:  Yes, Your Honor.

19        THE COURT:  And that was my fault.  All right.

20   Well, suffice it to say so far this is completely

21   inexact and I can only rule on what I can rule on.

22   And if I don't know how many documents were withheld

23   in full and then if I ask you to give them to me and

24   you don't give all of them to me, I can't make any

25   intelligent ruling.

1              MR.  STEGEBY:   I completely understand, Your

2        Honor.

3              THE COURT:  All right.  Okay.  Let's move on

4        to the FBI.  Now, the FBI has actually done two

5        document productions, right?

6              MR.  STEGEBY:  Yes, Your Honor.

7              THE COURT:  And the first document production

8        was immediately prior to our July 2nd hearing or

9        somewhere prior to our July 2nd hearing, and then

10       more recently you discovered there were documents on

11       loan to the State Attorney's Office in Hillsborough

12       County and so you got those documents back and

13       you've turned over an additional 238 documents.

14             MR.  STEGEBY:   That's correct, Your Honor.

15       Once the FBI was informed that the nonfederal law

16       enforcement agency was no longer considering the

17       documents that they had been lent to need protection

18       by them, the FBI then sent a letter to the various

19       agencies that they had worked with and lent

20       documents to and asked for the documents to be

21       produced back to them and that's how they got the

22       additional 408 documents.  When they went through

23       those, they decided to produce 238 of them.

24             THE COURT:  And so when you gave me the most

25       recent Vaughn index, it was an index that included

1          those withheld documents; is that correct?

2               MR. STEGEBY:  Yes, Your Honor.  And the FBI

3     ended up putting two different spreadsheets in the

4     Vaughn index because when we have reviewed the

5     documents, it turned out that the FBI had reused the

6     Bates numbers, some of the Bates numbers from the

7     first production.  So we have two separate

8     spreadsheets in the Vaughn index and they should

9     match up with the two productions.

10              THE COURT:  Okay.  All right.

11              MR. STEGEBY:  And to preempt questions about

12    the Vaughn index, I went through every document in

13    the Vaughn index, both the first production and the

14    second production, and I found some inconsistencies

15    that I informed the agency of and I have not heard

16    back with respect to all of the issues that I found.

17              THE COURT:  What kind of inconsistencies?

18              MR. STEGEBY:  There were some documents that

19    in my view had been listed with the wrong Bates

20    numbers and matched up -- there are two sections in

21    each of the two sections, one is for exemptions and

22    one is for duplicates.  And there were some

23    inconsistencies between the Bates numbers that I

24    found in the Vaughn index and the actual documents.

25              Now, they were able to explain most of my

1     concerns, but there are still a couple or a few

2     concerns that I personally have had.

3          THE COURT:  Okay.  I forgot to ask you one

4     question about the Executive Office of the U.S.

5     Attorney.  You had agreed that there were three

6     pages missing from the Vaughn index from the

7     Executive Office of the U.S Attorney, and then in

8     Tricia Francis, is that who it is?

9          MR. STEGEBY:  Yes, Your Honor.

10          THE COURT:  Her third affidavit, she says she

11     submitted an amended Vaughn index to you.  We've

12     never seen it.

13          MR. STEGEBY:  I would have to go back and

14     check that, Your Honor.

15          THE COURT:  Well, let me just see.  Have you

16     gotten an amended -- maybe -- Mr. Berlin?

17          MR. BERLIN:  No, Your Honor.

18          THE COURT:  Here's what she said.  Accordingly

19     I have included in -- she says, and I'm reading from

20     her affidavit which was filed on August 7, 2015, and

21     she says, "Plaintiff Gawker states that three

22     redacted pages that were referred to in the

23     Executive Office's release letter dated May 27th did

24     not appear in the Vaughn index which was submitted

25     on June 30th.  On August 5, 2015, I learned for the

```
1       first time that those pages were not included in the

2       Executive Office's Vaughn index and that was due to

3       an oversight.  Accordingly, I have included an entry

4       for those pages on an amended Vaughn index which has

5       been submitted to AUSA Kenneth Stegeby."

6              MR. STEGEBY:  I remember that third Vaughn

7       index.  I recently reviewed it.  I should have filed

8       it.  I don't know if it was attached to the email

9       where she attached the third declaration.  I would

10      have to look in my records for that.

11             THE COURT:  This was August 7th, Mr. Stegeby.

12             MR. STEGEBY:  Yes, Your Honor.

13             THE COURT:  What is today's date?  We're at

14      the end of October.

15             MR. STEGEBY:  Yes, Your Honor.

16             THE COURT:  Okay.  All right.  A couple more

17      questions.  The DVDs.  You have turned over -- now

18      turned over three DVDs and we had a problem last

19      time we were here with the soundtracks not matching

20      the DVDs and that -- anyway there were at least one

21      of them was a mess, maybe two of them.  Those

22      problems have been corrected?

23             MR. STEGEBY:  Yes, Your Honor.

24             THE COURT:  And you have turned them over.

25             MR. STEGEBY:  Yes, Your Honor.
```

1          THE COURT:  And that was July 13th?

2          MR. STEGEBY:  I don't remember the date.

3          THE COURT:  I wrote that down.  But somewhere

4     immediately or close to immediately after our last

5     hearing?

6          MR. STEGEBY:  Yes, Your Honor, I believe Your

7     Honor told us to do it within a week and --

8          THE COURT:  We were trying -- at that time

9     they had a trial, so we were -- although I'm not

10    sure we should be worried about that, but at that

11    time we did that for that reason.  Okay.

12         So according to the government, those problems

13    have been corrected.  Now, one of those DVDs is

14    still redacted to black out the person that's

15    talking on the tape, who we all know who it is but

16    that you are claiming privilege, right?

17         MR. STEGEBY:  I believe there may actually be

18    redactions to two of the DVDs, but one in particular

19    has quite a bit of redactions, both of a third

20    person in the room and that person's voice.

21         THE COURT:  But the same person is redacted on

22    both, without saying who that person is.

23         MR. STEGEBY:  Yes, Your Honor.

24         THE COURT:  All right.  As I recall, there

25    were also some CDs, is that correct, some recordings

1        of -- was it the sting operation or discussing the

2        sting operation?

3              MR. STEGEBY:  I believe it was some interviews

4        and it could possibly also be on the sting

5        operation.  And I believe there are two CDs with

6        audios on them.

7              THE COURT:  And you've turned those over?

8              MR. BERLIN:  There are some audio files that

9        we believe are missing, but we have received certain

10       audio files from the government.

11             MR. STEGEBY:  And I haven't heard which audio

12       files may be missing, if any.

13             THE COURT:  Well, we'll get to that.  All

14       right.  Let me ask you just a general question.  The

15       redacted -- we've looked through most of the

16       redacted -- I don't mean we've read everything, I'm

17       just saying we've looked through to see what has

18       been redacted.  And just generally, generally, names

19       have been redacted, any time there was an address, a

20       telephone number, a Social Security number, those

21       were redacted.  Anything else generally that for

22       privacy reasons that were redacted out of

23       everything?

24             MR. STEGEBY:  For privacy reasons, no, those

25       should be the only redactions that the FBI did.

1      They only have withheld even from me grand jury

2      proceedings, so I haven't had a chance to look at

3      those documents.  And there may have been one or two

4      or a few redactions under B-5.  I know --

5              THE COURT:  Remind me what B-5 is.

6              MR. STEGEBY:  Those would be like deliberative

7      process privilege and --

8              THE COURT:  But for the most part by far the

9      redactions are privacy redactions based on names.

10             MR. STEGEBY:  Yes, Your Honor.

11             THE COURT:  And there are some perhaps

12     addresses, telephone numbers, Social Security

13     numbers, that kind of thing.

14             MR. STEGEBY:  Yes, Your Honor.

15             THE COURT:  But mostly it's names, right?

16             MR. STEGEBY:  Yes.  And some signatures, but

17     the vast majority would be names.

18             THE COURT:  Signatures.  I just include those

19     with names, but okay, I'll write that down.  All

20     right.

21             Now, suppose, Mr. Stegeby, I decide that I

22     don't agree with all of your privacy exemptions with

23     respect -- obviously Social Security numbers,

24     telephone numbers, that kind of thing ought to be

25     redacted, but as far as names suppose I don't agree

1    with that and I order you to turn over the

2    unredacted documents.  It's my observation -- and

3    that's why I want to ask you this and you can

4    correct me if I'm wrong -- that what -- these

5    documents are on the computer and that you have

6    simply blacked out the names using a computer

7    ability to do that or program to do that, so you

8    could pull them up and unredact the names and turn

9    them over.  That would not be a difficult procedure,

10   right?

11        MR. STEGEBY:  Your Honor, I personally when I

12   do document reviews use Adobe Acrobat and that's a

13   pretty easy fix.  I don't know what software they

14   have, I presume they have better software than I do,

15   frankly, so that should not be an issue.

16        THE COURT:  Thank you, Mr. Stegeby, I would

17   like to ask Mr. Berlin some questions now.

18        MR. STEGEBY:  Certainly.  Thank you, Your

19   Honor.

20        THE COURT:  Okay, Mr. Berlin, remind me when

21   the trial is now set in state court?

22        MR. BERLIN:  First week of March 2016, Your

23   Honor.

24        THE COURT:  So it's coming up.

25        MR. BERLIN:  It is, Your Honor.  And implicit

1    in your question I should mention that we were in

2    court yesterday and the topic of this hearing came

3    up with Judge Campbell and there are some things

4    that precede the trial that are directly related to

5    the documents that we're getting and trying to get

6    in unredacted form from the FBI before the trial.

7    So we're not -- we're by no means in the sort of

8    emergency state that we were in when we were last

9    here, at least for the first half of the hearing,

10   but there are deadlines and that train is still

11   moving along, so.

12        THE COURT:  Okay.  Somehow I thought it was in

13   April.  Okay.  So that case is still set for trial

14   the first week of March.  And I'm assuming she's

15   told you that is a date certain and all that?

16        MR. BERLIN:  That is correct, Your Honor.

17        THE COURT:  All right.  Let me just follow up

18   on a couple of things I asked Mr. Stegeby.  As I

19   understand it, there are three DVDs that have been

20   turned over now and I understand you object to the

21   redaction of the person speaking on -- perhaps, I

22   don't know, perhaps he's viewed or something, but at

23   least speaking on the DVDs.  But other than that, do

24   you have any objections to the DVDs?

25        MR. BERLIN:  I'm a little bit at a

1    disadvantage because we have not seen the DVDs.  Let

2    me elaborate because I see you looking perplexed.

3    There was an initial production in which at least

4    two of the three DVDs had problems.  One was

5    truncated in time to a minute and 14 seconds and

6    there was no people in it at all.  The other one had

7    a significant audio issue.  We were permitted to see

8    those.

9          THE COURT:  By the state court judge?

10          MR. BERLIN:  By the state court.  In fact --

11          THE COURT:  You turned them over to Jim Case,

12    right?

13          MR. BERLIN:  Actually they went to Judge

14    Campbell because Judge Case was away at the time,

15    with everybody's agreement.  But Judge Campbell

16    looked at them, identified there might be some

17    issues, had counsel from both sides come to the

18    courthouse and review them, and that happened a day

19    or two before the last hearing.

20          THE COURT:  But since then you haven't seen

21    them?

22          MR. BERLIN:  Since then they have been

23    produced to the state court, but we've not seen

24    them.  So my understanding from Mr. Stegeby, who has

25    tried in an effort to be able to answer just such a

```
 1        question, I have asked Mr. Stegeby are there any

 2        other -- is there anything else that's been redacted

 3        or removed from the original, and the answer was no,

 4        they just removed the identity in terms of image and

 5        voice from one person, who as Your Honor noted I

 6        think everybody knows who it is.  We object to that,

 7        but if that's the only issue, that probably is the

 8        only issue, but I would put a footnote in to say at

 9        some point we would, if there were another issue, we

10        would like to be able to address it with the FBI,

11        but I don't understand there to be any at this time.

12             THE COURT:  What about when I asked the

13        question about CDs or audio recordings, whatever

14        media they're on, you mentioned a concern, so why

15        don't you tell me what that is.

16             MR. BERLIN:  Well, we received I think five

17        audio files from the government on a CD.  There are,

18        in reviewing the records, and we're generally

19        speaking a little bit handicapped in reviewing the

20        records because they come with a lot of blanks in

21        them for our copy and because, as Your Honor has

22        observed, there appear to be some that are missing

23        or unaccounted for and maybe we can circle back to

24        that.  But there are at least two audio recordings

25        that are referenced in the documents that we can see
```

1    that have not been produced to us.

2         So one of them is dated November 27, 2012, and

3    it reflects -- and we have an evidence log for that

4    call and we have other documents that refer to that

5    call, but we don't -- when I say we have an evidence

6    log for that call, we have an evidence log showing

7    there is a CD that reflects the audio of that call.

8    That's listed in our objections dating back to late

9    July and we don't have that audio.

10        On December 5th, 2012, there was another call.

11   We actually have a transcript or at least what

12   purports to be a transcript of a call from that

13   date, but we don't have the audio file that goes

14   with it.  We've raised that as well as our

15   objections.  There was a list in our objections of

16   the missing or unaccounted for documents and those

17   two were both on the list.  And in the various

18   papers that have followed we'll followed up about

19   that but we haven't gotten any answer on it.

20        THE COURT:  Mr. Stegeby, what about the two

21   audio recordings, the November 27, 2012 and

22   12/5/2012?

23        MR. STEGEBY:  Your Honor, I am unaware of us

24   not producing additional two audio files.  I don't

25   know if -- I frankly haven't listened to the audio

for a while, I was focused on the video since I was

specifically ordered to make sure that the videos

were appropriate.  So I don't know if somehow they

spliced these two additional audio files to it, I

would have to go back and look at my files and see

what we have received from the FBI.  So at this

point "I don't know" is the answer.

THE COURT:  Okay.  What about the audio

file -- what about the audio files you have

received?  I assume -- you mentioned there were some

that were turned over.

MR. BERLIN:  There were some that were turned

over and I don't believe there is any production

issues with those because I don't believe -- I think

all of the people who were on them had provided

waivers, so there were not -- not to my knowledge

any redactions.

THE COURT:  What about -- I hate to ask this,

my question here:  Are there still issues related to

document productions?

MR. BERLIN:  The answer to that is yes, Your

Honor.  Perhaps I can start with the FBI and then

move to the EOUSA, if that would be helpful.

THE COURT:  That would be fine.

MR. BERLIN:  There are significant issues in

1        terms of just accounting for documents.

2            THE COURT:  Well, as far as your arguments

3        that you make -- your objections and your arguments

4        that you make in response to the summary judgment,

5        if you'll just hold those.  I'm just asking if there

6        is anything else regarding number and that kind of

7        thing.

8            MR. BERLIN:  Yes.  So the answer is on the

9        EOUSA we have a question about the numbers of

10       documents -- I'm sorry, with respect to the FBI we

11       have a question about the numbers of documents that

12       have been produced.  I also have a question about

13       the EOUSA, but let me start with the FBI if I may.

14           THE COURT:  All right.

15           MR. BERLIN:  And some of that comes from the

16       fact that there are overlapping Bates numbers and so

17       we have tried to get clarity and we've put this in

18       our papers and in affidavit most recently from my

19       colleague Alia Smith who had the fun task of going

20       through and trying to make sense of this most recent

21       production.  But there are overlapping Bates

22       numbers, which makes this more difficult, but there

23       are also -- initially there were the -- FBI

24       represented that it had identified 1168 pages, it

25       got another 130 or thereabouts from the EOUSA, and

1        then only produced roughly 1178 pages.  So there is

2        a question as to what happened with those other

3        what's roughly 120 or 130 pages that are missing and

4        it's unclear and they have told us that they have

5        produced as part of their production and accounted

6        for the 130 documents that came from the EOUSA, so

7        there is a question as to what happened to those

8        documents that they had originally told us were

9        responsive.

10            And when we asked this question, to be fair,

11       we said -- they said well, we told you those were

12       potentially responsive.  And we said well, you

13       identified one investigative file about this very

14       matter, how could 10 percent of the documents not be

15       responsive, not even to make their way on a Vaughn

16       index.  So that's the first issue.  And one of the

17       issues that we have, and I don't -- I should say at

18       the outset that Mr. Stegeby has been a true -- he

19       has really worked very hard with us to try and

20       wrestle these things to the ground with the people

21       in the background for the FBI in Winchester and for

22       the U.S. Attorney's Office in Washington.

23            THE COURT:  That may be, but I find it hard --

24       we've been talking about this for how long and I

25       find it hard to believe why we can't get some sort

1        of consistency with numbers.

2            MR. BERLIN:  And that was the point I was

3        going to make, which is the first order of business

4        in a FOIA case before you start talking about

5        exemptions or whether they're properly on a Vaughn

6        index and whether the Vaughn index is satisfactory

7        is to make sure that you have the right universe of

8        documents in front of you.  And we cannot, despite

9        multiple declarations from Mr. Hardy, despite

10       multiple declarations from Ms. Francis, despite

11       multiple hearings, get clarity on that.  And that's

12       a problem and it's their burden, but it's a real --

13       I agree with you that that's a real problem, I just

14       wanted to commend Mr. Stegeby for his efforts to try

15       and get that done even against what seem to be very

16       difficult circumstances.  When I get to my argument

17       I have a proposed solution for that.

18           But going to the remaining documents, so we

19       have the -- there is also, and we've put this in our

20       papers more detail about how we know this, some of

21       which refers to the documents themselves so I'm

22       trying not to describe them in open court because as

23       you know in the state court proceeding they have

24       been designated as confidential.  But there is video

25       footage of the December 14, 2012 sting operation

1    that is referenced and described and we don't have.

2    That also is listed in our objections, it's restated

3    again in our oppositions to the summary judgment

4    motion, and we don't know where that is.

5        There is -- and this potentially relates to

6    both the FBI which refers to it in its documents and

7    the EOUSA -- a letter that says essentially we, the

8    government, have decided to decline prosecuting this

9    matter.  And this is a reference thing, and neither

10   agency has produced it or listed it on its Vaughn

11   index.  So we don't know where that is and that

12   actually is of some significance because we can tell

13   from the dates of those emails that refer to it when

14   that happened and when the investigation was

15   therefore over and that matters for things like an

16   assertion of attorney work product privilege because

17   you don't get to claim work product for something

18   that's prepared in anticipation of a matter that's

19   already concluded.

20       We are missing -- there are agreements between

21   that preceded the sting operation, there were

22   written agreements between Mr. Bollea and

23   Mr. Davidson, and we're missing one of the exhibits

24   from the final version, Exhibit B, we're missing

25   several drafts, and these things raise the question

1    as to whether we have a complete set of documents

2    before us.

3         We have put before the court a variety of

4    communications between the FBI and Mr. Bollea's

5    counsel, David Houston, and there were things that

6    we're back and forth with the FBI and we don't have

7    those documents from the FBI.  Now, I'm not

8    bellyaching about documents that I already have from

9    another source, but it raises a significant question

10   as to whether the documents that you are being told

11   represent the complete universe are in fact the

12   complete universe.

13        THE COURT:  And you've sat down with

14   Mr. Stegeby and obviously I know it's in your

15   filings or you say it's in your filings, but you sat

16   down with Mr. Stegeby and said look, we don't have

17   these, where are they --

18        MR. BERLIN:  We put it in our filing and when

19   we've talked, I've said we're missing documents and

20   these are issues.  And he's -- as he said to you

21   that he's made efforts with the folks in far away

22   lands to try and get them addressed.

23        THE COURT:  All right.

24        MR. BERLIN:  So that is --

25        THE COURT:  You were going -- you said you

1    also wanted to say something about the Executive

2    Office --

3         MR. BERLIN:  I just had a couple more on the

4    FBI, if I may.  One is, as Your Honor noted, the

5    Tampa Police Department returned documents and then

6    they produced certain of them.  In the original

7    production there was a document that said here's the

8    list of documents we gave to the Tampa Police

9    Department and there were 21 items.  They're not

10   described, they're listed by serial number, which we

11   don't know what those serial numbers mean, but there

12   is 21 items.

13        When they wrote them and said can you please

14   give us back your things, they said you have 18 of

15   them, can you please give back 18, and we have

16   really no way of verifying or sorting out that

17   discrepancy but that's something that really needs

18   to happen.

19        Then lastly, there is an issue about -- second

20   to lastly, there are several documents that are in

21   the second production that -- you may remember this,

22   we got it originally without a Vaughn index and with

23   just a list on the -- there were five batches that

24   we labeled them --

25        THE COURT:  We just got the Vaughn index, yes.

1          MR. BERLIN:  And then we got the Vaughn index.

2     And so we've tried to compare the Vaughn index with

3     the prior listings and we are still missing document

4     1198, document 1230, document 1231, and those are

5     not on the Vaughn index or in the production that

6     we've received or listed as duplicates.

7          And then lastly, there is the problem of the

8     duplicates.  I expressed that I was perplexed that

9     the FBI was taking the time to fill out a form every

10    time there was a duplicate and identify the earlier

11    page rather than just simply produce it and renumber

12    it.  But in the FBI's second production, there were

13    a number of pages that were listed as being withheld

14    because they were a duplicate, but in the actual

15    production those pages were in fact produced and the

16    page that purported to be a duplicate of an earlier

17    produced document was not in fact a duplicate and

18    that raises a question for us --

19         THE COURT:  You're talking about, for example,

20    I think you gave some examples where it appeared to

21    be a duplicate but it was a slight change or

22    something?

23         MR. BERLIN:  No, that's a different thing.

24    There were somewhere that was the case where we had

25    a copy of a document and we had same copy of a

1    document where somebody had written a handwritten

2    note.  And those things were produced and we just

3    noted them to illustrate that sometimes

4    duplicates are -- things that look like duplicates

5    are close.

6         But there are actually a number of pages where

7    the FBI said we're not producing this document

8    because it duplicates an earlier document, but then

9    actually produced that new document and when we

10   looked at it and said okay, does it actually

11   duplicate the earlier document, they're completely

12   different.

13        So one of our concerns is that we have and you

14   have been represented in a number of cases and

15   literally hundreds of documents, we are not

16   producing this because it is a duplicate of an

17   earlier document and in the small sample of places

18   where we have actually been mistakenly given the

19   duplicate document, they're not duplicates.  And so

20   we are concerned about the claim of we're

21   withholding this document as a duplicate because

22   it's a duplicate.

23        So those are sort of the universe, I think --

24   you may have other questions that identify some

25   others, but I think that's the universe of FBI

1      document issues.

2            THE COURT:   Mr. Berlin, I'm going to ask you

3      this because it appeared to me from your response to

4      the motion for summary judgment and especially when

5      we were talking about public interest and that sort

6      of thing, that you seem to attribute to the AUSA, to

7      the FBI perhaps, some secret ulterior reason for not

8      producing this.  So am I reading that wrong or you

9      just think it's sloppy?

10           MR. BERLIN:   I have a couple of questions

11     about a couple of specific documents that would

12     raise the question of whether there is something

13     funny going on.  Generally speaking, Your Honor, and

14     I don't want to label the government sloppy, but

15     generally I think it's sloppiness.  It's a little

16     difficult to know because if I knew -- if I got all

17     the things that I don't have and they were all

18     smoking guns, then I might have a different answer

19     to that question.  But I'm assuming that's not the

20     case and this is just sloppiness and that's not

21     really the main focus of my public interest argument

22     which I can reserve until the argument section.

23           But I do think that there is an issue and I

24     think -- I was going to save this for later, but

25     since you asked this question, let me speak to this.

```
 1        I think what's really going on, Your Honor, in most

 2        instances, putting aside that the public interest

 3        should enable us to get an answer to that question,

 4        is it sloppy or is it something more, that the real

 5        issue is that people who really know nothing about

 6        this file are the ones who are principally

 7        responding to the FOIA request.  In other words,

 8        you've got a bureaucracy --

 9             THE COURT:  That's always the way, isn't it?

10        With the FBI anyway.

11             MR. BERLIN:  Right, and I understand that, I

12        understand that's the way they have elected to do

13        it.  But I think at some point after this many

14        hearings and briefs and efforts to try to get a

15        straight answer on the universe of documents for

16        what's essentially one investigation, that at some

17        point the Court has some ability to say to the

18        people on the ground who know about it, can you help

19        your colleagues, your out-of-town colleagues who

20        really don't know what they're doing, and make sure

21        that there is a complete universe of documents so

22        that when the Court wants to say -- you began by the

23        hearing by saying how do I resolve this matter.  We

24        would like this matter to be resolved this matter

25        and move on and litigate our state court case and
```

1    get the documents to which we're entitled and move

2    on.   The way you do that is by getting somebody who

3    actually knows what's in this file.   You know, there

4    are two audio recordings -- where are they?   There

5    is a video recording; where is it?   That's an easy

6    thing to ask, but it's not an easy thing to ask a

7    bureaucrat in Winchester, Virginia who doesn't know

8    the answer to that question.   It's an easy question

9    to ask of the person who participated in the

10   investigation.

11        And I understand why as initial matter they

12   wanted to do it a different way and if that worked

13   for them and for you, we wouldn't object.   But at

14   this point I think you ought to be able to ask them

15   to involve the actual people with knowledge and to

16   get declarations from people with knowledge that

17   this is the complete universe.   Because you have a

18   series of -- one of the judges described this in one

19   of the cases we cited as a series of evolving

20   declarations and evolving sets of numbers and you're

21   constantly shooting at a moving target, you're not

22   going to hit it.

23        Would you like me to move on?   I have just a

24   couple things on EOUSA.   Would you like me to move

25   on to that?

1          THE COURT:  Yes, go ahead.

2          MR. BERLIN:  Your Honor has already identified

3     the three documents or so that were missing from the

4     Vaughn index and were promised to be on a new Vaughn

5     index.  We have not received that.

6          There is again a discrepancy between what the

7     production that we got on the 26th of June, which

8     accounted for 54 pages withholding 32 in full, and

9     the Vaughn index which by my count accounted for 60

10    pages, withholding 38.

11         It is a little frustrating, to say the least,

12    that the document that the EOUSA was not able to

13    give him but that he was able to find was a piece of

14    correspondence with me as Gawker's counsel that he's

15    actually attached to a court filing in this case.

16    It seemed -- that is not the saving thing, but

17    that's the issue there which is that we have not

18    received -- we don't have a number to know this is

19    the number of documents that we've given you -- we

20    know how many we've been given, that's the easy one.

21    This is the number of documents we've withheld in

22    full -- because it's not a moving target by hundreds

23    like it is with the FBI, but it's a moving target by

24    some and it does raise the question of whether the

25    EOUSA had certain evidence that was really its own.

1          So, for example, while the FBI files refer to

2     this declination letter, that comes from as best we

3     can tell and is identified as coming from

4     Ms. Sweeney, the AUSA working on this, and that

5     would be in their file, it's not a document they

6     would refer back to the FBI because it was their own

7     document, we don't have it, so there is just a

8     series of questions about whether that's a complete

9     production.

10         Again, I said this and I'll just reiterate

11    this, again that's an easy fix because instead of

12    asking Ms. Francis, a FOIA officer in Washington,

13    D.C. do we have a complete universe of documents,

14    Mr. Stegeby could ask Ms. Sweeney and Your Honor

15    could ask for a short declaration from Ms. Sweeney,

16    she could tell you this is the whole file, right?

17    And we would know the answer to that and then we

18    wouldn't be three hearings and however many filings

19    and six or seven months into a proceeding not

20    knowing what the universe of documents is.

21         THE COURT:  So your quick solution to that or

22    your solution to the problem is to get a declaration

23    from Ms. Sweeney and a declaration from --

24         MR. BERLIN:  I would say probably Jason Shearn

25    who is as best I can tell the lead FBI special agent

1    who worked on this.  That's not a secret, they put

2    that name in court filings.

3         So it would seem to me that, you know, I

4    understand that the reason the FBI and the EOUSA

5    have set up FOIA offices is so that their line

6    people don't have to be bothered with this on a

7    day-to-day basis, but I think at some point Your

8    Honor, who has devoted a lot of time to this, and we

9    who have devoted a lot of time to this, are entitled

10   to say okay, we've now given you multiple chances to

11   do it your way, I'd like you to get the person who

12   actually knows to do it.

13        And there is a lot of courts that have reached

14   the similar level of -- this is part of the

15   argument, but just since it's on this point, there

16   is a lot of courts that have reached this same level

17   of frustration, and we have a footnote that lists

18   all this that basically says look, you get a

19   declaration from a person who does not have personal

20   knowledge of whether this is the complete universe

21   of documents, or other things like whether there was

22   a grand jury investigation or not, you're not

23   getting a declaration that's properly credited for a

24   summary judgment motion and you ought to get -- and

25   if there weren't a discrepancy, we wouldn't be

1      quibbling about this, but now we are and we would

2      like that to happen.  That's my proposed fix.

3          If Mr. Stegeby has a better alternative, we're

4      open to it, but the goal -- before you get to the

5      questions of is the Vaughn index proper and are the

6      exemptions proper, you've got to make sure you're

7      dealing with a complete universe of documents and

8      accounting for them.

9          THE COURT:  Let me ask you another question as

10     we're talking about fixes here.  Suppose I end up --

11     if we ever do get to the argument here, suppose I

12     end up granting in part and denying in part

13     Mr. Stegeby's motion, the government's motion for

14     summary judgment, and I determine that some of the

15     redactions made for privacy reasons are not

16     appropriate and order them to turn over the redacted

17     document.  I suppose that -- you tell me, I mean,

18     most of the time you know who the person is, but I

19     guess you would still want me to ask the government

20     to turn over the unredacted documents.

21         MR. BERLIN:  That's correct, Your Honor.  You

22     alluded to this a couple of times at the last

23     hearing, sort of saying, you know, if you know who

24     these people are, why are you making a federal case

25     out of it, literally.

1          And the answer is that to be useful, or more

2     useful, a document that has a bunch of things cut

3     out of it is less useful and we are trying to get

4     the unredacted documents so that we can --

5          THE COURT:  Use it in trial.

6          MR. BERLIN:  So we can use them at trial, and

7     also there are some places where we think we know

8     who it is -- and some of it there is a lot of guess

9     work.  This is like, you know, looking at these

10    documents is sort of like putting a jigsaw puzzle

11    together with the pieces upside down, you don't

12    actually know all of what you're looking at.  So

13    there are places where there are legitimate

14    questions that we have, we think we know who it is,

15    we think if we're right that those people are public

16    and certainly that there is a public interest and

17    that we're entitled to it, but it's important to

18    have confirmation.  And we don't really want to be

19    in a situation where we try and use these documents

20    and Ms. Ramirez and Mr. Vogt are saying well, this

21    document is not usable because you don't have, you

22    know, complete information.  We want to have as

23    complete a set of the documents as we can.

24          And elevating it more to the purposes -- to

25    the broader purposes of the statute, if those things

1    are properly produced, then they should be properly

2    produced.  And not to put too fine a point on this,

3    Your Honor, but the FBI has -- as Your Honor noted

4    -- literally every time there is a person's name in

5    any document, redact it.  And our position is that

6    that's -- what they're supposed to do is ask the

7    question is there a privacy interest and then

8    they're supposed to ask the question is it

9    outweighed by a public interest and they really

10   appear to have --

11          THE COURT:  They have just redacted.

12          MR. BERLIN:  They don't appear to have done

13   that.  So we're here asking you to do it largely

14   because we believe they did not.

15          THE COURT:  All right.  Let me just see if I

16   have other -- we need to get on to whatever other

17   arguments that you have on the objections.  Give me

18   just a minute.

19          I just want to make the following comments.

20   With respect to the documents that the government

21   has turned over, because I told them I wanted to

22   look at the documents in light of the exemptions

23   that they have asserted, and these are the documents

24   that were not turned over at all, I'm not talking

25   about redacted documents.  My thought as to the

1      exemptions that they have been properly asserted, so

2      I'm not speaking to the fact that I have no idea if

3      I have all the documents and I have no idea what the

4      documents are that haven't been given to me and I

5      can't speak to the duplications.  But I would say

6      for those documents that I have the exemption and I

7      can look at the document, as a general matter I

8      think the exemptions have been properly asserted.

9          The other comment I just wanted to make, and I

10     wanted to make this in the beginning because I

11     thought it might help you as far as tailoring

12     whatever time you want to spend on the objections or

13     the motions.  There was an overall argument that

14     because of the fact that the government asserted the

15     law enforcement exemption 7(a) in the beginning and

16     just carved out all these documents and saying

17     they're exempt because there is an ongoing

18     investigation, that they should not now be allowed

19     to come in and assert these other exemptions.  It

20     does make it hard when we proceed in this matter and

21     I think I said when we were here last, it would have

22     been a lot easier if you'd have told me in the

23     beginning that, you know, if they're going to be

24     these other exemptions so that I would have known

25     this was going to happen.  And I still think that.

1          But my thoughts are I'm going to allow them to

2     assert these other exemptions even though those were

3     not exemptions that were originally asserted.  So I

4     just tell you that because I don't want you to spend

5     a whole lot of time arguing that because I have

6     thought through that and I think I said that

7     essentially at the last hearing, but I'm going to

8     probably -- I haven't written an order yet, but

9     allow them to assert those exemptions.  And I just

10    tell you that so that you can tailor any argument

11    and any other time.

12         The other question I had, Mr. Berlin, is the

13    burden here and so let me just think aloud and you

14    tell me if you agree with this or not.  You make a

15    FOIA request for all of the documents and then it is

16    up to -- the burden is on the government to assert

17    whatever exemptions they think apply and the burden

18    is on them to show that those exemptions apply.

19         Then as far as the public interest is

20    concerned, because the government is arguing that

21    there is really not a lot of public interest here,

22    that you want these documents simply for the trial

23    and in all truth that's probably the main reason you

24    want these documents.  But where does the public

25    interest come in, is the burden on the -- who is the

1       burden on regarding the public interest argument?

2            MR. BERLIN:   I think we talked about this a

3       little last time, but let me -- it was towards the

4       end of the hearing, so let me amplify what I said

5       there.   The burden of the FOIA -- the way the FOIA

6       as a statute is set up is that it presumes if the

7       government has a document, it should be made public

8       unless it falls into one of nine exemptions.

9            THE COURT:   And then the burden is on them.

10           MR. BERLIN:   And the burden is then on the

11      government to assert it.   As I pointed out

12      previously, exemption 3 is a mandatory exemption,

13      they have to assert it, and that's the one that

14      refers to other statutes; as relevant here, the

15      grand jury rule.   The other ones are discretionary,

16      and there is a lot of cases that say you don't have

17      to assert these exemptions.   Sometimes the

18      government says well, it costs a lot of money to

19      assert these exemptions and the courts have said

20      well, you can weigh that because these are

21      discretionary and decide that because FOIA's main

22      purpose is transparency in government and

23      understanding what happens, that you can still

24      produce it.

25           The burden rests firmly on the government to

1        establish the applicability of the exemptions.

2        Where that comes -- to answer your question about

3        exemptions 6 and 7 which have a public interest

4        component, they are, as I said earlier, supposed to,

5        when they get a FOIA request and when they respond

6        to a FOIA request, they are by statute required to

7        take into account the question of is there an

8        unwarranted invasion of personal privacy and that

9        basically involves two things.  One is, is this

10       information subject to a privacy interest; and two,

11       is it otherwise outweighed by a public interest?

12       And they're supposed to make that calculus.

13            Now, when the court reviews that, right, we

14       also as the plaintiff had something to say about it,

15       but at the end of the day they bear the ultimate

16       burden of establishing that.

17            The way this works is sort of like a summary

18       judgment where the moving party has the burden of

19       establishing that they're entitled to summary

20       judgment but certain things happen where it shifts

21       at a particular moment back to the burden of

22       persuasion on a particular issue.  But the ultimate

23       burden on that is still the government's.

24            We have not -- and just to give you an example

25       of this, Your Honor, so one of the people who is

1    mentioned throughout these documents is Bubba the

2    Love Sponge Clem, right?  They have a newspaper

3    article that's one of the pages of their production

4    that talks about his involvement in the matter

5    extensively, right?  So it's a little difficult for

6    the government to come in and say we didn't know

7    that his involvement in this had been made public --

8    just as an example.  I realize that there are other

9    things that have been made public besides just news

10   coverage involving Mr. Clem.  But the government has

11   information in its file that answers the question is

12   there a privacy interest and to what degree is this

13   private or not.  So that's sort of how the burden

14   works.

15       But as a practical matter you said to us

16   towards the end of the last hearing, you are telling

17   me that a lot of these people are public, but I

18   don't actually know that.  You know, my law clerk

19   happened to be aware of Mr. Clem's apology aired on

20   the radio and so that was something I happened to

21   know about or we as the chambers happened to know

22   about, but I don't know all that.

23       And I said okay, we now have more time, that's

24   a fair point, and we have submitted a lengthy

25   declaration from Mr. Thomas that assembles the

1        actual record evidence from the FBI's file, from

2        this court file, from public news reports, and from

3        other sources to demonstrate that, and that record

4        is unrebutted in this proceeding for purposes of

5        summary judgment; there is no factual showing that's

6        been made by the government.

7             And I should add, that declaration doesn't

8        speak to every person who was identified in the

9        documents.  We believe that there are other people

10       that are identified and that their involvement is

11       not public and we haven't come to the court and said

12       -- we've limited to the people who we say look,

13       these are actually the people whose involvement in

14       this is public and if their involvement is public,

15       they don't have a privacy interest.

16            And Mr. Stegeby has an argument about things

17       that are public can still be private and I'm happy

18       to address that.  But to answer your question about

19       the burdens, we came forward and said that.  We also

20       have come forward to try and explain in a little

21       more detail than we were able to -- or actually a

22       lot more detail than we were able to do in open

23       court last time, to explain -- to give some

24       additional background to the arguments about public

25       interest in addition to the ones that we could put

1      in our briefs.  And that's to be of help to the

2      court.  But the ultimate burden on all of the

3      exemptions at the end of the day is ultimately on

4      the government.

5           THE COURT:  Okay.  We're going -- give me just

6      a minute.  I'm going to break -- I'll probably break

7      in another 30 minutes or so, but if anybody needs to

8      recess, let me know and I'll recess.

9           Okay.  Why don't we go to -- we've already --

10     in response to my questions, it is now 10:20.  So

11     why don't we start, Mr. Berlin, with anything else

12     you want to argue regarding the objections.

13          MR. BERLIN:  Let me -- some of what I had to

14     say has already been accomplished in the answers to

15     the question and I tried to do it all at once while

16     I was answering in the hopes to be helpful.

17          Basically there is -- the way this works, as

18     Your Honor now obviously knows, is the first thing

19     we've got to do is to figure out whether we have a

20     complete universe of documents.  We've talked about

21     that and I'm not going to say anything more about

22     that, absent any questions or anything that

23     Mr. Stegeby might say in his part of the argument.

24          The next thing that's supposed to happen is

25     that the government then, if it wants to, can assert

1    exemptions.  I had a sense from the last hearing

2    that Your Honor wasn't so moved by the waiver

3    argument, but there is a different piece of this

4    which I do want to talk about and that's that there

5    is a way to assert exemptions which is to put

6    together a Vaughn index.  And the government has

7    been given a lot of opportunity to put together a

8    proper Vaughn index.  And the purpose of the Vaughn

9    index, as the cases make clear, is really to do

10   three things.  One is, it's to let them still keep

11   the documents that they're claiming are exempt from

12   being seen by me or by you, or unless you order in

13   camera review as you've done.

14        The second is to help you so that you can see

15   what the basis of exemptions are for individual

16   documents.  And the third is to allow us to have

17   some adversarial role in this process so that we can

18   say something.  Let me give you an example, if I

19   may, and I don't mean this in a disrespectful way,

20   but the last time we were here Your Honor looked in

21   some detail at the EOUSA's Vaughn index, you said

22   this looks like a pretty good Vaughn index, and I

23   don't disagree with that, I have some issues with it

24   but it's at least in the right direction.  And there

25   were a couple of documents that were -- you said

```
 1      well, it seems like this is something that's written

 2      by an attorney, it's probably attorney work product.

 3      Right?  And I was able, because the Vaughn index has

 4      had information on it, in responding in our

 5      objections, to say well, I have a question about

 6      whether that's protected by attorney work product

 7      because the date of the document postdates the

 8      actual potential litigation by more than a year.  So

 9      how do we have something that's prepared in

10      anticipation of litigation that's a year late?

11          And you may or may not buy that argument and

12      that's not the point of my argument right now.  The

13      point of my argument is that's an example of if we

14      didn't have that information on the Vaughn index and

15      they were just simply asserting an attorney work

16      product, and even if they gave that you document you

17      might look at it and it might not -- I mean no

18      disrespect to this, it may not occur to you that

19      that's an issue.

20          THE COURT:  The adversarial process.  But you

21      would agree that the Executive Office of the U.S.

22      Attorney's Vaughn index is acceptable?

23          MR. BERLIN:  There is a couple of footnotes to

24      that, but generally yes.  I put some of the

25      footnotes in our papers.  Just to give you one
```

```
 1      example, they have asserted -- their assertion of

 2      the privacy exemption comes with boilerplate

 3      language that is pretty clearly not specific to the

 4      document that they're looking at even just from the

 5      description of it because they're identifying all

 6      sorts of categories of people and it's the same

 7      language and that's really not what they're supposed

 8      to do.  But in fairness I'm quibbling around the

 9      margins.  Generally speaking that's doing what it's

10      supposed to do.

11            The FBI, on the other hand, and this is where

12      I wanted to go next before actually getting to the

13      merits of the exemptions.  Your Honor, we had a

14      hearing -- the first of the hearings was at the end

15      of June and at that point we were arguing about

16      whether we could do this in a bifurcated way.

17      Right?  Mr. Stegeby was saying that the government

18      wanted to do --

19            THE COURT:  The law enforcement.

20            MR. BERLIN:  -- the law enforcement exemption

21      and later on come back and do the others, a position

22      that Your Honor rejected.

23            THE COURT:  And part of the reason was we were

24      working on a time --

25            MR. BERLIN:  Timetable.  But it's not supposed
```

1       to go that way anyway.  And Mr. Stegeby, in making

2       that argument, expressed that if we do a full Vaughn

3       index, we have to go through each document line by

4       line and pull out whatever exemptions apply.  Right?

5       That's more time consuming.

6            And then Your Honor at that hearing and then

7       in the order that came out of that hearing said do a

8       Vaughn index and a supporting declaration and it

9       should be sufficiently specific and contain a

10      sufficient amount of information so that the Court

11      may rule on the claimed exemption.

12           Then we had a hearing early the next month,

13      early the next month, July 2nd, and Your Honor went

14      up there the Vaughn index that the FBI provided and

15      over and over again said I can't really make heads

16      or tails of this because the information that I need

17      is not in this Vaughn index.  And you said I need a

18      particularized explanation for the asserted

19      exemption as to how it applies to that record.

20           And then Mr. Stegeby again said -- and I

21      credit his candor with the court, he said look, in

22      most of the FOIA cases that I've been involved with,

23      the FBI creates a Vaughn index which is page by

24      page, line by line, like the EOUSA did.  And he

25      explained that we didn't do that here because of

1      lack of time.

2            Well, that was in early July; we're now at the

3      end of October, I think we could -- and there is a

4      new -- they gave you a Vaughn index, the newest

5      Vaughn index covers the first batch of documents

6      that they had produced by that time --

7            THE COURT:  But it's essentially the same.

8            MR. BERLIN:  It's essentially the same, but it

9      actually makes a few changes.  And my point is if

10     you were going to go back and make changes, they

11     could have probably accommodated the Court's request

12     to do this properly.  And in that regard if the FBI

13     is going to come forward and say we have properly

14     asserted these exemptions, it really has a

15     difficulty of doing that if months later where they

16     have had that time, haven't delivered a Vaughn index

17     that allows you or us in any meaningful way to

18     know -- sometimes we can glean it from the document

19     and the coding that they have used what they're

20     talking about, but in many cases -- and we've

21     identified a long list of examples -- we can't.  And

22     this is --

23            THE COURT:  But what's the solution?  I said

24     give me the documents, and looked at the documents,

25     and putting aside that there may be discrepancy in

1    numbers.  I realize that that takes some of your

2    adversarial argument away, but how are you harmed?

3         MR. BERLIN:  Well, our harm because we

4    can't -- look, I don't know, we may not be harmed at

5    all.  It may be that if we had the document, we

6    would agree it's something that should be exempt, so

7    it's difficult, but that's the way the process is

8    supposed to work.

9         You have told them repeatedly, sort of

10   separate from the waiver argument, because I hear

11   you on the waiver argument.  But that was sort of a

12   very technical argument that said if you didn't

13   assert it by such-and-such a time in your first

14   pleading, you've lost it.  This is a different

15   circumstance.  And courts have repeatedly found

16   themselves, especially with the FBI, in this exact

17   circumstance where they don't get -- you know, you

18   read this decision, it's like well, this is the

19   third time the cross motions for summary judgment

20   have come because I had to deny them the first two

21   times as moot because I didn't have a proper Vaughn

22   index.  And at some point the court says look, the

23   burden is on you, government, to do this and do this

24   properly.

25         And in this instance you have told them in

 1      your June 24th order and your July 2nd order and

 2      your September 28th order, bring me a proper Vaughn

 3      index.  And you have told them what it means, both

 4      at the hearing and in those orders.

 5          My point to you, Your Honor, is that at some

 6      point -- maybe it's today, maybe it's not today, but

 7      at some point you as the court are entitled to say

 8      and we as the litigant who are not able to

 9      participate because we didn't get it, are entitled

10      to ask you to say enough is enough and if you have

11      not brought me a proper Vaughn index and I have any

12      question about the application of this exemption,

13      unless it's a mandatory exemption, grand jury, you

14      can't assert it.  It's like enough already.

15          That's a different argument than waiver,

16      that's an argument that says you did not comply with

17      court orders, and I want to be clear about that.

18          THE COURT:  Suppose I look at -- in this

19      particular instance, assuming I have the documents,

20      there are not such a large number of documents that

21      I can't look at the documents and look at the

22      exemptions and make a determination.

23          So it would seem to me that even if I decide

24      it's not a proper Vaughn index, I can go back and

25      look at the documents and it just seems form over

1    substance now to say go back and do a third or

2    fourth Vaughn index.

3         MR. BERLIN:  Or do it once the right way.  But

4    yes, I hear your point on that.  The answer to that

5    question is it really --we are then left -- and

6    obviously you're going to do it that way because

7    you've now looked at the documents, but we are left

8    essentially relying --

9         THE COURT:  Trusting me.

10        MR. BERLIN:  Rely -- of course we trust you,

11   Your Honor.  But we're relying on you to make sure

12   that the calculus is right.  And so to that end, let

13   me, before coming to the privacy thing which I think

14   is the meat of this because that's by far the most

15   exemptions.  Most of the stuff that was withheld was

16   not withheld on privacy grounds.

17        THE COURT:  No.  You're right.

18        MR. BERLIN:  There are a few.  And I didn't

19   take your comments to say I necessarily think that

20   the privacy issue is, you know, this is going to be

21   decided against you on all counts, but on some of

22   these other exemptions.  And let me just say the

23   following about the other exemptions and then turn

24   to the privacy since they really relate to the

25   withheld documents.

```
1              On the grand jury, we don't disagree that if

2      there is a legitimate grand jury stuff, it doesn't

3      get produced.  The question we have is that there is

4      no evidence in this file, none, that there was

5      actually a grand jury impaneled.  You may have seen

6      it in documents that you reviewed.  We have seen

7      some grand jury subpoenas, but that's something that

8      a prosecutor --

9              THE COURT:  I have not seen it in documents

10     that I have reviewed.

11             MR. BERLIN:  Right.  So we don't -- and the

12     point of the grand jury secrecy rule is not to say

13     anything that ever touches a grand jury is secret,

14     it says that the things that would reveal the

15     workings of the grand jury are secret.  The

16     difference -- but if there was in fact no grand

17     jury, and they have not made that showing in

18     anything I have seen and it sounds like they have

19     not made that showing in anything you have seen --

20             THE COURT:  Well, I will tell you that I had

21     thought that Mr. Stegeby said in his response to

22     your objections that in the declaration that the FBI

23     furnished, I think the third declaration that he

24     stated there was, but I went back and looked at that

25     and I couldn't find that.  So that's one of the
```

1          questions I have for Mr. Stegeby.

2               MR. BERLIN:  And let me help, Your Honor.

3          There is actually a sentence in the thing, in

4          Mr. Hardy's declaration, that says there was a grand

5          jury declaration, there was a grand jury proceeding

6          and a grand jury was impaneled.  It does not, right,

7          and I would say to you, especially given all of the

8          other issues with the things that Mr. Hardy has put

9          in sworn declarations that have turned out not to be

10         right, that that is not -- that is not evidence

11         submitted on personal knowledge.  Mr. Hardy is the

12         one looking at documents and if he's looking at the

13         same documents that you are looking at and there is

14         no evidence that there is grand jury, what's the

15         basis of that assertion?  Maybe there is an answer

16         to that question, but I would ask Your Honor to get

17         to the bottom of that before concluding that this

18         stuff is grand jury material.

19              I would also say that the grand jury -- that

20         in the records, if there were a grand jury convened,

21         one of the things you would expect to see is a

22         transcript of grand jury proceedings because they're

23         required by federal rule to be transcribed and

24         presumably they would be in the U.S. attorney's file

25         for this matter.  We have no -- there is no

1      withholding of transcripts.  There is withholding of

2      subpoenas, there is withholding of correspondence

3      with people, there is withholding of materials that

4      people submitted, but if the U.S. Attorney's Office

5      is using grand jury subpoenas as opposed to some

6      other form of subpoena, administrative subpoena,

7      whatever, but there is no grand jury, the case law

8      is quite clear that that is not subject to being

9      withheld under FOIA.

10          And so my request to you if you're not going

11     to require a Vaughn index and you want to just rule

12     on what admittedly a small stack of these documents

13     for which they're claiming grand jury, is that

14     before you would get to the -- reach the conclusion

15     that this is grand jury material, that you would

16     press them to make sure that it in fact is the kind

17     of thing that properly falls within the statute.

18     And if you've done that and are satisfied, then

19     obviously we will accept that and we don't otherwise

20     contend that things that are properly grand jury

21     material need to be produced.  We just have a

22     serious question as to whether this stuff falls into

23     that category, or at least all of it.

24          The second one is the deliberative process

25     privilege; they have asserted that on a few

1      documents.  And the only thing I would say there,

2      Your Honor, is that there is a test for that, it

3      obviously has to be pre-decisional, which Your Honor

4      I think is probably aware of from other cases, and

5      significantly that it requires that factual material

6      -- let's say there is a memo and somebody, you know,

7      we all get memos from -- let's say they got a memo

8      from a law clerk.  I'm making this up because I

9      haven't seen the document.  And they say here's the

10     facts as with we understand it, here's our legal

11     analysis.  Right?  The factual portion of that is

12     not subject to being withheld under the deliberative

13     process privilege.  There may not be anything like

14     that, but we would want to make sure that because

15     these exemptions are supposed to be applied narrowly

16     and only to the material that it properly applies

17     to, that that's the case.

18          And then lastly, with respect to exemption

19     7(e) which relates to law enforcement techniques,

20     there are a number of things that they have withheld

21     that appear to be basically standard issue

22     government forms, right, in many instances that you

23     could pull up on the internet and look at.  So, for

24     example, they have withheld an evidence log on the

25     grounds that the logging of evidence would somehow

```
1        be a -- reveal a law enforcement technique and, as

2        the test requires, that it would compromise their --

3        you know, basically lead to the violation of a law.

4        Right?  And we have some skepticism about that.

5        Now, I don't know, there may be there is nothing I

6        scare about on those documents, I don't know, again,

7        this is like the puzzle with the pieces upside down.

8        But the idea here is that if you are going to do the

9        in camera review and we don't even get a Vaughn

10       index to say hey, here's our issues, that we need to

11       just make sure, hopefully through this argument,

12       that the constraints on what is and is not within

13       these categories is narrowly construed by Your

14       Honor.

15            And with respect to the law enforcement

16       techniques, there was a long list of documents that

17       have been redacted in addition to some that have

18       been withheld in ways that from the redactions it is

19       very difficult to make the case at least as we can

20       see it -- again we can't see all of the information

21       -- that this is a law enforcement technique.  And

22       not just any law enforcement technique, but one that

23       if we revealed would likely lead to criminal

24       activity by being able to circumvent that technique.

25       Right?
```

1          So, you know, in the classic example, so the

2     government can't come in and say it's a law

3     enforcement technique subject to exemption 7(e) that

4     we record telephone calls, because everybody knows

5     that the government does that.  That's not a secret

6     law enforcement technique that if it got out would

7     allow people to circumvent that.  There may be

8     specifics about how they do that or so forth that

9     would, but the general premise of what they're doing

10    has to be something that falls into that category

11    and that requires if we can't participate in that

12    through a Vaughn index, for you to sort of

13    scrutinize that in a way that makes sure that we're

14    not -- they're not overreaching.  And given the

15    number of documents that we can see -- I have a list

16    that I could supply at the break -- but there is a

17    long list of documents that we can see that are

18    redacted where we have serious questions about

19    whether that is being asserted.

20         So if Your Honor is going to make those

21    determinations in the absence of a proper Vaughn

22    index from the FBI, then we need to just urge that

23    the Court be sensitive to the concerns that I've

24    outlined so that we're not doing it because --

25    without that adversarial process, Your Honor might

1     look at a document and say yeah, that looks like

2     something that's a law enforcement technique or

3     yeah, that looks like something that's work product

4     and it may not be, and so we're asking for that.  If

5     Your Honor reaches that conclusion even with the

6     benefit of that, then obviously we respect that

7     decision and we would expect that the cross motions

8     for summary judgment would be resolved against us

9     and in favor of the government on those with respect

10    to those particular documents.

11         THE COURT:  Let's move on to the privacy.  Let

12    me just tell you, and you maybe intend to do this,

13    but at some point it's helpful to me to -- I mean,

14    there are individuals that we all know we're talking

15    about that have been redacted.  There may be other

16    individuals as well.  But it would be helpful to me

17    if we would talk specifically regarding specific

18    redactions, in other words, individuals that we all

19    know have been redacted and why they shouldn't have

20    been.

21         MR. BERLIN:  Would you like me to do it sort

22    of categorically by person?

23         THE COURT:  That might be helpful.  I don't

24    know how you were going to do it, but.  Do it

25    however you want, but at some point I can envision

1        my making a decision based on certain individuals,

2        if I instruct the government to turn over this

3        unredacted document.

4            MR. BERLIN:  I mean, my -- because the

5        government has made no factual showing about this

6        other than to assert the exemptions, my view -- I

7        happen to talk about that because I would like the

8        Court to be comfortable with what we're talking

9        about, but the record as it stands now is factually

10       unrebutted.  But it would seem that it would be a

11       lot easier for Your Honor, rather than going through

12       what amounts to 1,500 pages and saying I find this

13       on this particular redaction or I find that on that

14       particular redaction, to deal with people by

15       category, right?  If you decide, for example, that

16       Bubba Clem's identity is sufficiently well known

17       that his identity should be unredacted, it's

18       probably a lot easier to say just go through the

19       documents and do that.  So it would seem to me that

20       the way you proposed to proceed makes a lot of

21       sense.

22           Let me start with the person who's redacted

23       affidavit, as best we can tell, the most and that's

24       Keith Davidson.  Mr. Davidson has been identified in

25       a lot of different ways publicly.  He has identified

1    himself in court proceedings in California over a

2    subpoena to him.  He is identified by Mr. Bollea's

3    counsel both in that proceeding and in the state

4    court proceeding.  He has significantly been

5    identified by the government in this proceeding in

6    public court filings.  And he has been identified

7    and there has been a lot of news coverage of all of

8    those filings in the national press, identifying him

9    as the subject of this investigation.

10         It would seem to me that given all that, the

11    notion that Mr. Davidson's identity as connected to

12    this investigation is private is somehow fanciful,

13    right?  I mean, it's not -- there are cases that say

14    something that is practically obscure or something

15    that technically you could get but isn't really

16    public might not be public for this purpose, but

17    that's not the situation and that's not the

18    situation with really any of these people because

19    their identities are so well known.

20         So it would seem to me that the first order of

21    business is to say to the government, okay, we all

22    know that this involves Keith Davidson, you all have

23    told me that, he has said that, there has been news

24    coverage of that, I don't even have to get to the

25    public interest question because before I get to the

1    public interest, the first question is "is it

2    private" and that's not private.

3        I think the same thing is true with respect to

4    Bubba Clem.  Bubba Clem has been very vocal about

5    his involvement in this matter, he has talked about

6    it extensively on national radio programs, Howard

7    Stern, on his own radio program, he issued an

8    apology about the events that underlie this

9    investigation on his program -- which is one of the

10   audio files that was produced to us.  He has -- he

11   was deposed in our case.  He did not designate

12   anything in his deposition to be confidential.

13   Significant portions were filed in state court's

14   party's cross motions for summary judgment.  The

15   media then went through the cross motions for

16   summary judgment and reported at some length about

17   what Mr. Clem's own involvement in.  He then went to

18   his radio program the next day and said if you read

19   this article, now you know the whole truth and I'm

20   glad that it's out there.

21       In those circumstances, taking the position

22   that here's a person who we don't know that's

23   connected to this, I mean we all understand that

24   this investigation arose out of a tape that involves

25   Mr. Bollea and Ms. Clem and that Mr. Clem was there

1    and that's been public now for more than three

2    years.  And to, again, it's sort of like that cat is

3    out of the bag and to try and say that for the

4    government that there is a privacy interest for a

5    person who has so made his story, his voice, his

6    image, all public, that that is really -- doesn't

7    pass really the sniff test to me.  I think that

8    that's the story.

9        I also think, you know, you asked about some

10   of this, our understanding of the facts is that

11   having seen the portions of the videos that we were

12   allowed by the state court to see, is that he's not

13   involved in any sexual conduct personally.  So the

14   one sort of question that you would have which is

15   does any of this relate to something that's

16   sensitive as to him, the answer to that is no.

17       The third category of people are the agents

18   and government officials.  So Jason Shearn from the

19   FBI, Sara Sweeney from the U.S. Attorney's Office,

20   Robert Mosakowski from the U.S. Attorney's Office,

21   these are all people who have been put front and

22   center, they have not made it a secret that they

23   were involved in this investigation.  Long before

24   this proceeding began, they had openly shared that

25   with me.  But more importantly, their involvement is

1       reflected in public court filings in this case and

2       in the state court case without any objection from

3       them when we -- in fact, there was a point in the

4       state court case where there was an issue about

5       whether or not the government might assert a law

6       enforcement privilege as to certain documents that

7       were in Mr. Bollea's possession and we went to

8       Ms. Sweeney and had an email exchange with the

9       express purpose of attaching it to a court filing to

10      basically memorialize the government's position.  So

11      this is not a situation where that's the case.

12      Look, I'm not disputing the notion that targets of

13      investigations, witnesses in investigations, or

14      agents involved in investigations, can in different

15      circumstances have a privacy interest.  And

16      certainly with respect to agents, if this were a

17      case involving a confidential undercover agent, if

18      this were a case involving prosecution of a violent

19      crime where the person's safety might be involved,

20      that would be one thing.  But the sole justification

21      for the keeping the agent's and official's names

22      confidential that's offered in Mr. Hardy's

23      accompanying -- the declaration that accompanies his

24      Vaughn index is that if their identities were known,

25      they might face harassment from the target of the

1    investigation even if the person is not prosecuted.

2    And here there is no question that everybody knows

3    that they were involved, including significantly

4    Mr. Davidson.  And to basically say we need to keep

5    Mr. Davidson's identity private because he's the

6    target and then we need to keep their identities

7    private because Mr. Davidson might, if he knew who

8    they were, harass them when he already knows who

9    they are because, for example, Mr. Shearn was

10   present when he was detained after the sting

11   operation and presumably he or his counsel dealt

12   with Ms. Sweeney in terms of the decision whether to

13   prosecute.  That justification doesn't hold up in

14   these circumstances.  Let me just grab --

15        THE COURT:  What about lawyers?  We've got

16   Bubba Clem's lawyers, we've got Heather Clem's

17   lawyers; what about lawyers?

18        MR. BERLIN:  I don't -- I mean, look, there is

19   sort of two points to be made here.  One is that I

20   don't believe -- I mean, when people are doing their

21   job, that's sort of not -- and they're doing it in a

22   public way, that's not something that typically

23   involves what normally is understood to be a

24   personal privacy interest.  Right?  When I'm here

25   representing Gawker, I don't then get to say well,

1    geez, I'm here representing Gawker, but tell

2    anybody.  I'm here, we're in open court, there is

3    press sitting in the back, that's part of the job.

4         THE COURT:  You're on the docket sheet, the

5    docket sheet is public --

6         MR. BERLIN:  I'm on the docket sheet and so

7    forth.  In the case of Heather Clem, it was not a

8    secret that they were involved and appeared

9    regularly in court, that Barry Cohen and Michael

10   Gaines of the Cohen Law Group were her lawyers and I

11   don't think that their representation of her has

12   been a secret.

13        In the case of Bubba Clem, certainly the

14   lawyer-client relationship between Mr. Diaco and

15   Mr. Clem is probably one of the better known

16   relationships at this point in this venire, but also

17   true in terms of this case.  I mean, right, it's not

18   a secret that he was the lawyer, including that he

19   was regularly quoted in the press representing

20   Mr. Clem.  And I just think that their role

21   functioning as lawyers in connection with the matter

22   that is -- where everybody knows that they're the

23   lawyers representing these people is not the kind of

24   thing that has a personal privacy interest.

25        THE COURT:  Okay.  What about Howard Stern,

1      Mike Walters, Harvey Levin -- the TMZ guys and

2      Howard Stern?

3          MR. BERLIN:  Here's what happens.  You have an

4      FBI file and without getting into specifics, part of

5      the thing that the FBI is noting is that there are

6      statements being made on the Howard Stern radio

7      show, there are statements being made to people, the

8      people you just mentioned and others at TMZ.  Right?

9      Those things are public.  If you tune into Howard

10     Stern's radio show or you look up a program of that

11     particular date on the internet, you can see that

12     Howard Stern interviewed Bubba Clem or Howard Stern

13     interviewed Terry Bollea, you can see that TMZ

14     interviewed Terry Bollea and his lawyer.  When you

15     go on national television in the case of the TMZ, or

16     radio in the case of Howard Stern, or on the

17     internet in the case of both of them, as a media

18     personality you don't expect to have a personal

19     privacy interest in connection with that.

20         And what's going on here -- they're not

21     involved in the -- if you read the documents,

22     they're not involved in the investigation where

23     somebody is going to talk to them and saying what do

24     you know about this; they're involved in the

25     investigation simply because the FBI is noting

1        here's what's going on.  And when the FBI refers to

2        that, their reference to say, well, Bubba Clem went

3        on Howard Stern's show or Terry Bollea went on this

4        show and said thus and such, to redact their name is

5        sort of -- that's not protecting a privacy interest

6        as I think anybody understood it when this exemption

7        was put into place and it's designed to protect

8        people, you know, innocent people who get caught up

9        in an investigation in a way that it would reflect

10       badly on them.  But nobody is going to -- you know,

11       that's not going on reflect badly on them because

12       everybody knows that that's why they're being

13       mentioned is because their involvement has already

14       been literally broadcast nationally by them.

15               THE COURT:  As I recall, Houston, David

16       Houston signed a waiver, but what about -- isn't

17       that right?

18               MR. BERLIN:  That's correct, Your Honor.

19               THE COURT:  What about Christy Rozier, who is

20       his business manager?

21               MR. BERLIN:  I mean, this is sort of a little

22       bit of -- you know, if I thought about it, we might

23       have said look, okay, we need it for all the people

24       in your office particularly because Mr. Houston just

25       by personality tends to dictate a lot and then

```
 1        she'll send out the email or whatever with a

 2        dictated by her stamp at the bottom.  But her role

 3        as his business manager and person who does this for

 4        him is well known.  We cited in our affidavit a

 5        place where you can go to TMZ where there is a

 6        letter published from David Houston which has her

 7        identified as the sender and also in the letterhead,

 8        she appears on his letterhead as a person.  And I

 9        don't think that -- again, her role in this is not

10        because she has any involvement in this directly,

11        her role is because she's essentially assisting

12        Mr. Houston and working for him and it's in that

13        sense not really -- it's not any different than when

14        I'm here -- you know, last time -- Mr. Stegeby is

15        not here today with his paralegal, but his paralegal

16        came to court the last couple times; she doesn't get

17        to say don't tell anybody that I'm involved in these

18        matters that my supervising attorney is involved in

19        and that's essentially what this is.  It is

20        something that is not really a privacy interest, but

21        her connection to all of this is known.

22             THE COURT:  Okay.  I tend to agree with you so

23        far, although I haven't heard from Mr. Stegeby.

24        However, a concern I do have is there are a couple

25        of references to Mr. Hogan's former wife, his
```

1      current wife, and his children.

2           MR. BERLIN:  Right.  And those are simply

3      passing references.  They were not -- anything

4      that's -- I don't think there is anything more than

5      this; again, I'm operating with incomplete

6      information.  But what I'm talking about is where

7      the text that we've been given already says

8      something like, you know, "And Mr. Bollea's wife,

9      blank," or "And Mr. Bollea's son, blank," or, "And

10     Mr. Bollea's ex-wife, blank," and the notion that

11     we're referring to a person who is a readily

12     identifiable person but taking out the name, it's

13     silly, right?  And our point is simply that this

14     is --

15           THE COURT:  Maybe.

16           MR. BERLIN:  -- that this is silly.  And truth

17     be told, look, there may have been the situation

18     that if the government was wanting to protect the

19     person's privacy, they would have redacted the part

20     that also identified them.  But once we have gotten

21     to the point of having them identified as a distinct

22     individual, the premise of then saying but

23     withholding their name is a problem, that might

24     be -- and look, even if you would assume that let's

25     say it was your family where people are not known,

1         this is a family who when you say Terry Bollea's

2         wife, people know who that is.  When you say Terry

3         Bollea's ex-wife, son, daughter, people know who

4         they are because they all appeared for years on a

5         reality television show.  So they have their own

6         sense of that is a known individual in a way that an

7         ordinary person who has not been on a reality

8         television show, who is not a family of a celebrity,

9         might not.  And so --

10             THE COURT:  I'm not exactly familiar with that

11        show, but that's the former wife and the children?

12             MR. BERLIN:  Right.  His ex-wife, Linda

13        Bollea, Nick Bollea, Brooke Bollea -- they sometimes

14        go by Nick Hogan or Brooke Hogan, using his

15        professional name -- they were all for several

16        reasons so a reality television show called *Hogan*

17        *Knows Best* in which it basically profiled the family

18        in different sort of situations.  And then there was

19        a spin-off, as these things go, where his daughter

20        Brooke with her own show called *Brooke Knows Best*

21        and that went on for a couple of seasons.

22             So my point is in those circumstances the

23        notion that -- if they were referenced as they had

24        some actual connection to this, that would be a

25        different story and maybe they would have a privacy

1        interest.  But this is literally like a passing --

2        as I understand it, the examples I've seen are

3        passing references where they're identified and you

4        know who they are, but the FBI has sort of pursued

5        this fiction that we will identify a person as Terry

6        Bollea's wife, ex-wife, son, daughter, but white-out

7        their name because their understanding of the rules

8        is we have to redact their name, and I don't think

9        that's what the statute contemplates.

10            THE COURT:  That's my list.  Anything else?

11            MR. BERLIN:  Let me just -- there are a couple

12       places -- and we put this -- and Mr. Thomas had this

13       in his declaration, where the government has

14       actually redacted Mr. Bollea's name --

15            THE COURT:  Nicknames.

16            MR. BERLIN:  -- but they're nicknames or

17       pseudonyms.  That appears both in various documents

18       including agreements and so forth.  That may have

19       just been an oversight because they may not be aware

20       of them, but having brought that to the Court's

21       attention, obviously if he's waived his --

22            THE COURT:  Right.  Okay.  I had that on my

23       list, I just forgot it.

24            MR. BERLIN:  Let me make sure I'm not omitting

25       anything from that list.  As I said, Your Honor,

there are a number of people whose identities are

mentioned in this documents where we have not tried

to make the showing that they're public because we

don't think that they're public.  They may be a

public interest, that's a different question, but

this is limited to the people who we really truly

think are public.

        But there is one place also which we've noted

in the very last paragraph of Mr. Thomas's

declaration where Davidson is also referred --

refers to Mr. Bollea by a pseudonym and we would ask

that that -- because that's obviously been waived,

be unredacted.  And I think that's it on the

question of public.

        THE COURT:  Okay.  Anything else regarding

your objections?

        MR. BERLIN:  Well, I wanted to just say a word

about the public interest, if I could, Your Honor.

My view about this is that the vast majority of

redactions for privacy that we care about would be

taken care of by what I just said because if they're

public, you don't get to the public interest prong,

right, because you're balancing a private interest

against the public interest.  If there is no real

privacy interest, you don't have to do the

1      balancing.

2          But let me just say a word about the public

3      interest in this investigation, particularly for

4      people like the U.S. Attorney's Office personnel and

5      the FBI, just as an example.  There are basically

6      three strands in the case law that allow -- I'm

7      simplifying a little bit here, because all these

8      cases are sort of fact specific, but there are three

9      categories in the case law of public interest that

10     are recognized to overcome privacy.  The first is

11     when you assert that there is government misconduct,

12     right?  And you asked about this earlier and there

13     is -- I have a couple questions about this.  I do

14     have some questions about how -- there were three

15     DVDs produced and easily the most interesting audio

16     of the three was turned over in the middle of a DVD

17     where before and after it wasn't.  That could have

18     just been a dumb coincidence, but it at least raises

19     a question.  But that's really not the point of my

20     public interest argument.

21          The point of my public interest argument goes

22     to the third and second strand.  The second strand

23     is this.  There is a public interest in

24     understanding how the government makes decisions,

25     right?  And you don't need to say that there is

1    misconduct to say I want to understand how the

2    government makes decisions.  And the decisions that

3    are being made here, which involve sort of

4    significant issues of in my judgment about how the

5    FBI does its job, how the prosecution and the U.S.

6    Attorney's Office does its job, is this.  You have a

7    situation where Mr. Bollea, it's well known,

8    complained about Mr. Davidson saying he was being

9    extorted.  The FBI investigated for several months.

10   There are audio recordings, there is 302s, there is

11   a full investigation resulting in a sting operation,

12   and then it turns out that sometime a few months

13   later in a letter that we don't have, the U.S.

14   Attorney's Office says we're declining to prosecute.

15   So this is sort of an interesting set of

16   circumstances, especially given the substantial

17   public interest that's already happened both in the

18   state court case against Gawker and in this case

19   about this FOIA matter about the investigation.

20        And the real issue is this.  One way of

21   looking at this is to say when you -- if somebody

22   comes to you and says if you don't pay me money, I

23   will release information about you, that's

24   extortion.  And then there is a question as to why

25   was that person who did that not prosecuted, right?

1      That's a fair question and one would like to know

2      the answer to that, right?

3         The flip side of that is also true, which is

4      you might look at this and say when somebody comes

5      and threatens you -- if somebody comes and threatens

6      you and says if you don't do X, you don't pay me a

7      hundred thousand dollars, I'm going to murder you,

8      that's clearly extortion because what you're

9      threatening to do is prohibited by a criminal

10     statute.

11        But there are some people who would look at

12     this and say well, geez, if what the "or else" is,

13     if you don't do this, you don't pay me money, and

14     what you're threatening is essentially to engage in

15     speech that is true and newsworthy and therefore

16     protected by the First Amendment, that that can't be

17     extortion.  And there are cases on this which we've

18     cited in our papers.

19        The idea here is not -- you don't need to

20     resolve that question, I'm not asking you to decide

21     that question, I'm simply saying that that's why

22     this is an interesting question because we have a

23     situation where you have some people who will look

24     at this and say that was extortion, how come this

25     guy didn't get prosecuted, and you'll have other

1    people look at this and say, boy, this is a

2    celebrity that's trying to use the government to

3    protect his reputation and maybe that's not a good

4    use of government resources and it was good that he

5    didn't get prosecuted since what he is essentially

6    being threatened with is truthful speech about a

7    matter of public concern at a time when -- you know,

8    by the time this investigation was going on, your

9    colleague on the federal bench, Judge Whittemore,

10   had already issued a couple of decisions finding

11   just that, right?  So there are more that come later

12   from the state appellate court.

13       So this is the question.  And the whole point

14   of FOIA is to be able to say we would like to have

15   information about how this went so that we can

16   understand that.  And if you get the information and

17   it's got all manner of holes in it, it's harder to

18   assess whether that's what's going on.  That's

19   really the second strand of the public interest.

20       The third strand, and this is illustrated most

21   directly by the *Potter* case that's cited in our

22   papers, but the third strand is that getting

23   information for a civil lawsuit in certain

24   circumstances can be a public interest.

25       Now, I want to be clear, I don't want to

1    overstate this because most of the cases say look,

2    FOIA is not a discovery tool, we're not worried

3    about private litigation, we're worried about public

4    interest.  And the reason for that is that -- where

5    this comes up most frequently is criminal defendants

6    or people who are convicted --

7          THE COURT:  Sure.  All the time.

8          MR. BERLIN:  -- come in saying I want all the

9    information about all the witnesses who were

10   testifying against me at trial, and the courts would

11   be inundated and usually that's with no, you know,

12   there there.

13         So part of the reason why we submitted this

14   lengthy declaration for Mr. Thomas that -- there are

15   two that came with our objections, one was public

16   which dealt with the questions we just talked about

17   in terms of who's already known to be public and the

18   second was a different set of things and I don't

19   want to go into it in detail because it's

20   confidential for a reason.  But the showing that

21   we've tried to make is that the part of the issue

22   here is that the overarching purpose of FOIA is to

23   improve the functioning of government, right?  We

24   look at the government, we understand how it works,

25   right?  But you can't, as an ancillary benefit, as

1       an ancillary basis of FOIA and assertion of

2       exemptions essentially allow a governmental

3       proceeding in this case, a state court judicial

4       proceeding, to be -- for lack of a better word --

5       limited or corrupted by not having complete

6       information when there is as we have shown in this

7       declaration I think substantial evidence that what

8       is being told to the state court differs in material

9       respects from what is being told to the FBI.

10              And that interest which is -- and again, I

11      don't think that -- you can't just come in and say I

12      need this for a civil lawsuit, that doesn't get me

13      anywhere, I have to make the seeing that I've made.

14      But with the showing I've made, I do think there is

15      a public interest in the FOIA process not being used

16      or the exemptions in the FOIA process not being used

17      to allow somebody who has called upon the government

18      to investigate an alleged crime, to shield

19      information when they are a plaintiff in a civil

20      case and making dramatically inconsistent

21      statements.

22              So those three strands, I'm relying really on

23      the second and third, I have some questions about

24      the first, but that's really the public interest

25      argument that I would advance.

1          Unless Your Honor -- and I think that that

2     allows Your Honor to disclose -- I mean, look, as a

3     practical matter disclosing the individual,

4     unredacting the names of the individuals that we

5     covered in the prior section of my argument probably

6     gets me 90 percent of the documents unredacted

7     because that's most of the people.  There are people

8     that are not unredacted and we understand that and

9     we think that the public interest argument that I

10    just made would allow unredacting the rest of them

11    because the balance tips in that favor.  But we at a

12    minimum would ask for you to focus first and

13    foremost on the fact that these people are not

14    private or don't have that sort of privacy interest

15    in any meaningful sense even before you get to the

16    public interest and that's the way it should go.

17         The first question is is there a privacy

18    interest; if there is not, you don't need to balance

19    it because it's not an interest that gets balanced.

20         So unless you have any questions, Your Honor,

21    I will sit down and let Mr. Stegeby do his thing and

22    then hopefully say a few words very briefly in

23    response.

24         THE COURT:  All right.  Mr. Stegeby, before

25    you start, let's take about a 10-minute recess.

1          Maybe until -- it's 5 after 11, maybe until 11:15.

2                    (Recess was taken from 11:03 until 11:14 a.m.)

3               THE COURT:  All right, Mr. Stegeby.

4               MR. STEGEBY:  Yes, Your Honor.

5               THE COURT:  I will tell you that over the

6     recess Ms. Kirkwood went back and looked what she

7     was given the day of our last hearing and she

8     thought they were part and parcel of the FBI

9     documents, but we do have those documents that you

10    referred to earlier that you thought you had given

11    to us on the day of the hearing.

12              MR. STEGEBY:  Yes, Your Honor.

13              THE COURT:  I have them.

14              MR. STEGEBY:  Great.

15              THE COURT:  I haven't looked at them because I

16    didn't know I had them, but I have them.  So that

17    puts us closer to the number.  We're still not

18    exact, but closer to the number.

19              The other thing, since we're on that subject,

20    let me ask you a couple questions, then I promise

21    I'll be quiet and let you proceed.  Mr. Berlin

22    suggested, because we were having some problems with

23    trying to figure out what's the universe of

24    documents, a declaration by Sara Sweeney of this

25    U.S. Attorney's Office regarding the AUSA documents

1    and a declaration by Jason Stern from the FBI saying

2    I suppose something to the best of their knowledge

3    these are all of the documents.  What is your

4    position on that?

5         MR. STEGEBY:  Your Honor, I may have sort of

6    an interim approach before we go there.  I would

7    prefer not to have federal employees swear to all

8    the documents because they may not know where all

9    the documents are.

10        My understanding is that the documents that

11   the FBI have, they are up in West Virginia, so the

12   people who deal with the documents and are making

13   all the redactions and withholdings would be likely

14   part of Mr. Harder's FOIA team.  So that's why I

15   presume that they would be the ones who would be in

16   a better position to address the number of

17   documents.

18        THE COURT:  All right.  What about

19   Ms. Sweeney?

20        MR. STEGEBY:  Ms. Sweeney, she too probably

21   does not have all of the documents herself.  I've

22   seen the file that she has and we certainly could

23   attest to the number of documents we have there.  We

24   don't know if the EOUSA themselves have produced any

25   documents that would add to the number of documents

1     that we have in our file locally.  My understanding

2     is that when we got the FOIA request, the EOUSA

3     asked our office to copy our file and send it up to

4     them so they have all those documents.  They may

5     have added documents on their own, I don't know

6     that.

7          THE COURT:  Okay.  So, all right, you said you

8     had an interim suggestion, but maybe -- are you

9     telling me the interim suggestion is to have a

10    declaration from someone else that you said has

11    better knowledge, or are there some other

12    suggestions?

13         MR. STEGEBY:  I do have another thought, Your

14    Honor.  I guess it could be sort of like either

15    formal or informal mediation where the parties get

16    together and if I'm told which documents are

17    missing, I can try to track them down and if that

18    satisfies the court and the other side, I think that

19    would be the better way.

20         THE COURT:  Well, when you say informal

21    mediation, I picture a mediator with you.  Are you

22    saying an informal meeting with Mr. Berlin and/or

23    someone else from Gawker?  Or a mediator?

24         MR. STEGEBY:  Your Honor, either way is fine

25    by me, whether Gawker's attorney, Mr. Berlin, would

```
1        agree to an informal meeting between him or someone

2        else who represents Gawker and myself and him simply

3        giving me a list of documents that they believe are

4        missing, I can go and track them down.  I've

5        mediated FOIA cases as well and that's been a pretty

6        good -- we've had good luck with that.

7                THE COURT:  Okay.

8                MR. STEGEBY:  So either way is preferable to

9        me.

10               THE COURT:  All right.  Mr. Berlin, I will

11       come back and ask you that question in a little bit.

12               Mr. Stegeby, frankly, and I will tell you

13       several things before we start and maybe will help

14       you as far as tailoring your arguments or concern.

15               As I said to Mr. Berlin, even though the other

16       exemptions were not asserted by your office in the

17       very beginning, I'm still going to consider them so

18       you can make an argument if you want, but I wouldn't

19       spend a lot of time on it.

20               The other thing I will tell you, and I went

21       through each individual with Mr. Berlin, I'd be

22       happy, you can do the same if you would like, but I

23       am inclined on the privacy as far as most -- maybe

24       all, but I'd have to go back and look -- most of the

25       individuals to find that there is no privacy
```

1    exemption.

2        And as far as the other thing, I just wanted

3    to say in the beginning some of the withheld

4    documents, a couple of them, not many, just a

5    couple, are what I consider tweets and I still don't

6    understand this, but I'm assuming the tweets are

7    from one individual to another, not something like

8    "follow me" or tweeting to the world.

9        MR. STEGEBY:  Your Honor, I actually don't

10   know how to use Twitter myself, so I don't know

11   exactly what it is.  What I do know is I presume

12   you're talking about the three separate individual

13   documents like 1174, 76, and 78.

14       THE COURT:  Right.

15       MR. STEGEBY:  I have looked at those.  For the

16   most part, depending on your ruling as to whether a

17   person has a privacy interest or not, all of those

18   tweets contain some personal information.  There is

19   one, I think it was on 1174, the one up to the right

20   corner, that did not identify anyone as far as I

21   could tell.

22       But this argument may be moot based on your

23   ruling when it comes to whether a privacy interest

24   exists or not.

25       THE COURT:  Right.  And I would agree that

1       that person or persons -- that person is not

2       identified, I agree with that wholeheartedly.

3               I think I had one other question regarding

4       what I've got here besides that.  With respect to

5       the grand jury documents --

6               MR. STEGEBY:  Yes, Your Honor.

7               THE COURT:  I don't have the grand jury

8       documents.

9               MR. STEGEBY:  Yes, Your Honor.

10              THE COURT:  I was trying to find where it is

11      on the Vaughn index, but Mr. Berlin is telling me he

12      hopes that I consider such-and-such and

13      such-and-such in order to make that determination

14      and you haven't turned over the grand jury documents

15      to me.

16              MR. STEGEBY:  Yes, Your Honor, and I don't

17      have them either.  The FBI was adamant that they

18      would not produce them to us.  We're not in a

19      position to push them harder than we have done.

20      Your Honor has --

21              THE COURT:  How can I rule on those other than

22      "trust me, these are all grand jury documents"?

23              MR. STEGEBY:  I can go back with a suggestion

24      that they produce the documents to the Court.  We've

25      tried, Your Honor; we have been unsuccessful so far.

1          THE COURT:  Maybe if they're concerned about

2     you, maybe they could produce them to me.  I don't

3     know, other than "trust me, these are grand jury

4     documents," and the description that you have which

5     is very brief description, it's hard for me to

6     really make any kind of determination.  With that

7     said.  I don't have the grand jury documents.

8          One other question I think I had before we

9     started.  Did I remember this incorrectly?  In your

10    response to Mr. Berlin's objections, and I said I

11    was going to ask you about that, didn't Mr. Hardy's

12    declaration, I think it was the third one, didn't

13    you say it said something about an impanelled grand

14    jury?

15         MR. STEGEBY:  Yes, Your Honor.

16         THE COURT:  Can you show me where that is

17    because --

18         MR. STEGEBY:  Yes, Your Honor, I believe it's

19    paragraph 14.

20         THE COURT:  Hold on.  I've got to figure out

21    where his most recent declaration is.

22         MR. STEGEBY:  The most recent declaration is

23    actually number 4 and that addresses the DVD

24    problems and the missing documents.

25         THE COURT:  It's number 4?  Is that the one

1    it's in, number 4?

2         MR. STEGEBY:  No, the one is number 3, it's

3    Document 37-1.

4         THE COURT:  Just a minute.  That's what I

5    recall, number 3, not the 4th.  I have the 4th here.

6    Okay.  I'm sorry, I don't want to hold you up

7    anymore.  I had the 4th and I was looking at the

8    4th; it's the 3rd.  Let me write down what paragraph

9    you say it's in.

10        MR. STEGEBY:  14.  I can lend you my copy if

11   you would like to take a look at it.  I underlined

12   the section.

13        THE COURT:  I'm sure I have it up here, it's

14   just trying to locate it quickly.  Okay, thank you.

15   And it does say that, you are absolutely correct.

16        MR. STEGEBY:  Thank you, Your Honor.  Any

17   further questions?

18        THE COURT:  No, not right now.  Go ahead.

19        MR. STEGEBY:  I'm not going to talk about the

20   bad DVDs, I think that's been covered already, and

21   similarly the waiver argument, unless you have any

22   questions about those.

23        THE COURT:  No.  The only issue with the DVD

24   would be if I decide that Bubba Clem is not -- there

25   is no privacy exemption that applies to him, then he

1         would come out of the DVD.

2              MR. STEGEBY:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MR. STEGEBY:  And we covered the missing

5         documents to the some extent.  So let me go into the

6         privacy concerns here.  Obviously if Your Honor

7         finds that a person doesn't have privacy protection,

8         we're going to have to redact the names of those

9         persons and I know you spoke with Mr. Berlin about a

10        number of individuals.  When I went through the

11        documents, I started making a list of all the names

12        in the documents and I could not go through -- get

13        through with all the names.  There are a lot of

14        names in these documents.

15             One suggestion that I have is it seems like --

16             THE COURT:  Well, I think, though, wouldn't

17        you agree -- and there may be lots of names in the

18        documents, I don't discount that, but those are the

19        names -- the ones that we went over are the ones

20        that appear most important, wouldn't you think, and

21        if I entered any kind of order, it would be

22        something to the extent that the following persons

23        enjoy no privacy exemptions, and you would have to

24        go through and unredact those particular names.

25             MR. STEGEBY:  Certainly, Your Honor.  I did

1      have a suggestion with respect to those persons that

2      Mr. Berlin mentioned.  In my mind there seems to be

3      a sliding scale as to who is such a public figure or

4      is so widely known that he or she does not have any

5      public interest -- or privacy interest.

6          My suggestion would be that we potentially

7      brief the courts on a list --

8          THE COURT:  No, I don't want to go through

9      another -- listen, we have done enough briefing and

10     enough filing.  If you want to tell me, you tell me.

11         MR. STEGEBY:  Well, with respect to the

12     persons that you listed, I would like to keep the

13     federal employees -- the special agents and the AUSA

14     -- protected still.  While certainly there is case

15     law out there that says that public officials have a

16     diminished privacy interest, but just because they

17     perform a duty based on their official position

18     doesn't eliminate their privacy concerns.  There is

19     a privacy protection --

20         THE COURT:  What is the privacy concern, for

21     example, Mr. Shearn and Ms. Sweeney, they have

22     communicated with opposing counsel, I mean, there

23     has been nothing hidden about their involvement in

24     this, this is not the type of thing that I'm

25     concerned about any physical harm or -- what is the

1     concern other than the fact one is an assistant U.S.

2     attorney, one is an FBI agent.  Other than that,

3     what is the concern?

4          MR. STEGEBY:  Well, Your Honor, first we have

5     to establish that they have a privacy interest and

6     if they do that, then you have to weigh the public

7     interest against the privacy interest.  And that is

8     the point where I would like to talk about when it

9     comes to the special agent and Ms. Sweeney.  So I

10    just want to flag that I think that those

11    individuals, the federal employees, the public

12    interest does not outweigh their privacy interest.

13    So I just wanted to make sure to state that even

14    though they're public officials, that doesn't take

15    away or eliminate their privacy interest.

16         THE COURT:  Well, I don't disagree that there

17    could be, Assistant United States Attorney and could

18    be FBI agents where that would be that exemption.

19    But with this particular -- these particular

20    individuals and this particular situation, I'm

21    struggling with the privacy exemption.

22         MR. STEGEBY:  I will get to that when I talk

23    about the public interests, if I may, Your Honor.

24         THE COURT:  Okay.

25         MR. STEGEBY:  So with respect to the list,

1      those are at least individuals that I would like the

2      to keep the redactions for.

3           Obviously we have the three individuals who

4      have signed waivers and we talk about those and

5      those have not been redacted except for perhaps by

6      mistake, you know, reference to --

7           THE COURT:  What about Mr. Bollea's nickname?

8           MR. STEGEBY:  Oh, Bubba the Love Sponge?

9           MR. BERLIN:  It's Hootie, Your Honor.

10          THE COURT:  No.  Hootie.

11          MR. STEGEBY:  I've seen references to

12     Mr. Bollea calling him Hootie.  I haven't seen him

13     say that directly, but there is evidence of that in

14     the record, so.

15          THE COURT:  Okay.

16          MR. STEGEBY:  And then also with respect to

17     Bubba, obviously he's a well known figure and I

18     would be hard pressed to argue that his name should

19     be -- and his image should be kept redacted.  But I

20     will leave that to Your Honor to decide after I go

21     through the public interest versus the private

22     interest.  It's obviously possible that Your Honor

23     will find that he is so well known that he doesn't

24     have a privacy interest, in which the next step is

25     not going to apply to him.

1          Now, just because people are well known in the

2     public or there has been publications about them or

3     they have been on interviews on radio and so forth,

4     doesn't necessarily mean that they don't have a

5     privacy interest.  There are case law out there that

6     says that even though some people in the public can

7     deduce who the individual is, there still may be a

8     privacy interest there and specifically because if

9     there is information out there that exists, the

10    courts have denied production of documents because

11    producing the documents would have added information

12    to whatever is out there.

13         Another reason is that if there is public

14    gossip out there, that is what it is, it's gossip,

15    it has not been verified.  So if a production is

16    made that would affirm or show that the gossip is

17    actually true, that is a privacy interest for

18    individuals and I've cited a number of cases in my

19    briefs on point.

20         THE COURT:  Are you talking about any

21    particular individual?

22         MR. STEGEBY:  Just individuals in general and

23    that's why I was thinking about if Your Honor wanted

24    us to sort of brief that issue because we have

25    talked -- Bubba obviously is the most well known

1    person besides Mr. Bollea involved in this case.

2         Keith Davidson -- I have not seen the court

3    documents where he filed something apparently in

4    California.  He is certainly somewhat known in the

5    community.  But like I said, that doesn't

6    necessarily mean that he doesn't have any privacy

7    interest.  So you look at the public interests and

8    weigh it against Davidson's privacy interest, you

9    may come to the conclusion that he should be

10   protected nonetheless.

11        And that is particularly true when information

12   is contained in law enforcement files because if

13   you're named in law enforcement files and that leaks

14   out, people can certainly get a different opinion of

15   you than what they had before the documents were

16   produced.  So there is sort of a heightened privacy

17   interest if you're mentioned in, for example, FBI

18   records as opposed to GSA files.  So that is

19   something to consider.

20        Let me just jump over to the public interest.

21        THE COURT:  Is Mr. Davidson listed -- are you

22   saying just because the FBI made the production or,

23   I mean, is that then that he shouldn't be because

24   he's listed in the production that they made?

25        MR. STEGEBY:  Well, if we were ordered to

1    unredact Davidson's name and we produced the

2    documents to Gawker, at this point they can't use

3    them in the publication in the Gawker Media or

4    broadcast it somehow because of the protections they

5    have in the state court.  But if that is lifted,

6    they can send out the documents and then it will

7    become public knowledge that Davidson was

8    investigated by the FBI, which could potentially

9    affect him professionally, personally and what not.

10   So there is certainly some privacy interest that he

11   has.

12            THE COURT:  Okay.

13            MR. STEGEBY:  So it may be less than some of

14   the other people we talked about.  So the public

15   interest may outweigh his privacy interest.  But

16   Your Honor may find that it doesn't.  So Davidson is

17   probably the one, in addition to Sweeney and the

18   special agent, that I would be -- I would protect.

19   After all, he was never indicted, so there were no

20   charges brought against him.

21            I think there are a number of people in the

22   documents that I have no idea who they are, so I

23   could not make a reference to whether someone would

24   have a privacy interest or not.  I know Mr. Berlin

25   spoke about attorneys to the parties here and also

1       the attorney of Mr. Clem.  I don't have any specific

2       interest in them myself and they certainly are known

3       to represent the various people, so that is

4       obviously something that the Court is going to take

5       into consideration.

6             The public interest certainly exists if a

7       party were to ask for information about an agency in

8       a number of cases, but there is case law that says

9       that just because a party or a FOIA requester asks

10      for information regarding one single case, that does

11      not provide enough information to actually -- for

12      the public to examine the operations or the actions

13      of an agency.  So there are a number of cases that

14      have found that there is no public interest at all

15      when a person asks for information about one single

16      case, which is the case here.

17            THE COURT:  Yes, I read that in either your

18      motion for summary judgment or your response to the

19      objections.  So to suggest that there is a public

20      interest in having the FBI disclose these documents

21      because there may be I guess something nefarious

22      going on or something of that sort by the fact that

23      we're looking at one case, that's not sufficient to

24      say there is a public interest.

25            MR. STEGEBY:  Yes, Your Honor, that is what

1       I'm saying.  And in addition, I know Mr. Berlin said

2       that there are three strands of cases out there

3       regarding asking for information about the agency's

4       actions based on -- one of them was based on

5       misconduct by the agency, and to the extent that

6       he's asserting that, there is case law out there

7       that says that just a pure basically an argument

8       that the FBI has done something to protect

9       Mr. Hogan, they have to follow up with compelling

10      evidence to show that they need the documents in

11      order to confirm that the FBI acted nefariously.

12      And we haven't seen any evidence of that, just mere

13      allegations and circumstantial evidence I guess

14      based on the DVDs.

15              And on that point, Mr. Harder filed a

16      declaration stating no, we're not protecting Hogan,

17      we just made a mistake.  So I don't think that is

18      sufficient to base a decision that there is a public

19      interest here.

20              THE COURT:  Okay.  When you say he filed a

21      declaration saying we're not protecting Hogan --

22              MR. STEGEBY:  It's indirectly.  So what he

23      says is we made a mistake, we took the audio from

24      the first DVD and put it on the second one, it just

25      ended up where it ended up and that's it.  So they

1      are definitely not part of a conspiracy between TPD

2      and the U.S. Attorney's Office here and Mr. Bollea.

3      There is just no evidence of that.

4              THE COURT:  Okay.

5              MR. STEGEBY:  In other words, in this case I

6      fail to see the public interest and even if there is

7      a public interest here, so the Court will find it

8      outweighs certain privacy interests.  They still

9      could not use those documents because of the

10     protection afforded by the state court; they're

11     under seal.

12             I know that Mr. Berlin stated I think it was

13     in his opposition to our motion for summary judgment

14     that he has filed suit or he has filed a motion with

15     the Court, trying to unseal the documents because of

16     the --

17             THE COURT:  The state court.

18             MR. STEGEBY:  In the state court.

19             THE COURT:  Because that's where the order is,

20     the protection order.

21             MR. STEGEBY:  Correct.  Correct.  But until he

22     succeeds in that motion, if he indeed does, there is

23     no public interest here.  The documents cannot be

24     used in any way.  So how can there be a public

25     interest?

1          If you don't have any more questions of me,

2     I'm done.

3          THE COURT:  All right.  Mr. Berlin, if you

4     could respond to a couple of things.  First of all,

5     Mr. Keith Davidson, Sara Sweeney and Jason Shearn,

6     and then also the mediation, and then whatever else

7     you want to respond to.

8          MR. BERLIN:  Let me talk about the

9     declarations.  My hope in the declarations process

10    is not -- the purpose of the declarations was not to

11    trip up a federal employee who may not know that

12    there's some other document in a different file.

13    That's not the point.  The point was to say we have

14    a person who has now submitted four declarations

15    evolving, Mr. Hardy, and in the case of Ms. Francis,

16    three declarations, also evolving.

17         The second I think declaration from

18    Ms. Francis, maybe the first one, one of them

19    attached a declaration from paralegal Ms. Brown who

20    described a process of putting aside that it admits

21    significant violations of the statutory time frames,

22    basically says we got the request in Washington, we

23    requested the documents from Florida, a different

24    person in Florida gathered the documents, then they

25    were sent and they were reviewed by one paralegal,

1     then another paralegal.  And the real problem that

2     we're trying to get at is that none of the people

3     who ultimately have the documents have any knowledge

4     of the underlying investigation.  They weren't

5     involved; they don't know.

6          And what I'm trying to ask the Court to do in

7     some fashion -- declaration was the idea -- was to

8     say, look, I understand why in the first instance

9     you don't want to waste the time of Ms. Sweeney and

10    Mr. Shearn, but we're now at a point where we've

11    been at this six months and we still don't have any

12    clarity that we have a complete universe of

13    documents.

14         And look, I've talked to Mr. Stegeby so many

15    times I could recite his telephone number by memory.

16    So the mediation idea -- it's not that -- we're

17    always available to see if we can be of service to

18    try and get to the resolution of this and we have

19    filed -- we listed at the beginning of our

20    objections, here are seven or eight categories --

21    here are seven or eight documents or categories of

22    documents -- the video footage of the sting, the

23    couple of audio files, the declination letter -- and

24    we've laid them out, right, and we said here's what

25    we're missing, right?  That was at the end of July,

1    we're now at the end of October, and sort of a

2    suggestion that says can we have another

3    conversation so we understand what you say you're

4    missing isn't -- it's not really advancing the ball.

5         I'm always to happy to talk to him and I don't

6    want to pooh-pooh his suggestion to work together,

7    we've tried to work very closely together.  What I

8    want -- what I was asking for was, at the Court's

9    direction, to actually get some involvement -- and I

10   think it's probably Mr. Shearn and Ms. Sweeney.  If

11   there are other people that, you know, because I

12   don't know, including because the names of the

13   agents have all been redacted, if there is someone

14   else that needs to participate in that.

15        But it does seem reasonable at this juncture

16   for the Court to express a modest level of

17   frustration with the government and say okay, the

18   method that you all have employed for doing this is

19   not working at least in this case and we need you to

20   get somebody who actually knows what the universe of

21   documents is to be involved in the process of

22   confirming that before I finish this case, we have

23   met the requirement that we have a proper universe

24   of documents.

25        And that's -- the suggestion of a mediation

1    sort of is doing the same thing that we've already

2    done, which is to have us say here's what we're

3    missing, right?  I am happy to continue to do that

4    with Mr. Stegeby, but that's not -- you know, the

5    link between me and him isn't the problem.  The link

6    between him, the people in Winchester and

7    Washington, and the link between those people and

8    the people actually have personal knowledge of this,

9    is the problem.  And I don't -- I'm asking on bended

10   knee for the Court to try and fix that.

11        I also -- I do have some nagging concerns

12   about the very brief discussion of the erroneous

13   production of the DVDs that's contained in

14   Mr. Hardy's declaration and would ask separately for

15   a slightly more elaborate description of that.  And

16   the reason I'm asking is both for public interest

17   purposes, I want to make sure there was nothing

18   nefarious.  But more importantly, in the state court

19   case after the original set of DVDs was reviewed, we

20   had a motion in limine hearing because at that point

21   the trial was a few days later and there was a

22   ruling that the trial judge made at that point that

23   said, you know, I'm waiting for the production of

24   the rest of the FBI documents so this was all

25   without prejudice, but Mr. Bollea's counsel was

1       arguing that these pieces of evidence may not be

2       reliable because there has been issues with the

3       production of two of them.

4            So what I'm looking for, in an effort to not

5       be penalized because they made this -- if it's

6       really just a mistake, because they made this

7       mistake, is some declaration from Mr. Hardy that

8       gives enough information that we can know that what

9       we now have is a reliable piece of evidence that we

10      can then use in the state court without being

11      challenged that, no, that wasn't reliable because

12      the FBI botched the production the first time.

13           And that's a separate point, but it's -- it

14      relates to this and since Mr. Stegeby was talking

15      about the DVDs and that that was already addressed

16      in an affidavit, it really is just addressed sort of

17      in a half a sentence saying this is how it happened,

18      but it doesn't really explain it in any detail that

19      would allow us to reasonably argue to the state

20      court that the new DVDs that the state court now has

21      are in the judgment of the FBI correct.

22           And we would also ask for that, that's sort of

23      a footnote point, but it shouldn't be that you

24      ordered them to produce DVDs, they produced them

25      improperly, and now having gone to the trouble of

1    getting them produced correctly, we can't use them

2    because there is an issue that's being raised by

3    Mr. Bollea and his counsel about the initial

4    incorrect production.

5        But that was the purpose of the affidavits.

6    If Your Honor and Mr. Stegeby has a different way of

7    actually getting those people involved, but it

8    seemed to me that getting a declaration -- asking

9    those people, hey, this is the stack of documents

10   that we have, it's not a big stack, can you spend --

11   in the case of the EOUSA it will take 15 minutes, in

12   the case of Mr. Shearn it will probably take a

13   couple hours, can you look at the stack and tell me

14   if you know of anything that's missing, number one;

15   number two, can you account for the documents that

16   they have listed in their papers that are

17   unaccounted for, why do we still not have those

18   documents, did they go to the Tampa Police

19   Department and we did not get them back, and can we

20   do that.

21       And if we do that and we order the production

22   of the duplicates as opposed to just sheets that

23   says this is a duplicate, we can then know that we

24   have a complete set and then we can check that off

25   our list and hopefully get to the point where this

1    can be concluded.  So that's what I would say about

2    the documents.

3         Your Honor, I had a couple other comments, but

4    you had one other --

5         THE COURT:  Yes, I have a question; I probably

6    had one, now I've forgotten it.  You mentioned the

7    DVDs and you mentioned that when we ordered the

8    production and the FBI turned them over and they

9    were turned over to the state court somewhere around

10   July 13th, and I'm talking about the corrected ones,

11   that the state court judge was the only one that had

12   seen them?  Is that right?

13        MR. BERLIN:  I don't know whether the state

14   court judge has watched the new production of DVDs.

15        THE COURT:  Well, let me just put it this way.

16   You haven't seen them.

17        MR. BERLIN:  That is correct.

18        THE COURT:  And I'm assuming the other side

19   probably hasn't seen them.

20        MR. BERLIN:  That is my -- they're represented

21   here, but that's my understanding as well.

22        THE COURT:  Okay.  All right.  But there are

23   DVDs that both sides have seen of the acts from

24   other sources, right?

25        MR. BERLIN:  Let me answer the question this

1     way.   It is my understanding that DVDs -- that the

2     three DVDs as they were taken from Mr. Davidson were

3     reviewed by -- during the sting operation by

4     Mr. Bollea and his counsel, right?  So that's as to

5     them.   I can't speak other times what they have

6     reviewed.

7          On the Gawker side of this, in effect Gawker

8     was provided one of the three DVDs from which it

9     wrote its initial story that started this whole

10    thing back in October of 2012, and it saw that DVD.

11    It has not seen what has been provided by the FBI in

12    a way to confirm that those two things match and it

13    has not seen at all the other two DVDs that have

14    been provided because it only had one, not three.

15         THE COURT:  Thank you.

16         MR. BERLIN:  And that's actually one of the

17    issues which was, you know, that's discussed in a

18    little bit more detail in that confidential Thomas

19    declaration about that discrepancy in the state

20    court case and the significance of it.

21         Let me just address -- you had a question

22    about the -- I think about the privacy issue, but

23    let me just, if I could, just to deal with a couple

24    of housekeeping things.

25         There was an issue about the tweets which we

1      haven't seen and are just described.

2           THE COURT:  Right.

3           MR. BERLIN:  It was hard to understand from

4      the colloquy that Your Honor had with Mr. Stegeby

5      whether you thought that if the privacy rulings that

6      you suggested you might well make would moot that or

7      would not moot that, and I just wanted to understand

8      that.

9           THE COURT:  I know Mr. Stegeby seemed to think

10     it would, but I don't think it would because they

11     withheld the entire thing, they haven't redacted

12     any.

13          MR. STEGEBY:  Your Honor, I think there is a

14     couple of references to the person, that famous

15     person, that could be unredacted depending on your

16     ruling.  But there are references to other people

17     who would still be redacted.

18          THE COURT:  Okay.  But you withheld all of it,

19     right, you haven't redacted it and turned it over,

20     you withheld all of it.

21          MR. STEGEBY:  That is correct.

22          THE COURT:  Okay.  So, I mean, if I say that

23     Mr. Clem is to be unredacted, that would certainly

24     mean that anything that's been turned over that's

25     redacted would have to be corrected, but these

1    haven't been turned over at all.  So I think I would

2    have to determine that these had to be turned over.

3    I mean, I don't see -- you know, it's got a name at

4    the top, but then it's got the whole body of what

5    was said.

6         MR. BERLIN:  Got it.  So in other words, it

7    may be possible to direct the provision of an

8    unredacted document, but it would simply may be only

9    unredacting the name, is I think what Mr. Stegeby --

10   as I understand what he was saying.

11        THE COURT:  Well, I don't know -- I don't know

12   how -- they haven't turned over any of it and

13   clearly if I order as we say Bubba Clem's name to be

14   unredacted, then that's fine, but there is -- I

15   don't know whether that means they would turn over

16   the entire tweet, because there is lots of stuff in

17   there.  Not lots, but some.

18        MR. STEGEBY:  Your Honor, it's been a while

19   since I saw the documents, but as far as I remember

20   there are mentions of other people there and maybe

21   even a tweet or email address or something that

22   absolutely would have to be --

23        THE COURT:  Well, yes, and clearly the

24   addresses -- there are addresses and phone numbers

25   and they would have to be redacted and I agree with

1      that.  I'm just not quite sure why the entire tweet

2      has to be withheld.  But I'll look at it again.

3              MR. STEGEBY:  Yes, Your Honor.

4              MR. BERLIN:  I appreciate your clarifying.  As

5      I said, it's a little hard to keep up when all we're

6      look at is a big black box.

7              Your Honor I think has already addressed the

8      grand jury documents and I'm not sure how we get

9      around that problem because you're absolutely right,

10     if you're essentially saying, would you, Gawker,

11     please rely on me, Judge Bucklew, to --

12             THE COURT:  And I haven't seen them.

13             MR. BERLIN:  -- and you can't look at them,

14     you don't know whether there is actually an

15     empaneled grand jury.  And the only thing I wanted

16     to point out was that putting aside the other

17     portions of Mr. Hardy's declarations that have been

18     made and then turned out not to be correct, the

19     statement that you look at basically says the

20     records responsive to plaintiff's requests reflect

21     that one or more federal grand juries were impaneled

22     in relation to the investigation.

23             You know, that raises -- a person who's

24     testifying there was a grand jury probably -- and

25     he's doing it based looking at the documents.  So I

1    would ask that if we are going to go the route of

2    getting more information from let's say Ms. Sweeney,

3    that we understand from somebody who actually knows

4    that there was actually a grand jury impanelled

5    rather than from Mr. Hardy who it appears is basing

6    that either on reviewing documents -- which as best

7    we can tell don't include transcripts or anything

8    that shows a grand jury being impaneled, or that

9    he's basing it on being told that by somebody else

10   in which case it's not a proper declaration because

11   it's hearsay, you have to get the person that could

12   actually speak to that.

13        Again, my general principle on this is if it's

14   truly grand jury material that would reveal the

15   workings of the grand jury, we agree that that is

16   something that's exempt and is protected by Rule

17   6(c).  But the way this is being asserted which is

18   essentially a statement from somebody who doesn't

19   know that there was a grand jury based on -- what

20   appears to be based on review of documents, coupled

21   with a representation by the government we're not

22   going to give you, the court, the documents, please

23   trust us, I think that probably -- not probably,

24   that does not do what the statute contemplates that

25   happens in a FOIA lawsuit which is that the

1      government bears its burden of demonstrating there

2      was an impanelled grand jury and that the materials

3      that they're seeking to claim exemptions for do

4      not -- you know, would reveal the workings of that

5      grand jury as opposed to being things that are sort

6      of ancillary to the grand jury.

7            And that, again, if we're going to go the

8      route of not getting yet another Vaughn index and

9      whatever, you have to get the documents I would

10     think and hopefully make that determination.  But I

11     don't know that Mr. Hardy's declaration on this

12     point -- he could not have -- unless he said I was

13     involved in the grand jury as a person on behalf of

14     the FBI, and I think he's clearly not, he's just a

15     records guy, he could not have any personal

16     knowledge of there being a grand jury impaneled

17     unless he's reviewed the documents, except for

18     having reviewed the documents and we would ask for

19     something that's a little bit more clear on that

20     from some combination of either asking Ms. Sweeney

21     or Your Honor looking at the documents and making

22     your own draw.

23           Turning if I can to the privacy piece of this,

24     I wanted to address first -- Mr. Stegeby started

25     with the federal employees, Agent Shearn and

1      Ms. Sweeney and Mr. Mosakowski and so forth.  He is

2      right that public officials, although they have a

3      diminished privacy interest, have some privacy

4      interest, right, starting if you were writing on a

5      clean slate.  But that is not true where their

6      involvement in a particular matter has been the

7      subject of other public disclosures.  I'm making a

8      different argument that doesn't really -- he's sort

9      of responding to an argument that I'm not making,

10     right?  I'm not coming and saying, you know here's

11     an agent, we don't know who it is, but please tell

12     us who it is; I'm coming and saying here is an agent

13     that's been widely disclosed including in their own

14     court filings, can you please unredact his name.  Or

15     in Ms. Sweeney's case, her name.  And that's a

16     different argument.

17          And then the second piece of the argument is

18     just because somebody is well known doesn't mean

19     that they don't have any privacy interest.  And

20     again, I'm not making that argument, I'm not saying

21     because Bubba Clem is well known, he has no privacy

22     interest.  I'm not saying because Bubba Clem is on

23     the radio every day and talks about his life for

24     four hours every day, that he has no privacy

25     interest.

1          What I'm saying is that in relationship to

2     this investigation -- and that's what our showing

3     has made in the lengthy declaration that Mr. Thomas

4     submitted -- in relation to this investigation, he's

5     talked extensively about it, on the Howard Stern

6     show, on his own radio, in his apology, in his

7     deposition testimony, and in commenting on the

8     publication of his deposition testimony.

9          THE COURT:  I agree with you.

10         MR. BERLIN:  Then I won't belabor the point.

11    But that's a different argument and I'm not making

12    that argument.

13         And turning to Mr. Davidson, you know, the

14    filings that we're talking about, Mr. Stegeby seemed

15    to say that he hadn't seen them, but they're

16    actually attached to the declaration that we

17    submitted and in many case the references to him are

18    attached to documents that the FBI or the U.S.

19    Attorney's Office has submitted in this case.

20         It is also true -- and we've listed this in

21    our papers -- that -- and this isn't the main

22    argument, but I just wanted to mention, he is also

23    mentioned in unredacted form in documents that have

24    been produced to us as part of the FBI's production,

25    which is just one further piece of evidence that his

1      privacy is not there.  And again, he's not well

2      known in the way that Bubba Clem is well known, but

3      his identity as the target or the subject of this

4      investigation is well known including out of his own

5      mouth and including, as now has been reported widely

6      in the press.  And that's not something that is --

7      it's not a general argument that any target of an

8      investigation can be revealed; it's the argument

9      that in this instance under these facts he can be.

10           It's our position, Your Honor, that you don't

11     need to get to the public interest if there is no

12     privacy.  And there is lots of cases we've cited

13     that make the point that -- rather obvious point

14     that if something is public, it's not private, and

15     that's sort of the piece of the argument --

16           THE COURT:  That's fine, I asked in the

17     beginning how that worked, but go ahead.

18           MR. BERLIN:  So we've made that point.  And

19     look, you could quibble about whose burden it is,

20     but at this point we now have I think a fairly

21     convincing and uncontroverted factual record that

22     these things are not private.

23           But speaking to the public interest prong,

24     just to correct something I think that Mr. Stegeby

25     said, the notion that there is no public interest if

1        what your request relates to is only one

2        investigation, is incorrect.  There are literally

3        case after case after case where the investigation

4        involves -- sorry, the FOIA request involves one

5        investigation and the court says yes, there is a

6        public interest in that.  Right?  So there is a

7        series of these cases that makes writing a brief

8        difficult in this area, but there is a series of

9        cases brought by a non-profit organization in

10       Washington called Citizens for Responsibility and

11       Ethics in Washington -- CREW is the acronym, I think

12       I have the name right.  And they brought a bunch of

13       these cases and they look like they're all part of

14       the same proceeding because they're all Washington

15       cases that go up and down between the DC circuit and

16       the DC federal court where a lot of these FOIA cases

17       are decided.

18           But in the CREW cases, the courts have found a

19       public interest in various investigations --

20       individual investigations that happen.  And some of

21       them involve politicians.  There is a case

22       involving -- one of the cases we cited involves the

23       Department of Interior's investigation of a people

24       who improperly hunted a bear in violation of some

25       federal regulations on park land and those people

1    were not, you know, politicians, but that was

2    something that the court said look, we want to

3    understand how the Department of Interior does this.

4    They're individual investigations and it doesn't

5    mean that -- and again, it does not mean that every

6    time a person walks in and says I have an

7    investigation that I was the subject of, even though

8    I'm not sitting in jail having been convicted, I get

9    every piece of paper that you have and that's a

10    public interest.

11          That's not -- I'm not making that extreme

12    argument.  But I do want to correct, however, that

13    in appropriate circumstances a FOIA request that

14    seeks to understand how the government carried out

15    its function, even in connection with one individual

16    investigation, is a proper subject of public

17    interest.

18          And for the reasons I articulated earlier,

19    understanding in this case how it is that whether --

20    you don't have to -- I have views about this, you

21    may have different views about this, that's not the

22    point of the exercise.  The point of the exercise is

23    there is a public interest in understanding, you

24    know, are we -- why aren't we prosecuting a person

25    who appears to have engaged in extortion?

1          Or conversely, why are we using the

2     government's resources to help a celebrity protect

3     his reputation?  Those are two different ways of

4     viewing this investigation.  And the government

5     obviously had different ways of viewing this

6     investigation because they investigated and then

7     they didn't prosecute.  Understanding the policy of

8     how that gets made without any showing of misconduct

9     is a proper purpose of FOIA.

10         And the last thing that I wanted to say is

11    that Mr. Stegeby's contention that there is no

12    public interest at this time because I cannot

13    disclose the documents, is also incorrect.  I could

14    make a FOIA request, even if I were not under a

15    Protective Order in the state court case.  And I

16    could come to you and say there is a public interest

17    in this particular investigation and you would have

18    to make that determination at this time.

19         And it will make no difference to your

20    analysis whether I get the documents and do nothing

21    with them other than look at them myself, or I get

22    the documents and I publish them on the internet or

23    in the newspaper or on a television broadcast,

24    right.  The calculus is not made based on can I use

25    them for a certain purpose or another purpose; the

1    calculus is made based on the substance of the

2    request.

3         And Mr. Stegeby is right, we have asked the

4    state court to lift the Protective Order so that the

5    public can see some of these documents, but -- and

6    they'll make whatever decision the court makes,

7    that's still pending.

8         And in fact, the state court, yes, one of the

9    things that the state court yesterday asked was is

10   that something that, you know, I have your motion, I

11   have all the documents, but wouldn't it make more

12   sense for you to take this up with Judge Bucklew

13   first if you're going to get more documents?  Then I

14   don't have to review them twice, I can just review

15   the final set of production and I'll review them

16   once.  So that was her question to us and --

17        THE COURT:  Did you tell her that might take a

18   while?

19        MR. BERLIN:  I made no representations about

20   how long it would take either Your Honor to rule

21   or the government --

22        THE COURT:  No, I'm not talking about me

23   ruling, I'm talking about getting the documents.

24        MR. BERLIN:  I did make a comment to that

25   effect, that I really had no -- I have had no great

1       success -- and no offense intended to Mr. Stegeby --

2       getting the documents produced in a timely fashion

3       in some respects in this case.  So I told her I

4       didn't know how long it would and if it was going to

5       be a while, we would let her know that.

6              But in fact one of the things she asked was

7       that we report to her after this hearing and we have

8       some guidance -- it may not be today, but when we

9       have guidance on that subject, how long that will

10      likely be.

11             But the point that I wanted to make is that

12      the public interest is not determined based on can I

13      use the documents, can I not use the documents, will

14      I in use the documents, will I not use the

15      documents.

16             FOIA requests are generally tries and

17      certainly Gawker is a news organization.  But for

18      the unusual nature of a Protective Order in a state

19      court case when it makes a FOIA request, it does so

20      with the intent of informing the public and it would

21      like to inform the public here as well.

22             Just because it's -- you know, that's part of

23      what its mission is, but it's not -- you know, it's

24      respecting the state court Protective Order; in the

25      meantime asking through the appropriate channels for

1      it to be modified.

2            But that public interest is not determined

3      based on will I make them public.  That's not what's

4      recognized in the case law and I just wanted to make

5      that clear.

6            Unless Your Honor has any questions --

7            THE COURT:  No, I don't.  Mr. Stegeby, I'll go

8      back and look at Ms. Sweeney and Mr. Mosakowski and

9      Jason -- is it Stern, Starn?

10           MR BERLIN:  Shearn, S-H-E-A-R-N, Your Honor.

11           THE COURT:  As well as who is the other one

12     that you argued specifically?

13           MR. BERLIN:  I think it was Mr. Davidson.

14           THE COURT:  Mr. Davidson, right?

15           MR. STEGEBY:  Oh, I thought you were talking

16     about --

17           THE COURT:  I'll go back and look at those.

18     I've still got to figure out what to do about the

19     fact I don't have any grand jury information and I

20     can't really make any kind of determination.

21           And the second thing besides the grand jury

22     information that I don't have is trying to figure

23     out how we determine what our universe of documents

24     is.  So anyway --

25           MR. STEGEBY:  Your Honor, based upon the

1    hearing here today, I'm going to go back again and

2    try to persuade the FBI to provide the grand jury

3    documents.  If I'm successful, how -- should I just

4    produce them to the Court?

5        THE COURT:  Uh-huh.

6        MR. STEGEBY:  We'll add some Bates stamps to

7    them so we can know exactly what documents they are.

8    I can't promise that I will get them; I can promise

9    that I will tell them what I believe the outcome is

10   going to be in case I don't get them.

11       THE COURT:  Okay.

12       MR. BERLIN:  Your Honor, may I ask one other

13   thing?  I don't know what the timeframe -- you asked

14   about the timeframe.  There is still a lagging issue

15   of the grand jury documents and whether we have a

16   complete universe of documents.  But given that we

17   are still on a train moving forward in state court

18   and given that this has been pending a while, if the

19   Court is otherwise agreeable, I would ask if it's

20   possible if the Court is going to rule on the

21   privacy exemptions, which is now a known universe of

22   documents, if we would not hold up that for -- you

23   know, because it could take a little while --

24       THE COURT:  No, I understand.

25       MR. BERLIN:  -- to resolve the other issues

1    and that would allow the FBI to hopefully produce a

2    significant number of unredacted documents, would

3    allow us to get them to Judge Campbell and so forth.

4         THE COURT:  I agree.

5         MR. BERLIN:  Thank you, Your Honor.

6         THE COURT:  Thank you.

7         MR. STEGEBY:  Thank you, Your Honor.

8         (The proceedings adjourned at 12:11 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                C E R T I F I C A T E

 2

 3     STATE OF FLORIDA            )

 4     COUNTY OF HILLSBOROUGH   )

 5         I, Lynann Nicely, RMR, CRR, Official Court

 6     Reporter for the United States District Court, Middle

 7     District, Tampa Division,

 8         DO HEREBY CERTIFY, that I was authorized to and

 9     did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 134, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, November 1, 2015.

19

20

21              /s/ Lynann Nicely
                Lynann Nicely, RMR, CRR,
22              Official Court Reporter

23

24

25
```