```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION


GAWKER MEDIA, LLC, and GREGG   )  Tampa, Florida
D. THOMAS,                     )
                               )
                 Plaintiffs,   )  No. 8:15-cv-1202-T-24EAJ
                               )
            vs.                )  December 8, 2015
                               )
FBI and EXECUTIVE OFFICE OF    )  10:57 a.m.
UNITED STATES ATTORNEYS,       )
                               )
                 Defendants,   )  Courtroom 15B
                               )
            vs.                )
                               )
TERRY GENE BOLLEA,             )
                               )
       Intervenor Defendant.   )
                               )
_____)
```

**TRANSCRIPT OF MISCELLANEOUS HEARING**
BEFORE THE HONORABLE SUSAN C. BUCKLEW
UNITED STATES DISTRICT JUDGE

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone:  (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

**A P P E A R A N C E S**

**PLAINTIFFS COUNSEL:**

      **Seth D. Berlin, Esq.**
      Levine, Sullivan, Koch & Schulz, LLP
      1899 L Street, NW, Suite 200
      Washington, D.C. 20036
      (202) 508-1122

      **Gregg Darrow Thomas, Esq.**
      Thomas & LoCicero, PL
      601 South Boulevard
      Tampa, Florida 33606
      (813) 984-3060

**DEFENSE COUNSEL:**

      **Erik K. Stegeby, Assistant U.S. Attorney**
      U.S. Attorney's Office
      400 North Tampa Street, Suite 3200
      Tampa, Florida 33602
      (813) 274-6200

**INTERVENOR COUNSEL:**

      **Christina Ramirez, Esq.**
      **Shane Vogt, Esq.**
      Bajo Cuva Cohen Turkel, PA
      100 North Tampa Street, Suite 1900
      Tampa, Florida 33602
      (813) 221-2626

                **ALSO PRESENT:**

                Sarah Jirousek-Wint,
                Unit Chief, FOIA Litigation

                Rundy Harwell,
                USAO Chief, Civil Division

- - -

<u>**P R O C E E D I N G S**</u>

- - -

1         COURT SECURITY OFFICER:  All rise.

2         This Honorable Court is now in session.

5         THE COURT:  The matter that is set this morning is *Gawker Media versus the FBI and Executive Office of the U.S. Attorney*.  This is Case No. 8:15-cv-1202-T-24EAJ.

8         If I could get counsel to state their appearances, please, starting with counsel for the Plaintiff.

10         MR. BERLIN:  Good morning, Your Honor.  Seth Berlin with Levine, Sullivan, Koch & Schulz in Washington, D.C., on behalf of Gawker Media.  And Gregg Thomas.

13         THE COURT:  Good morning.

14         MR. STEGEBY:  Good morning, Your Honor.  Erik Stegeby on behalf of the federal government.  With me, I have Ms. Jirousek-Wint.  Ms. Jirousek-Wint is the unit chief of the FOIA litigation of the FBI.  And then I have civil chief, Mr. Harwell.

19         THE COURT:  At my request?

20         MR. STEGEBY:  At your request, Your Honor.

21         And my paralegal, Ms. Pipas.

22         THE COURT:  How are you?

23         And in the second -- at the second table.

24         MS. RAMIREZ:  Christina Ramirez and Shane Vogt with Bajo, Cuva, Cohen & Turkel, here on behalf of Intervenor

1    Terry Gene Bollea.

2              THE COURT:  Mr. Stegeby, let me ask, the witness,

3    is she going to be a witness or she is just here for support

4    from the FBI, the FOIA section?

5              MR. STEGEBY:  Your Honor, we are not going to call

6    her as a witness.  And my hope is that I will have the

7    answers that the Court will ask of me.  If I don't know the

8    answer, she's here to support me.

9              And I would like to ask for perhaps a moment to

10   speak with my client.

11             THE COURT:  Before we start?

12             MR. STEGEBY:  No, during the hearing.  So I'm

13   prepared to provide Your Honor with as much knowledge as I

14   have; and if we reach a point where I don't have the answers

15   to the question, I may ask the Court for a moment to speak

16   with my client to obtain any additional facts, Your Honor.

17             THE COURT:  Well, Mr. Harwell, I asked you to be

18   here because, frankly, I'm just more than just frustrated

19   with -- and I don't know who to be frustrated with, whether I

20   should be frustrated with Mr. Stegeby, whether I should be

21   frustrated with the FBI, whether I should be frustrated with

22   the executive office.  But I think in my last order, I

23   said -- I mean, clearly, out of frustration, I don't know

24   whether the defendants are just simply incompetent or that

25   you're just glossing over this and disregarding what we are

1  doing here.  So I'm just fed up.

2           And I've spent a lot of time on this.  We have had

3  a lot of hearings, and I don't want to keep doing this.  It's

4  wasting all of our time.  Not just my time, plaintiffs' time.

5  It's got to be wasting your time, too.  If you just do it

6  right the first time, we won't be doing this.  So at any

7  rate...

8           All right.  Here's what I would like to do.  I

9  would like to go through, Mr. Stegeby, a number of questions

10 and verify, I think, what I think I know, but I'm not

11 entirely sure.

12          And then I will give, Mr. Berlin, you, the

13 opportunity to address any issues you have.

14          And, Mr. Stegeby, in response.

15          So, Mr. Stegeby, why don't you stand at the podium

16 and just let me make sure I understand where we are.

17          MR. STEGEBY:  Yes, Your Honor.

18          THE COURT:  And I'm just going to go through the

19 list and go through what I think is your answer on behalf of

20 the FBI and the executive office of the United States

21 Attorney.  Okay?

22          MR. STEGEBY:  Yes, Your Honor.

23          THE COURT:  All right.  And most of these are --

24 in fact, perhaps all of them are in answer to Gawker's

25 objections as far as missing or unaccounted for documents in

1    the filing that they made on 11-16-2015.

2            The first is the video of the December 14th, 2012

3    sting operation.

4            The FBI has now located, and that has been

5    turned over; is that correct?

6            MR. STEGEBY:  Yes, Your Honor, that is correct.

7            THE COURT:  All right.  The audio of the November

8    27th, 2012 call between Houston and Davidson, that has been

9    located and that has been turned over?

10            MR. STEGEBY:  Yes, Your Honor.

11            THE COURT:  They also mentioned a transcript.  Was

12    there a transcript?

13            MR. STEGEBY:  No, Your Honor.  We have not been

14    able to locate a transcript of the audio.

15            THE COURT:  Okay.  So no transcript was located

16    and none turned over.

17            The audio of the December 5th, 2012 call between

18    Houston and Davidson, you located -- the FBI located and it's

19    been turned over?

20            MR. STEGEBY:  Yes, Your Honor.

21            THE COURT:  Okay.  Drafts, Version 4 and redline,

22    Version 5, of the Hogan-Davidson agreement.  And your answer

23    was, "No other versions other than those turned over have

24    been located"?

25            MR. STEGEBY:  That is correct, Your Honor.  There

1  are multiple copies of the settlement.  Some of them are

2  identical, but some of them have some notations on the sides,

3  and some of them were identical and withheld as duplicates,

4  but we have now turned over all the duplicates in addition to

5  the original documents.

6          THE COURT:  Okay.  Does the draft, Version 4, or

7  redline, Version 5, have any meaning to you?

8          MR. STEGEBY:  Not specifically, Your Honor.

9          THE COURT:  Okay.  All right.  The declination

10  letter in the United States Attorney's Office, decision not

11  to prosecute, which apparently was not locatable over these

12  many months until just recently, two letters were located and

13  turned over on December 4th; is that correct?

14          MR. STEGEBY:  That's correct, Your Honor.

15          THE COURT:  Missing communications between

16  Davidson and Hogan.

17          And your response was, "No additional, other than

18  what was turned over, and we have turned over everything that

19  we have."

20          MR. STEGEBY:  That is correct, Your Honor.

21          THE COURT:  All right.  They had a question is why

22  the FBI loaned 21 files for the Tampa P.D., but requested

23  only 18 be returned.

24          And your response was that they actually requested

25  everything be returned, not just the 18, 302s, but

1  everything.

2          And everything now has been returned around turned

3  over?

4          MR. STEGEBY:  That is correct, Your Honor.  We

5  initially submitted a request from the FBI to the Tampa

6  Police Department, and we received two productions from them.

7  As far as we know, we have received everything and turned

8  over everything to the plaintiff.

9          And with respect to the 18, 302s, that was only

10  part of the request.  It was including, but not limited to.

11          THE COURT:  Okay.  Documents from the FBI second

12  production in August that were not produced and not included

13  in the FBI's *Vaughn* index.

14          You've now filed a new *Vaughn* index.  In fact, I

15  think both the executive office of the U.S. Attorney and the

16  FBI filed knew -- you filed new *Vaughn* indexes on behalf of

17  both, right?

18          MR. STEGEBY:  That is correct, Your Honor.

19          THE COURT:  And you did turn over to me the

20  unredacted documents in compliance with my order, and I have

21  reviewed them, and I have found that they were properly

22  withheld.

23          The -- and I'm now going to talk about my 12-2

24  order.  The production of unredacted documents in compliance

25  with the Court's November 4th order.

1          You apparently turned over a disk in which a

2   number of the documents remained redacted.  And your response

3   was there was a software error, and those unredacted

4   documents were actually produced on December the 2nd or

5   December the 4th?

6          MR. STEGEBY:  Yes, Your Honor.  There were two

7   productions.  One was on November 30th.  And that is the one

8   that contained some errors by a software glitch.

9          Those documents were supposed to be documents that

10  had been reprocessed pursuant to the Court's order

11  unredacting certain names that the Court ordered.

12         So the November 30th production was incomplete

13  and, therefore, we made a second production on December 2nd.

14  And that one contained the additional documents where names

15  had been unredacted pursuant to the Court's order.

16         In addition, we also had some documents that we

17  had received, I believe, from the Tampa Police Department.

18         THE COURT:  Those were the documents that --

19  allegedly you had requested all the documents, but you only

20  got -- you didn't get all of the documents?

21         MR. STEGEBY:  That's correct, Your Honor.

22         THE COURT:  And they subsequently discovered they

23  had more documents and turned them over?

24         MR. STEGEBY:  That's correct, Your Honor.  I

25  believe they had discovered that November 18th.

1          THE COURT:  Could I ask you a question?  When you

2    turned over the disk that you said was -- had a software

3    error and that things were unredacted that should have been

4    redacted, did you actually turn it over or did it come

5    directly from the FBI?

6          MR. STEGEBY:  I got a copy from the FBI, and the

7    FBI sent a copy directly to plaintiff.

8          THE COURT:  Okay.  Did you look at it?

9          MR. STEGEBY:  I looked at it, yes.  Not every

10   page, Your Honor.  In fact, I went through the disk with

11   Mr. Berlin, and I noted some concerns that I had with the

12   disk.

13         THE COURT:  Okay.  And there was a concern about

14   the production of duplicates in compliance with my October

15   30th order.  I had said, you know, you need to turn over

16   duplicates, because the plaintiffs felt like that some of the

17   duplicates were not duplicates.  They were new documents.

18         And only duplicates being withheld, now, are those

19   which are withheld in full.  In other words, which you've

20   said are -- should be withheld in full.  Everything else has

21   been turned over, right?

22         MR. STEGEBY:  That's correct, Your Honor.

23         THE COURT:  All duplicates?

24         MR. STEGEBY:  Yes.

25         THE COURT:  Okay.  There was a discrepancy between

1  the FBI statement that they were producing 546 documents when

2  they only produced 490 documents.  So what is the answer to

3  that?

4       MR. STEGEBY:  Your Honor, we received 490 -- there

5  is a question as to whether it's 490 or 491 documents from

6  the Tampa Police Department.  Then, in addition, we had 56

7  documents that we produced which were from prior releases.

8  And if you combine those two, you get the full number of

9  pages that were produced in this case.

10       So there are no other documents that need to be

11  produced.  We have produced all of the documents.

12       THE COURT:  Okay.  And you all have searched

13  everything, evidence rooms, all those little places that

14  things seem to have been hidden that you couldn't find and

15  now have found?

16       MR. STEGEBY:  Yes, Your Honor.

17       As I noted in our response a couple of weeks ago,

18  under FOIA, an exhaustive search is not necessary.  It's a

19  reasonable search.

20       We have gone over and above the reasonableness

21  standard and also looked in places where normally you don't

22  look for FOIA documents, but that is correct, Your Honor.

23       THE COURT:  Okay.  Is there anything else that you

24  need to say or you feel like you need to say?

25       MR. STEGEBY:  If Your Honor has questions, I'm

1  happy to answer.  If you want me to give some type of an

2  opening statement, I would be happy to do that, too.

3          I think, you know, for purposes of FOIA, we have

4  litigated and researched and produced and whatnot everything

5  that needs to be done.  And I offer to brief further certain

6  issues last time, but I don't think that's necessary.

7          THE COURT:  Okay.  All right.  Have you had

8  discussions with either Mr. Thomas or Mr. Berlin?

9          MR. STEGEBY:  Yes, we have had communications

10 constantly throughout, from the beginning of the case until

11 now.

12         THE COURT:  No, I mean recently.

13         MR. STEGEBY:  Oh, yes, we have had discussions.

14 As I mentioned, when we received the DVD on -- it was

15 produced on November 30th.  I think we received it a day or

16 two after that.  And I looked at it.  I spoke with him.  I

17 contacted him, and we went through the DVD.  And that's when

18 I raised some concerns about what was on the DVD.

19         I believe we may have actually spoken after that

20 as well.  We have certainly exchanged some e-mails after

21 that.

22         THE COURT:  So is it your understanding that you

23 have turned everything over?

24         MR. STEGEBY:  Yes, Your Honor.

25         THE COURT:  All videos, all audios, all documents?

1          MR. STEGEBY:  Yes, Your Honor.

2          THE COURT:  All right.

3          MR. STEGEBY:  I understand that Mr. Berlin has

4    some questions about certain things.  For the most part, I

5    think that pertains to the documents that we have produced,

6    certain names that he would like to see, and that we think

7    would be inappropriate to unredact.

8          THE COURT:  Something other than what I ruled on?

9          MR. STEGEBY:  That's correct, Your Honor.  Third

10   parties that have not signed release waivers and have not

11   made public announcements about their involvement --

12         THE COURT:  Something other than what I have ruled

13   on?

14         MR. STEGEBY:  Correct.

15         THE COURT:  Okay.  Thank you.

16         Mr. Berlin.

17         MR. BERLIN:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MR. BERLIN:  Would you like me to address -- I

20   want to first see if you have any questions or if you would

21   like me to address what Mr. Stegeby said.  I can try and do

22   that.

23         THE COURT:  Why don't you just summarize briefly

24   where we are as far as your satisfaction with the production.

25   I mean, I realize -- I realize that you pointed out a number

1  of things were missing, and they have apparently found some

2  of those things or all of those things.  I'm not sure what

3  your position is going to be.

4        But as far as putting aside any frustration and

5  all that, where we are.

6        MR. BERLIN:  Very well, Your Honor.  Let me just

7  start by -- if I could address as a preliminary matter two

8  things.  One is just to say thank you to you, Your Honor.  As

9  you've expressed some frustration, we share your frustration,

10  and it's required some amount of sticking with us to get to

11  the bottom of this.  And if you will pardon the wrestling

12  pun, given the underlying matter, to wrestle this to the

13  ground.

14        And I have some thoughts if the Court -- at the

15  end, if the Court is interested, about sort of how we got to

16  this point, but let me address your question.

17        In answer to the question of have we gotten what

18  we are supposed to get, the answer, like many things in this

19  case, is yes and no.

20        It is correct that we have gotten a number of

21  things that Mr. Stegeby has enumerated.

22        Let me first start with the materials that were

23  supposed to be unredacted.  And that basically falls into a

24  number of different categories.  We obviously received --

25  although we were supposed to receive them on the 30th of

1  November, we did not receive them in a meaningful way until,

2  I think, Friday of last week.  So we spent some time this

3  week in trying to go through them.

4       What we have noticed doing that -- and I can't

5  report now that that review has exhaustively been completed.

6  It's a difficult exercise to look at redacted documents and

7  figure out if you have what you are supposed to have.

8       THE COURT:  Friday of last week was December 4th,

9  right?

10      MR. BERLIN:  Yes, that's correct, Your Honor.

11      THE COURT:  Okay.

12      MR. BERLIN:  But just let me give you an example.

13 So in the first production, when we got redacted documents,

14 just to use this as an example, we received notes of an

15 interview with Bubba Clem, which have a variety of things

16 that are of particular interest in this case.

17      In the supposedly complete production of documents

18 that had names that were supposed to be unredacted, we don't

19 have that document.  We don't even -- it's not as if it's

20 been produced again and it's still redacted.  It's just

21 missing.

22      We also have documents that have been produced

23 where it's pretty clear -- we're not a hundred percent sure,

24 but you can sort a tell generally from the context, it takes

25 some doing to do this, but that there are names that

1  Your Honor ordered redacted that are still unredacted in the

2  documents.

3          More generally, if you look at the numbers in the

4  three productions that we have gotten, Your Honor, taking a

5  side overlapping Bates numbering and duplicates -- and, I

6  mean, this requires some amount of math -- but there appear

7  to be 2,000 documents or thereabouts; 2069, I think we've

8  counted.

9          THE COURT:  Which is not an inordinate number of

10 documents.  I mean --

11         MR. BERLIN:  I will say, Your Honor -- and I've

12 been at this for quite awhile.  I've never spent this much

13 effort getting 2,000 documents produced anywhere in any case.

14         In terms of the unredacted documents, we have been

15 produced roughly -- in two productions.  One, that was --

16 there was a software error and there was some files that were

17 supposed to end up on a disk, didn't end up on the disk, and

18 then later they said, okay, here's the rest of it.  Those

19 documents total around 760 pages.

20         As a broad matter -- and, again, this is not

21 something we've fully been able to -- I couldn't give you a

22 complete list yet.  But as a broad matter, the notion that

23 two-thirds of the documents that we had don't have the name

24 Davidson, Shearn, Clem, et cetera, all of these names, it

25 just -- it does raise some significant level of skepticism on

1   our part.

2              THE COURT:  What do you mean they don't have the

3   names?

4              MR. BERLIN:  In other words, if you buy the

5   assertion that 700 pages that they have produced and said,

6   here's all the pages that we owe you that we are supposed to

7   unredact pursuant to Judge Bucklew's order, right, and there

8   were 2,000 pages total, that means that on two-thirds of the

9   pages about this investigation of Mr. Davidson, his name,

10  Bubba Clem's name, Jason Shearn's name, don't appear, because

11  if they did, they would have to give us a page and say, here

12  it is in unredacted form.

13             Does that make sense?  I know the point that I

14  made at the first time didn't come through, and it strikes us

15  as highly -- you know, is that possible, but it strikes us as

16  quite strange.  So that's the issue.

17             With respect to the video file, Mr. Stegeby

18  alluded to the fact that it was not playing when he received

19  it.  That file was produced pursuant to the state court

20  order.  My understanding is that was produced to Judge Case.

21  We don't know, because we don't have the disk, if it was

22  playable when he got it.

23             THE COURT:  What video are we talking about now?

24  You are not talking about December 14th?  Is that what you

25  are talking about?

```
 1          MR. BERLIN:  I'll talking about, yes, the December
 2   14th, 2012 video of the sting operation.
 3          THE COURT:  Okay.
 4          MR. BERLIN:  When Mr. Stegeby called to say, "I
 5   have these disks.  They are ready to be picked up.  Can you
 6   please arrange for Judge Case to do that?"
 7          We, then, sent the e-mail with the information,
 8   here is how you reach Judge Case and so forth.
 9          But he called me and said, "That video does not
10   appear to play."
11          THE COURT:  Judge Case?
12          MR. BERLIN:  Mr. Stegeby called me and said --
13   it's actually two disks.  He said, "One of two disks does not
14   appear to play."
15          "I don't know" -- this is a question -- "whether
16   that disk was fixed, essentially, before it was turned over
17   to Judge Case.  We don't have it because it doesn't come to
18   us; it comes to him."
19          THE COURT:  Listen, I cannot remember what the
20   state court judge's order said.  Why is a video of the sting
21   operation going to Judge Case?
22          MR. BERLIN:  Well, Your Honor, this may be more
23   information than the Court wants.  When that order was --
24   when that protocol was agreed upon, which is the video
25   footage was supposed to go to Judge Case, it was our
```

1  understanding, speaking for the Gawker defendants, that the

2  videos we were talking about were sex tapes, and that that

3  was consistent with an order of the state court that said --

4          THE COURT:  That was my understanding.

5          MR. BERLIN:  -- if they are sex tapes, you are

6  supposed to review those.

7          When the -- and, in fact, what happened is that

8  Mr. Stegeby first provided in a stack of materials that disk

9  to us; but when we realized it was video footage and we

10  review the protocol, we realized that as a technical matter,

11  that applied to DVDs, period.  And part of that was because

12  we did not have a complete understanding of what we are

13  talking about.

14          THE COURT:  Okay.

15          MR. BERLIN:  I'm not sure that's necessarily true

16  of Mr. Bollea.  And we, in an effort to strictly comply with

17  that and not be charged with violating the court order, sent

18  it back to Mr. Stegeby and said we believe that -- although

19  we think it's a little silly, given that this is not a sex

20  tape, but videotape footage of three people sitting in

21  their -- you know, fully dressed in a room, having a

22  conversation is not something that a state court magistrate

23  needs to review, but we will take that up with the state

24  court.

25          THE COURT:  So it was turned over.  So you don't

1   know whether --

2          MR. BERLIN:  Well, it plays and --

3          THE COURT:  Let me ask Mr. Stegeby.

4          MR. STEGEBY:  Yes, Your Honor.  When I initially

5   received a copy of the sting video, I spoke with Mr. Berlin,

6   and I clicked on random videos.  I believe there were 18

7   files or so.  And many of them didn't file.  And we tried to

8   copy them over to our system so we could try to play them off

9   of our network, and there were two of them that seemed to

10  work.

11         So we contacted the FBI, and they quickly

12  reprocessed it and sent out duplicate copies to us.  And I

13  tested that DVD, and that one seemed to play perfectly well.

14  Quality of the video itself is so-so.  It's a little grainy,

15  and you have some background noise, but it does play.  And

16  that is the copy that I then produced to Judge Case.

17         And when we received the copy from Gawker, we kept

18  that copy instead.

19         THE COURT:  Okay.

20         MR. STEGEBY:  So the one that Judge Case has, it

21  does play.

22         THE COURT:  Okay.  Thank you.

23         MR. BERLIN:  Excellent.  Thank you.

24         With respect to the audio files, there is two

25  issues.  One is we got a disk of audio files which we were

1   unable to open.  I may not be describing the technical issue

2   as accurately as I could, but we were not able to open the

3   files.

4           We produced a copy of that, as we are required to

5   do, to Mr. Vogt and -- on behalf of -- who's here on behalf

6   of Mr. Bollea, and they, too, were unable to access the copy.

7   We have tried to make them a duplicate.  I don't know if that

8   will work.

9           But we -- I am told by my office that we were,

10  through some sort of technical magic, able to finally access

11  the files, but there may be a problem with the audio file,

12  which we still have not been able to sort out.

13          THE COURT:  Is that both November 27th and

14  December 5th or just --

15          MR. BERLIN:  They have reproduced those two files

16  and the previously produced audio files in unredacted form

17  all on one disk, and the problem is for the whole disk.

18          THE COURT:  Okay.

19          MR. BERLIN:  More significantly perhaps is that

20  when the Tampa Police Department sent back their materials,

21  they wrote and said, "We have eight CDs."

22          We have been produced either six or seven files,

23  depending on how you count them.  If you count the sting

24  audio as two separate files, it was originally, as we

25  received it, divided into two parts, then it would be seven

1    files, but we appear to be still missing at least one file

2    that the Tampa Police Department had.  And we have raised

3    this with Mr. Stegeby, and I don't at this point have an

4    answer to that.

5              THE COURT:  Okay.  Well, let me just ask him.

6              MR. BERLIN:  Sure.

7              THE COURT:  Are you aware of a missing file that

8    you got back from the Tampa Police Department or you didn't

9    get back from the Tampa Police Department or you got back and

10   didn't turn over?

11             MR. STEGEBY:  Your Honor, I'm not aware of another

12   audio file.  I'm aware of the seven files that we had --

13   initially we produced five of them.  I played those off of my

14   system.

15             With respect to the second two, have they been

16   produced in one single CD?  I have not attempted to open

17   those.  I just assumed that they worked.  So I don't know if

18   they just got a bad copy.  If our copy is good, we would be

19   happy to make that work.

20             THE COURT:  Okay.  All right.  I realize this is

21   all quick.  I have set this -- you know, we ended up December

22   4th to the Friday and Tuesday.

23             MR. BERLIN:  I'm reasonably confident that we

24   probably -- one would hope that it would not require the

25   involvement of a federal judge's time to get a proper copy of

1    an audio file, but I do still have this question about it.

2              THE COURT:  Okay.

3              MR. BERLIN:  Because Tampa is saying we are

4    sending back eight files, and we only have seven, then it

5    raises the question of, you know, is there a missing file.

6    And we don't -- I think there is probably an answer to that

7    question that would require a little bit of digging on the

8    part of the FBI.  But it's probably worth getting to the

9    bottom of that while we are trying to make sure we have a

10   complete universe of documents.

11             Then Your Honor asked about the agreement between

12   Davidson and Bollea.

13             THE COURT:  That was one of your objections.

14             MR. BERLIN:  Which was one of the objections.

15             Your Honor asked about drafts, which I would like

16   to come back in a minute.  But the thing that is perhaps most

17   perplexing is the agreement that was actually seized during

18   the sting operation, the final agreement that they sat down

19   and signed just before effectuating the sting and detaining

20   Mr. Davidson, is missing part of that -- those pages.  We

21   have part of the agreement.  We don't have the other part.

22             And it is inconceivable to me that the FBI --

23   maybe I shouldn't say inconceivable.  But it would be very

24   surprising to me that the FBI would spend several months

25   cooperating with Mr. Bollea, having him negotiate this

1   agreement, effectuate it, a meeting where they had

2   Mr. Davidson fly from California, effectuate a sting, and

3   take evidence and be missing pages of the key document in the

4   case.

5          And that strikes me as a little hard to swallow.

6   And we have not been able to really get to the bottom other

7   than saying -- they are saying, "We don't have it," but it

8   does raise a significant concern.

9          THE COURT:  This is the original one?

10          MR. BERLIN:  Right.  There is an exhibit, which is

11   significant in this matter, to the original agreement, the

12   final original agreement that they sat down and signed.  We

13   don't want the original.  We will take a copy.  I'm not

14   asking for them to depart with their own evidence, but that's

15   missing.

16          And before you have get to drafts, the final seems

17   like somebody ought to have that and have all those pages,

18   and we don't know why we are missing --

19          THE COURT:  I'm not understanding.  Are you

20   missing an exhibit to the agreement?

21          MR. BERLIN:  It's an exhibit.  It's -- I believe

22   it's Exhibit B is what it's called, Your Honor.

23          THE COURT:  Okay.

24          MR. BERLIN:  And it's missing those pages.  But

25   they are all sitting there signing and initialling them, and

1   we don't know where that is.

2            And that brings me to the question, Your Honor, I

3   asked about the -- whether this is complete, which may

4   address the drafts and also probably addresses the missing

5   communications.  We got a bunch of communication from

6   Mr. Bollea, which we separately asked, "Tell us your

7   communications with the FBI."

8            We have a bunch of e-mails that the FBI hasn't

9   produced.  I'm not here bothering the federal court about

10  things we already have.  But it does raise --

11           THE COURT:  Yes, you are.

12           MR. BERLIN:  But hear me out, Your Honor, because

13  I'm not asking for those documents.  What those documents

14  tell us is that there is something missing.  And one of the

15  questions that I have, which I have not been able to get an

16  answer to, Your Honor, I asked this question, "Have you

17  searched everywhere?  The evidence room, whatever."

18           One place that does not appear to have been

19  searched, but, again, maybe Mr. Stegeby can answer this, is

20  Mr. Shearn's e-mail.  Right?  So to the extent that they are

21  going back and forth and saying, this is the stuff that would

22  be relevant to this investigation.

23           If I were involved in a civil case and you came to

24  me and said, you know, produce the documents that are

25  relevant to this, and I didn't search the e-mail of the key

1    person, I probably would be laughed out of the court or maybe

2    sanctioned.  So that's a question that we have.

3           And the thing that caught my eye about this, and

4    we didn't really focus on this, they represented that they

5    had given us -- they had gone through their entire

6    investigative file, and then we got the submission recently

7    that said, well, we went through our investigative file, but

8    not our evidence, because we don't normally search our

9    evidence.  And that raised questions about, okay, well, what

10   did you actually search.

11          And when we get to the issue of these drafts,

12   which went back and forth between Mr. Houston and Mr. Shearn

13   electronically by e-mail, and we get to the question of these

14   missing communications, it raises the question, did they

15   search the lead investigator's e-mail.  And if they didn't,

16   it's -- you know, this isn't a complicated thing.  You put in

17   the search terms "Bollea," "Clem," "sex tape," "Davidson,"

18   you are going to find the documents.  It's not -- you know,

19   there are places where you end up with -- if I came and I

20   said, "Give me everything in -- in all of the FBI," and they

21   had to search, you know, 500 people's or 5,000 people's

22   e-mails, that would be a different story.  Here we have the

23   one guy, and I don't know the answer to that question.

24          THE COURT:  Let me ask Mr. Stegeby.

25          Do you know whether Agent Shearn's e-mails were

1   searched?

2            MR. STEGEBY:  Your Honor, typically -- it's my

3   understanding that the FBI maintains a central record system.

4   Any document that would be relevant to any investigation

5   would be collected in that system.

6            That system, I believe, was searched, sent e-mails

7   that would have been relevant to this investigation would

8   have been captured --

9            THE COURT:  Even Agent Shearn's e-mails?

10            MR. STEGEBY:  I'm sorry?

11            THE COURT:  Agent Shearn's e-mails that were

12   relevant to this investigation were searched?

13            MR. STEGEBY:  It is my understanding that all

14   relevant e-mails would have been captured.  And since he's an

15   employee of the FBI, his e-mails should have been captured as

16   well.

17            THE COURT:  Okay.

18            MR. STEGEBY:  But at some point, Your Honor, I

19   would like to talk about the completeness of searches and the

20   attacks on the reasonableness of the search that we conducted.

21            THE COURT:  Okay.

22            MR. BERLIN:  What is unclear to me from that

23   answer, Your Honor -- and I'm not trying to belabor the

24   point -- is if what they are saying is when Mr. Shearn

25   concludes in realtime during the investigation that an e-mail

1    is sufficiently relevant to the investigation that he adds it

2    to the investigative file, that's one thing, but it's not

3    actually capturing.  It's relying on, you know, his judgment

4    in realtime about what's relevant, not what the FOIA statute

5    actually requires, which is the documents that are not

6    otherwise exempted to be produced.

7            If what they are saying is all of those records

8    would be imported into the central record system, that's a

9    different story, but I understood -- and maybe I -- I

10   understood it was the former, and maybe Mr. Stegeby and his

11   colleagues are able to clarify that while we are all here.

12           THE COURT:  Are you asking who makes the

13   determination as far as whether it's relevant or not?

14           MR. BERLIN:  I'm asking whether the central record

15   system -- if the central record system includes Mr. Shearn's

16   e-mails, then they have said, okay, we have searched that.

17           If the central record system only includes the

18   e-mails that Mr. Shearn determined way back when should be

19   added to the investigative file, then we don't know, because

20   we still have to search his e-mails.  So that's that

21   difference that I'm asking about.

22           THE COURT:  Do you know, Mr. Stegeby?

23           MR. STEGEBY:  That, I do not know today,

24   Your Honor.

25           THE COURT:  Okay.

1      MR. BERLIN:  Because it would seem to me that if

2  they haven't otherwise searched his e-mail, then that's a

3  place where at least some of the documents that we are

4  identifying is missing are likely to live, because we are

5  seeing them on the other side.  And, again, it's not the ones

6  we have, it's the ones we don't have that we are worried

7  about here.

8          The last thing I wanted to address was the -- with

9  respect to the questions that Your Honor asked, and then

10  there is the other issue that Mr. Stegeby raised about other

11  people that I also want to address, which is this:  That the

12  productions that have been made to Your Honor as -- in the

13  last week or so as documents that are being withheld, there

14  is a mystery -- there are actually two mysteries about them,

15  and that's this:  One is that the Bates numbers that are

16  listed on the *Vaughn* index for those two most recent

17  productions, the Bates numbers of documents that have already

18  been listed earlier on *Vaughn* indexes and presumably,

19  therefore, had already been produced to Your Honor for

20  review.  And we don't understand why they're producing

21  documents that Your Honor has already reviewed for re-review,

22  No. 1.

23          No. 2, the page ranges for those documents that

24  are listed are different.  So, for example, the first -- if

25  you look at the first of the two *Vaughn* index additions for

1   the last two productions, the first item is page ranges 951

2   through 953.  When you go back and you find that on an

3   earlier *Vaughn* index, it's Pages 951 through 954.  And this

4   pattern of things that don't match between the two places

5   that are listed on the *Vaughn* index continues.

6            Now, if Your Honor has already reviewed the

7   50-something pages that they have produced and concluded that

8   they are not producible, then that answers the question,

9   but --

10           THE COURT:  And I was going to say, why does it

11  matter?

12           MR. BERLIN:  It doesn't, but I wanted to flag for

13  Your Honor that they may have asked you to review things that

14  have already been done or that there is a separate problem.

15           One other place is -- this was a small thing, but

16  they listed -- they told us that Page 1354 was a

17  duplicate of -- was on the *Vaughn* index as not being

18  produced.  And when you go to the *Vaughn* index, it's not

19  listed as being withheld, it's listed as a duplicate.  And

20  the duplicate that it's a document of has been produced and

21  is the middle of the transcript.  And we don't understand why

22  that document is being withheld.  Again, it just raises

23  questions about what they are doing, which we are trying to

24  stitch together.

25           I don't that, you know -- the republic is probably

1    not going to rise or fall on Page 1354, but is something that

2    as a package when Your Honor is asking me had they done what

3    they are supposed to do, it does raise questions.

4           I did want to address the other piece of

5    Your Honor's orders, and that's this:  The Government, as you

6    know, has been taking the position throughout this exercise

7    that any name, even pseudonyms -- there is a point in the

8    documents where there are a series of references to Mr. X,

9    which we know from some documents that we've seen in some

10   other places, they redacted that.  It's obviously not an

11   identifiable -- there is not a person named Mr. X.  It's a

12   pseudonym for an identifier.

13          And that's during this operation.  It's our

14   understanding of how Mr. Davidson referred to his client or

15   Mr. Houston, perhaps, referred to Mr. Davidson's client.

16          So there is a bunch of these things that are --

17   where they have been taking this position sort of to absurd

18   links.  But the bottom line is they have taken the position

19   that if -- unless the person signed the waiver, they get to

20   withhold the name regardless of how public.

21          And we litigated this issue in front of

22   Your Honor.  Your Honor issued a lengthy opinion, which went

23   through some specific people, but started before it got to

24   the specific people and made the general point that said, if

25   somebody is public, their identity is not private.  And

1    that's the principal that got applied throughout the order.

2             And in the -- shortly after the order was issued,

3    the Tampa Police Department, which had been investigating

4    this matter, as Your Honor knows, because the files were

5    returned, the Tampa Police Department concluded its

6    investigation, elected also not to prosecute Mr. Davidson,

7    and released about a 35-page report, which listed the names

8    of Mr. X, identified who Mr. Davidson's client was as a radio

9    personality named Matt "Spice Boy" Lloyd.

10            It identified -- the person who went on his behalf

11   to the sting operation is a woman named Lori Burbridge.  It

12   identified Mr. Lloyd's wife as also being involved, a woman

13   named Tasha Carrega.  It identified some other law

14   enforcement people.  It identified Mr. Davidson's lawyer here

15   in Tampa as Brian Albritton, and then identified all of this

16   publicly.  There were numerous news reports of all this,

17   describing this -- much of this was posted on Bubba Clem's

18   website.  He talked about it on his radio show for days.

19            And we went to the FBI and said, Look, under the

20   provisions -- under the reasoning -- under the principles

21   laid out in Judge Bucklew's order, these people are now all

22   clearly public, and before you go through the trouble of" --

23   because they hadn't yet done the review that unredacted all

24   these things, we said to them, "Look, you are going to go

25   through this.  Let's not go through this twice."  Here's this

1  list we gave them.  There are more people in these reports

2  than we gave them, but we identified ten names.  And we said,

3  "If these people are here, they are all public now, could you

4  please unredact them?"

5          And the Government basically, other than not doing

6  it, has not actually responded substantively to that position

7  and appears to be taking the position that if they're not

8  specifically enumerated in any order, then too bad.

9          And that's wrong for a couple of reasons.  One is

10  that we are all lawyers.  We are trained to reason by

11  analogy?  So just to give you an example.  One of the people

12  that Your Honor ruled needed to be disclosed was a woman

13  named Casey Rozier, who is David Houston's assistant.

14          THE COURT:  Right.

15          MR. BERLIN:  A couple of weeks later, you went

16  through the EOUSA documents and you concluded -- even though

17  we hadn't made any showing about this and this hadn't been

18  discussed, but another one of his assistants, a woman named

19  Emily Heavrin, also needed to be unredacted in a particular

20  document.

21          You were capable of reasoning by analogy that

22  said, okay, I did this once for Ms. Rozier; I am going to do

23  the same thing for Ms. Hevren.

24          So we were asking the Government to apply the

25  overarching principle of Your Honor's order that if something

1 is public, it is not private, and to disclose this.  And we

2 tried very hard to do that before the Government did its

3 second review to unredact names so that they wouldn't have to

4 do it --

5    THE COURT:  Again.

6    MR. BERLIN:  -- again and yet, you know, here we

7 are.

8    We have -- because we have been trying to get them

9 to do this without -- we haven't wanted to bother Your Honor

10 about that in these other things where we were just trying to

11 get strict compliance, if you will, with the order.  But

12 since you've convened this hearing, and I know -- and in

13 order that -- expressed a -- I think fairly viewed a desire

14 to conclude this matter, I want to take the opportunity to

15 raise this issue.

16    I have with me a copy of the Tampa Police

17 Department report if Your Honor would like to see it at some

18 point.  And the documents that were also released -- related

19 to that by the Hillsborough County State Attorney's Office.

20 Again, all public.

21    We cited, when we sent this to Mr. Stegeby, a

22 variety of the news coverage that had also reported these

23 things and in many instances posted them in their entirety so

24 that they could see not only that they were released by an

25 agency but had been the subject of widespread publicity.  And

1   we thought that that ought to do it because it was the same

2   principle that was being applied.

3           THE COURT:  This was a TPD report or a state

4   attorney report?

5           MR. BERLIN:  It's a little bit of both.  The

6   report is the TPD.  They actually released their report.  The

7   Hillsborough County State Attorney's Office then released

8   additional records that were sort of supplementing the

9   report, if you will, that related to their now closed

10  investigation.  And I have a copy of both of them.

11          But it is the principle that Your Honor

12  articulated, which is that if these things -- we thought this

13  was not the kind of thing that we needed to bother you about,

14  frankly, because we thought that a normal party in a case

15  would be able to look at the public nature of these documents

16  and the principles outlined in Your Honor's detailed order,

17  that I'm told is now going to be a published decision, would

18  be able to apply them.

19          And we are now at the point where the Government

20  is still taking the position that if it's not -- if I don't

21  have a waiver or a court order, I'm not doing that.  And the

22  problem with this is that the FOIA statute actually imposes

23  upon the Government the obligation to make this calculus to

24  begin with before we get to Your Honor.

25          And, secondarily, if they are going to come to

1  this court and say these things are private, the burden is

2  not on me on that point, the burden is on me on the public

3  interest point, it's on them.

4          THE COURT:  When did TPD release their report?

5          MR. BERLIN:  It was the middle of November.  I can

6  give you the exact date.

7          THE COURT:  When I say "release," I'm assuming

8  release to the press?

9          MR. BERLIN:  Yes, Your Honor.  We found out about

10  it from a local TV station's news report.  That's how we

11  learned that it had been released.

12          THE COURT:  And you have --

13          MR. BERLIN:  It's dated November 13th.

14          THE COURT:  And you have a copy?

15          MR. BERLIN:  I do have a copy, Your Honor.

16          THE COURT:  Well, I'm not sure -- so it's a Tampa

17  Police Department document, right?

18          MR. BERLIN:  Right.

19          And I should have made one other thing clear,

20  which I now understand where Your Honor's confusion may be

21  coming from.

22          The Tampa Police Department, as the Court knows,

23  got a bunch of evidence from the FBI.  So the Tampa Police

24  Department report recites in significant respects the Tampa

25  Police Department's review of the FBI's evidence and

1    describes it, including, for example, to name these other

2    parties that are involved.

3             THE COURT:  But they haven't redacted, meaning the

4    TPD?

5             MR. BERLIN:  They haven't redacted at all.

6             THE COURT:  So why are you seeking that in a FOIA

7    request from the FBI?

8             MR. BERLIN:  I'm not seeking the Tampa Police

9    Department.  What I'm saying is to the extent that the Tampa

10   Police Department has come out and publicly said we did a

11   follow-on investigation --

12            THE COURT:  Oh, I see what you're saying.

13            MR. BERLIN:  -- where we reviewed FBI evidence,

14   these are people named in the FBI records, and they have done

15   all that publicly.

16            The FBI can't then turn around and say, well, no,

17   those people are still private for purposes of our

18   investigation, because TPD is already out all those people.

19            We have gone to the FBI with that report and said,

20   here's the report, here's the names, and we didn't ask for

21   every name that was in the TPD report.  We're trying to be

22   reasonable about this.  We picked the ones that were sort of

23   significant.  I think it's a list of ten names.  And said,

24   these names should be unredacted.

25            And the same thing is true with respect to a

1   couple of FBI agents and -- that were -- in addition,

2   Your Honor, we used agent -- there were other names that were

3   mentioned in our papers, but we used Agent Shearn as the

4   primary example because he was the lead investigator.  There

5   were other names.

6           And, again, in an attempt to narrow things,

7   instead of saying, please go through and redact every agent's

8   names, we said, look, if there is somebody who is an

9   undercover agent who is a problem to disclose, don't disclose

10  that, No. 1.

11          No. 2, if there is somebody who is involved in a

12  specific confidential law enforcement technique, since

13  Your Honor recognized that exception, that's okay.

14          And then we, third, went to them and said, look,

15  here's a list of about 20 documents that were really the ones

16  that we care about.  Most of them are the statements that

17  were given by witnesses and that to the FBI, because that's

18  the thing that is -- matters most perhaps to Gawker.

19          And we said, look, just deal with these 20 or 30

20  pages and get -- if there is agents other than Agent Shearn

21  that are listed here, can you focus just on those?  We have

22  been trying to narrow the areas that are at issue.

23          And we haven't gotten a -- we got a response

24  saying, generally, we are not going to unidentify anybody

25  else, but we didn't get a response to our sort of compromise

1    to say, look, can we just narrow -- focus on these narrow --

2    this narrow universe.

3            And what I'm trying to say to Your Honor since --

4    in the hopes of concluding this, is to say, look, I don't

5    think that Your Honor expects to issue an order that goes

6    through in detail and says, this is the legal principle on

7    which I'm relying in making this order, which is the things

8    that are already known are not a secret, and then say, okay,

9    here's a bunch of things that are already known, but the FBI

10   gets to keep those as a secret.

11           Like, that just doesn't seem to be where we ought

12   to be, and that was the point that I tried to make to the

13   Government informally.  Had planned, if it didn't work, to

14   bring it to Your Honor's attention, but since you scheduled

15   this hearing, I fell compelled not to -- I think Your Honor

16   would be irritated with me if I came back tomorrow with a

17   brief that said, can I also ask you about this.  You've

18   scheduled a hearing.  We very much appreciate.  So I wanted

19   to raise this issue.

20           But it does -- and I can hand out this report, but

21   the name along with the e-mail traffic back on forth on this

22   issue.  But the principle is a very simple one in which

23   Your Honor adopted in your earlier order, which is that if

24   these people's identities in connection with the FBI

25   investigation are already public, that there is not a basis

1    for the Government to validly assert a privacy exception.

2             THE COURT:  How many names are those?

3             MR. BERLIN:  Well, there is more than the ones we

4    asked for, but we specifically enumerated ten names,

5    Your Honor.

6             THE COURT:  Okay.  All right.  Other than that,

7    anything else?

8             MR. BERLIN:  I had two other things that are

9    unrelated to the production, which I would like to save until

10   we get to the bottom of that.  Mr. Stegeby might have

11   questions, but -- if that's all right, Your Honor.

12            THE COURT:  All right.  Mr. Stegeby.

13            MR. STEGEBY:  Yes, Your Honor.  First, I wanted to

14   mention that Mr. Berlin has sent me a number of e-mails with

15   various names of different phases of this stage, so we don't

16   know which names he really is looking for.  It's just in

17   question at this point.

18            THE COURT:  Okay.

19            MR. STEGEBY:  Second of all, with respect to the

20   privacy interest of those individuals, we reviewed the

21   Court's orders, and quite in detail, to figure out whether we

22   could accommodate Mr. Berlin's request of unredacting other

23   documents or other names.

24            It seems like there are two principles that the

25   Court laid out in its orders, and it seems to be a very well

1    struck balance between -- you know, based on FOIA case law.

2         There is definitely case law that says individuals

3    may retain their privacy interest even if their names have

4    been made public and even if part of the public could even

5    deduce from certain facts that this is the person who was

6    involved in this incident.  So there is absolutely still a

7    privacy interest in those documents.

8         And we have laid out in our briefs to the Court

9    the fact that we don't believe that there is sufficient

10   public interest to outweigh those private interests for those

11   individuals.

12        And the two principles we could find that the

13   Court has laid out in this case, is that if the Government in

14   public filings with this Court, in this court, produces names

15   of individuals, whether it's federal employees or otherwise,

16   then that is fair game.  And Your Honor has pointed out

17   specifically AUSA Sweeney and Agent Shearn.  We have

18   unredacted them.

19        At the same time, just because a person's name is

20   out there in the public -- and the Tampa Police report that

21   they issued is sort of a red herring here because that simply

22   means that some name is out there related to this

23   investigation.

24        Well, everybody knows who the Hogan family members

25   are.  And they obviously are related to some extent to the

1    case because they are Hogan's family.  And Your Honor

2    would -- allowed us to redact their names.

3                    THE COURT:  Sure.

4                    MR. STEGEBY:  So one principle is whether we have

5    publicly announced the name of a federal employee or a third

6    party in this case.

7                    Another principle --

8                    THE COURT:  "We" being who?  Who is "we"?

9                    MR. STEGEBY:  The federal government.  In other

10   words, anything that we have filed.

11                   THE COURT:  Not the TPD, not the State Attorney's

12   Office, but the federal government?

13                   MR. STEGEBY:  Correct.  Correct.

14                   The other principle that the Court appears to have

15   laid out is if an individual has publicly announced

16   themselves --

17                   THE COURT:  Right.

18                   MR. STEGEBY:  -- that they are related to this

19   case or related to the state court case as well.

20                   So those two principles -- when we look at those

21   and we look at the names that we have been provided by

22   Gawker, we could not make a correlation there.

23                   So we have taken the position that we are

24   following the Court's order, both by spirit and the letter,

25   and we should not have to unredact any other names unless the

1   Court so orders.

2           Second of all, with respect to the search,

3   initially, the plaintiffs did not complain about the FBI's or

4   the EOUSA's searches.  When it comes to FOIA cases --

5           THE COURT:  I'm sorry, what are you talking about

6   now?  Searches of what?  Where they looked for documents?

7           MR. STEGEBY:  Yes, correct.  So -- yes.  So when

8   it comes to the universe of documents and the completeness

9   that Gawker is asking for.

10          FOIA -- and I've laid this out in briefs before.

11  FOIA is not a litigation tool.  It's not a question of

12  getting every document from every database that we have.

13  It's a reasonableness position.

14          In fact, we litigated -- not my office personally,

15  but the FBI was involved in a case that was recently decided

16  by the District Court in mid-November.  And I have a copy of

17  it for both the Court and plaintiff, if you may, if you would

18  like to have it.

19          THE COURT:  A District Court somewhere else?

20          MR. STEGEBY:  No, it's a Circuit Court case I

21  believe up in D.C.

22          THE COURT:  A circuit case?

23          MR. STEGEBY:  Yes.

24          THE COURT:  D.C. circuit?

25          MR. STEGEBY:  Yes.  Yes, Your Honor.  I'm sorry if

1   I wasn't clear on that.

2               THE COURT:  Okay.

3               MR. STEGEBY:  But I believe it's the D.C. circuit

4   who issued this order in mid-November.

5               THE COURT:  Do you have the --

6               MR. STEGEBY:  I do, Your Honor.

7               THE COURT:  It's an opinion?

8               MR. STEGEBY:  Yes, Your Honor.

9               THE COURT:  Why don't you read the cite into the

10  record and give it to me.

11              MR. STEGEBY:  Yes, certainly, Your Honor.

12              The citation is -- it's *Mobley versus Central*

13  *Intelligence Agency*, and the citation number is 2015 WL

14  7423687.

15              And specifically it says, "Finally, the FBI" --

16              THE COURT:  What is it?  Give me -- what Westlaw,

17  2000 what?

18              MR. STEGEBY:  2015, Your Honor.

19              THE COURT:  2015, okay.  Go ahead.

20              MR. STEGEBY:  I'm citing here from Page 11:

21              "Finally, the FBI search under FOIA is not

22  unreasonable simply because it fails to produce all relevant

23  material."

24              And the Court goes into detail with respect to the

25  standard for a search -- a reasonable search under the FOIA.

1          This is precisely the reason, I believe, that FOIA

2    should not be used as a litigation tool or as a discovery

3    tool.  We should not have had to get to this point.  The

4    question is was our search reasonable?  If it was, did we

5    produce the material.  Whether we produced all documents is

6    not the question.

7          It's did we reasonably find all the relevant

8    documents, responsive documents?

9          Now, if plaintiff is able to point out to --

10   certain particular documents that they are interested in that

11   they believe we have not produced, the answer is to file

12   another FOIA request, and then we get to search for those

13   documents.

14         So I believe in this case, we have done a

15   reasonable search.  We have found the documents.  We have

16   produced the documents.  And I think most of these arguments

17   right now are, frankly, moot.

18         If the Court doesn't have any further questions,

19   I'm --

20         THE COURT:  Okay.  Well, you know, it may be

21   reasonable.  It's in the eye of the beholder.  But when you

22   miss videos or you miss audio recordings or you miss

23   declination letters that we have been talking about now

24   for -- which would -- normally you would think would be

25   there, it seems to me that's not quite a reasonable search.

1          As I said, maybe reasonable is in the eye of the

2     beholder, but I could go through all of the affidavits that

3     say, well, inadvertently or mistakenly or that sort of -- I

4     mean, it's just -- each affidavit is replete with things like

5     inadvertently or mistakenly or we looked here or we didn't

6     look there.  And it just seems that -- I mean, this is not

7     a lot of documents.  I just don't understand how this could

8     have been as difficult to do as it has been.

9          As I said, maybe reasonableness is in the eye of

10    the beholder, but, in my opinion, it hasn't been reasonable.

11         Okay.  Let me hear from Mr. Berlin and then we

12    will conclude.

13         MR. BERLIN:  Thank you.

14         Your Honor has already addressed the

15    reasonableness point, and I would just add to that quickly,

16    that if you were going -- we didn't raise this initially

17    because we were told this involves one investigation.  We got

18    our investigative materials together, and we have gone

19    through them.

20         When we began to realize that there were -- that

21    that was some sort of FBI term of art that said, well, we

22    have gone through our investigative file -- and I put that

23    term in quotes -- but not our evidence, and maybe not even

24    all of Mr. Shearn's e-mail, that's when we began to raise

25    this.  And I don't think that either of those two things

1   falls into the category of an unreasonable search.

2          If I said, please search the entirety of the

3   records of the Justice Department in all its offices

4   throughout the world or throughout the country to see if

5   there were any stray documents relating to this

6   investigation, Your Honor would probably say, that's not a

7   reasonable search.

8          The things that we are talking about, I think,

9   fall comfortably within that area.  And, in fact, there are a

10  number of cases that say, where there are things that are

11  obviously supposed to be there that are not, it raises a

12  question about whether the search was reasonable.

13         And here it seems to me that the thing to do, if I

14  might suggest, Your Honor, is to get the answer to the

15  question that we asked and had a colloquy with you and with

16  Mr. Stegeby earlier about whether or not Mr. Shearn's e-mails

17  are -- in fact, were not included in their search.  If we can

18  get the answer to that, we are probably -- that issue has

19  probably now been run to ground.

20         With respect to the earlier point that Mr. Stegeby

21  made about the privacy issues, I think that the -- the point

22  that Your Honor made, I don't think, and it's not true and

23  it's not limited this way by any of the cases -- Your Honor

24  cited, I think, four different cases in your opinion about

25  when something is public, it's not private, were limited

1   necessarily to disclosures only by the Government.  There is

2   a number of ways that things can become public.

3           Certainly, through the FBI's release of records to

4   the Tampa Police Department, which then describes those

5   records in a public report, that seems to me to be one of

6   them that would be fair game.

7           The example that Mr. Stegeby gave involving

8   Bollea's family, my understanding of the Court's exclusion of

9   those individuals from Your Honor's order was that they

10  didn't -- that obviously everybody knows who Mr. Bollea's

11  wife and his children are, but that their connection to the

12  investigation was not otherwise public, and that that was the

13  dividing line that Your Honor drew.

14          Here, we are talking about a bunch of people who

15  are obviously connected to the investigation because they are

16  discussed in a police report summarizing FBI records about

17  this investigation.  So we have not just that they are

18  public, but that they are public and connected to the

19  investigation.

20          It would seem -- and I ask Your Honor -- I mean,

21  look, if Your Honor wants we -- I don't think this is what

22  Your Honor wants.  If Your Honor wants, we could file yet

23  another brief attaching these documents and brief each of

24  these individuals.

25          What I would hope would be the case is that we

1   could use the time today for Your Honor to give some guidance

2   on the subject.  If Your Honor wants to, you know, look at

3   the police report before we end -- and the state's attorney

4   documents before we do that, very well.

5           But the general principles that we are trying to

6   apply are not -- don't seem to be that complicated and

7   probably not in need of another round of briefing.

8           I will say that as recently as Wednesday of last

9   week, on the 2nd of December, I e-mailed Mr. Stegeby a

10  follow-up e-mail to say, here's this issue and here are the

11  specific ten people we are talking about.

12          So when he says, I don't know which people and --

13  that's not actually correct.  And I could give you that

14  e-mail as well.

15          THE COURT:  Well, I don't know which ten people

16  you are talking about.

17          MR. BERLIN:  Would you like me to list them now?

18          THE COURT:  I'm not anxious to have another round

19  of briefing either.  And I'm anxious to conclude this.  And I

20  understand that the e-mails of Jason Shearn, but I'm not

21  sure -- and I don't have a copy of the report.  I don't know

22  how in the world that I can address this unless you give me

23  some of that.

24          MR. BERLIN:  Sure.  Might I propose that we hand

25  up the report.  I'll give you a copy of the e-mail that lists

1   the specific people.  If it's helpful, I could also give

2   Your Honor, you know -- I have the report -- I have the

3   Hillsborough County State's Attorney documents that were also

4   released.  The e-mail chain, that includes my recent e-mail

5   from Wednesday and my earlier e-mails.

6          THE COURT:  That's fine, whatever you have.

7          MR. BERLIN:  And I think it will be obvious.  And

8   then perhaps Your Honor could just give us some guidance on

9   that.  I'm not sure that I have more to say in terms of

10  briefing on it.

11         THE COURT:  Okay.

12         MR. BERLIN:  And there are a couple of other

13  issues that we have identified today that I think -- let me

14  propose something else, Your Honor.

15         We will undoubtedly go through the documents more

16  since we just got them on Friday and discovery issues.  And I

17  don't -- I'm delighted to have your involvement, but,

18  Your Honor, I don't think that you need to be involved in

19  what is essentially a production of documents in compliance

20  with an order in terms of micromanaging it.

21         And one of the problems that we have had, as is

22  reflected in our most recent submission, is that sometimes we

23  write to Mr. Stegeby, and it's my understanding -- and I

24  should say that my understanding is that Mr. Stegeby has been

25  a -- as you've described in an earlier hearing, a good

1   soldier, and he has tried to run those up the flagpole with

2   the people at his client.  I don't know the details, because

3   obviously that's privileged on their end.

4            But oftentimes we make these requests.  And this

5   e-mail chain I'm about to hand you will be a perfect example.

6   And they go into sort of a black hole where we don't get an

7   answer.

8            And then there is a question as to whether do we

9   follow up, do we then go bother Judge Bucklew?  What is

10  the -- so one of the things that I would propose is that you

11  direct the Government that when we come up with what will be

12  the inevitable, hey, this was not redacted or this was not

13  unredacted and it should have been, that we agree on a period

14  for them to respond and to respond in writing so that we can

15  have some closure to this without it just percolating on

16  indefinitely.

17           And I would propose -- I mean, on an individual

18  document, it would seem that if they could get back to us

19  within five days, that would be a useful piece of any relief

20  that we could get out of today's hearing so that we could

21  bring this hopefully to a conclusion without having to bother

22  Your Honor about, you know, on such and such a page, this

23  name wasn't properly redacted or not redacted and that we

24  could get to the bottom of it.

25           It may still generate a small list of things in

1  dispute, but hopefully that process will substantially reduce

2  that.  Because my experience has been so far that when

3  Your Honor has directed firmly the Government to do things,

4  like, where are the things on this list at A through H, that

5  even though they have told us, we don't have them, they start

6  showing up.  And if there were some directive to the

7  Government to do something of -- like that.

8            If they have a different proposal, I'm amenable to

9  it, but I think we need to put something in place so that we

10  can deal with the inevitable individual documents that there

11  are questions about without having to run back to court every

12  time, because that's not what you want and it's certainly not

13  what we want.

14            THE COURT:  All right.

15            MR. BERLIN:  If it would be helpful, I can address

16  the last two things or if you would like to still deal with

17  the documents?

18            THE COURT:  No.  I think I understand.  You are

19  going to give me a copy of the e-mails that relate to your

20  request for the additional unredaction, the persons that you

21  have suggested should be unredacted.  You are going to give

22  me a copy of the Tampa Police Department report and any

23  attachments that are appropriate.

24            I have one question to come back to the Government

25  regarding Jason Shearn's e-mails, but I would agree.  Some

1    sort of procedure is probably helpful.

2              MR. BERLIN:  All right.

3              THE COURT:  I would like not to be involved, and I

4    would like to conclude this.

5              MR. BERLIN:  Well, I tried to give some thought --

6    and this is actually where the next two things are going to

7    go.  I tried to give some thought -- Your Honor has been very

8    generous with your time in scheduling now four hearings in

9    this matter.  Several of them on short notice.

10             And so reading the spirit of Your Honor's most

11   recent order, I tried to think about, okay, what would we

12   need to do to conclude this?  One of them is to raise the

13   issues with the production.

14             One of them is to raise these issues with these

15   other names from the Tampa Police Department, which we will

16   give you.

17             One of the them is to come up with a procedure for

18   not having to keep continuing to come back to court over

19   individual documents where there is an issue, but without

20   that stuff going into a black hole.

21             The last things that comes up in a FOIA case, and

22   I hesitate to raise this because it's probably my least

23   favorite thing and your least favorite thing, and that is the

24   subject of attorneys' fees.

25             As Your Honor knows, we have spent -- this case

1  has had many, many twists and turns that could have been

2  avoided.  And Your Honor spoke earlier about the difficulty

3  in securing the production of roughly only 2,000 pages.  It's

4  cost a substantial amount of money.

5          I often encourage clients in this setting, even

6  though they are entitled to fees under FOIA, to let it go,

7  but this really has cost so much money unnecessarily that

8  it's difficult to do that.

9          I know from my past experience, that the very last

10 thing that judges like to do is to have a fee motion.  And so

11 I have a proposal, which I've raised with Mr. Stegeby, and I

12 sort of got a part answer.

13         I would like to propose that we informally try and

14 resolve the issue, but that -- in case that doesn't work,

15 which sometimes happens, that Your Honor consider referring

16 that question to a mediation in front of Magistrate

17 Judge Jenkins.  Because I believe it's the kind of thing that

18 if we could get the principals, not just Mr. Stegeby and me

19 writing e-mails back and forth or exchanging information, but

20 if we could get the decision-makers in a room, I would think

21 that issue could be resolved.

22         I have assurances from my client that they would

23 like to resolve that and are prepared to be extremely

24 reasonable in what they are asking for to do that.

25         And I would ask that that be referred and

1   scheduled at some point, you know, 30 or 40 days out, so that

2   if the discussions don't work, we are not starting at that

3   point to just go down that road.

4           And it would be my sincere hope that by doing that

5   and investing a short amount of time by the Magistrate Judge,

6   we might avoid --

7           THE COURT:  She is the magistrate judge on this

8   case, right?

9           MR. BERLIN:  That's my understanding, Your Honor.

10          THE COURT:  Yes.

11          MR. BERLIN:  And that we would be able to avoid a

12  substantial amount of time.

13          When I raised this with Mr. Stegeby, he wrote back

14  and he said, I think that the mediation part is premature,

15  because we would like to discuss it.  And my -- given the

16  history of this matter, I was a little reluctant to just

17  leave that open-ended.

18          And I would like to -- if we put it on the

19  calendar with Magistrate Jenkins and it turns out we do not

20  need it, great.  Everybody will be delighted to have that

21  period of time taken off their calendar, but I would like to

22  try and --

23          THE COURT:  Obviously, I can't refer the

24  attorneys' fees issue to Judge Jenkins for mediation or

25  anybody for mediation until such time as I have a motion for

1    attorneys' fees.

2            MR. BERLIN:  Let me propose, because the part of

3    this that is burdensome for everybody is putting together the

4    specifics of the fee request.  What I can give to Mr. Stegeby

5    informally is probably not what I would file in a court if I

6    were asking for fees.

7            So if it's acceptable to Your Honor, what I might

8    do -- what I would like to do is to file a short motion

9    requesting fees in an amount to be determined, and Your Honor

10   could then perhaps refer the entitlement and the amount to

11   the mediation.

12           But I was trying to get out of having to have the

13   parties spend additional resources briefing that issue if it

14   can be resolved informally, and I would like to find a way to

15   do that.  Perhaps even if the Government were to, for

16   example, consent to that, maybe we could do that even without

17   the -- even the short motion I described, because it would

18   just -- you know, it's increasing the fees and it's just

19   wasteful.  So I'm trying to avoid that.

20           THE COURT:  Okay.

21           MR. BERLIN:  Then the last issue is a housekeeping

22   issue.  When we were here at the first hearing, Your Honor,

23   on the 24th of June, there was a portion of the hearing which

24   Your Honor heard from Mr. Stegeby by himself.

25           THE COURT:  Yes.

1          MR. BERLIN:  My understanding is that that was

2     done because at that time, there was a local law enforcement

3     investigation that was confidential.  Now that everybody

4     knows that, the investigation is over, they have released the

5     report.

6          I would ask -- and I've, again, raised this with

7     Mr. Stegeby and have not gotten an answer from the Government

8     about their position, but I would ask that that portion of

9     the transcript now be unsealed.

10         THE COURT:  Do you have any objections to that,

11    Mr. Stegeby?

12         MR. STEGEBY:  Well, in my view, it's sort of

13    unnecessary to unseal it.  The conditions that we had or were

14    under at that time and the reason I couldn't tell the open

15    court, you know, they don't exist now, and there is no reason

16    to unseal the records in my mind.  But it obviously is

17    Your Honor's decision.

18         THE COURT:  Yeah, well, I don't see any reason to

19    keep it sealed anymore, because what we discussed is now

20    entirely public.  So my concern was to protect the

21    investigation that was allegedly going on at that time with

22    Tampa Police Department.

23         Obviously, they have been forthcoming in saying

24    they had an investigation, investigation is closed.  So to

25    the extent that we can unseal everything, we ought to unseal

1  it.

2          So I'll grant that motion.  We will unseal them.

3          MR. STEGEBY:  Yes, Your Honor.

4          MR. BERLIN:  Thank you, Your Honor.

5          And on that point, the oral motion is sufficient?

6  You don't need a written motion?

7          THE COURT:  That's fine.

8          MR. BERLIN:  Thank you.

9          THE COURT:  I'll direct the clerk to unseal it.

10          Okay.  Or direct -- I guess I'll have to direct

11  the court reporter.

12          Are you debating on saying something else?

13          MR. BERLIN:  I was gathering the documents that

14  Your Honor was asking for.

15          THE COURT:  Okay.

16          MR. STEGEBY:  I apologize, Your Honor.

17          THE COURT:  Do you have them?

18          MR. BERLIN:  I do.

19          THE COURT:  Can you give them to the CSO, who will

20  give them to me.

21          (*Document tendered.*)

22          MR. STEGEBY:  Your Honor, a couple of minor

23  things.

24          THE COURT:  Yes, Mr. Stegeby.  I'm not finished.

25  I have some questions of you, and then you can say whatever

```
 1  you want, too.

 2            So go ahead.

 3            Thank you.

 4            Go ahead.

 5            MR. STEGEBY:  Thank you.

 6            We would be happy to provide some sort of a status

 7  report within 30 days when it comes to the attorneys' fees.

 8  So if that fits within the Judge's decision, that will be

 9  fine by us.

10            THE COURT:  All right.  Well, Mr. Stegeby, then,

11  should it come to this, do you have any objection to my

12  referring the entitlement of attorney fees to the magistrate

13  judge?

14            MR. STEGEBY:  Your Honor, in principle, we have no

15  problems with that.  As Mr. Berlin said, my point was that

16  it's a little premature right now.  We haven't seen any

17  records.  We haven't been offered any records --

18            THE COURT:  Okay.

19            MR. STEGEBY:  -- you know, bills or whatnot.  We

20  would like to look at them.  And it may turn out they are

21  reasonable and that we agree with them.

22            THE COURT:  Could I ask you -- I want to make sure

23  that I understand your position.  With respect to the

24  additional request for unredaction that was made to you --

25  and I haven't read any of this, obviously.  -- it was your
```

1   position that what you did was you unredacted those names

2   that I told you to unredact, right?

3          MR. STEGEBY:  That's correct.  And we also looked

4   at some other names in the list.  And you will note in the

5   e-mails that Mr. Berlin sent to me, he -- at least in one of

6   them, he said, here are the names, including, which means but

7   not limited to.  So that's why we weren't sure exactly what

8   names that they wanted unredacted.

9          THE COURT:  Okay.

10          MR. STEGEBY:  But we did look at other names as

11   well based on the two principles that I mentioned earlier in

12   court, which we believe is the Court's order, marching

13   orders.  And we are unaware of any other names where the

14   person has publicly announced themselves that they have

15   participated in this investigation or is related to the

16   investigation or names that we as the Government, federal

17   government, had published publicly in this case.

18          THE COURT:  Okay.  I want to go back to because

19   I'm not sure I understand this.

20          I want to go back to Agent Shearn's e-mails.  The

21   concern that was addressed was that there are e-mails that

22   are out there that have not been turned over.  And the

23   request was -- or the location was apparently thought to be

24   in Agent Shearn's e-mails.

25          And you explained the process, but would you go

1    through that again with me.  Is it Agent Shearn that -- he

2    identifies what he thinks is relevant or somebody else

3    identifies it?

4              MR. STEGEBY:  Your Honor, I do not know that

5    particular part of the process.  My understanding is that

6    e-mails are captured into the central record system.

7              THE COURT:  All e-mails?

8              MR. STEGEBY:  I don't know if all e-mails are

9    captured in that system, Your Honor.

10             THE COURT:  Maybe she knows.

11             MR. STEGEBY:  May I speak with her?

12             THE COURT:  Yes.

13             MR. STEGEBY:  Thank you, your Honor.

14             (*Brief pause.*)

15             MR. STEGEBY:  Your Honor, all e-mails are not

16   captured.  When it comes to a specific investigation, it is

17   the agent who determines which records are going to be

18   submitted to the central record system.  So that seems to be

19   the determining factor.

20             But, again, as I mentioned before, when it comes

21   to FOIA cases, the reasonableness of the search and the

22   database records that we are looking for, the question is

23   whether that search is reasonable.  And, again, I have to

24   reiterate the *Mobley* case, and I would like to provide

25   Your Honor with a copy of that case, as well as plaintiffs.

1      THE COURT:  And that's fine.  I'm just trying to

2  understand.  What is the FBI central record system?  Is that

3  when -- is an investigate -- I don't pretend to understand

4  that.

5      When an investigation -- let's assume this

6  investigation was going on.  Then at the conclusion of the

7  investigation, records are -- the agent identifies records or

8  e-mails that are related to the investigation and that goes

9  into some sort of central record system?  I just don't

10  understand.

11      MR. STEGEBY:  Your Honor, I don't know if the

12  agent immediately after he sends the e-mails to someone sends

13  them off to the central record system or if it's at the

14  conclusion of the investigation he goes through all the

15  various e-mails.  I do not know the answer to that question.

16      THE COURT:  Well, does anybody -- I don't know

17  what the central record system is, so maybe you could help me

18  out.

19      MR. BERLIN:  Your Honor, if I might, also?  In the

20  records that have been produced, we have documents that say

21  we are adding this specific e-mail to the case file.  So by

22  analogy, my understanding of this is that we have in our

23  office a case file for this matter, which is kept in the

24  central file room.  And I can send things to it, but I also

25  have my own e-mail.

1          THE COURT:  Okay.

2          MR. BERLIN:  And I think those are the two

3    categories we are talking about here as I understand it.

4          THE COURT:  Okay.

5          MR. STEGEBY:  Your Honor, we have a representative

6    here, as I mentioned, from the FBI who is more familiar with

7    the record system that they have.  So she is happy to answer

8    questions.

9          THE COURT:  Okay.  And the concern I have or what

10   I don't understand is when you say a search is made of the

11   central record system for documents having to do -- that --

12   having to do with this investigation, I don't know -- it --

13   just explain that to me, if you will.

14         MS. JIROUSEK-WINT:  So, yes.  We do a search of

15   the central record system, which I think we explained in one

16   of the declarations for Mr. Hardy.  It's -- the central

17   record system is a system where everything is indexed by a

18   series of names; you know, witnesses involved in the

19   investigation; anything that would be relevant to the

20   investigation.  So we do a search of that system.

21         THE COURT:  How does the document get in the

22   central record system?

23         MS. JIROUSEK-WINT:  Right.  So with e-mails, the

24   case agent -- and it could be during the investigation or at

25   the conclusion of the investigation.  In this case, the

1   investigation has been included, so everything would have

2   been uploaded into the central record system.

3          But the agent will look at e-mails and make a

4   determination about what they think are records relevant to

5   the investigation and upload those into the system.  So

6   that's how it works.

7          THE COURT:  Upload them into the system under the

8   name of the investigation or --

9          MS. JIROUSEK-WINT:  Right.  It would be into the

10   case file for the investigation.

11          THE COURT:  There's a central case file?

12          MS. JIROUSEK-WINT:  Yes, that's correct.

13          THE COURT:  Okay.  And so it's the agent that

14   makes the determination as far as relevance?

15          MS. JIROUSEK-WINT:  That's correct.  That's

16   correct.  Yeah.

17          And as Mr. Stegeby mentioned, the *Mobley* decision

18   actually speaks specifically to e-mails and in a search of

19   the central record system for relevant e-mails.

20          THE COURT:  Okay.  Thank you.

21          Would you just for the -- so the record is

22   correct, would you state your name.

23          MS. JIROUSEK-WINT:  Sure.  My name is Sarah,

24   S-a-r-a-h, Jirousek-Wint, J-i-r-o-u-s-e-k, hyphen, W-i-n-t.

25   I'm the unit chief of the FOIA litigation unit in the office

1    of general counsel at the FBI.

2              THE COURT:  And where are you located?

3              MS. JIROUSEK-WINT:  D.C.

4              THE COURT:  Thank you.

5              MS. JIROUSEK-WINT:  Thank you.

6              THE COURT:  Thank you for being here.

7              MS. JIROUSEK-WINT:  Of course.  Thank you for

8    having me.

9              MR. STEGEBY:  May I?

10             THE COURT:  Yes.

11             (*Document tendered.*)

12             THE COURT:  Okay.  All right.  Mr. Stegeby, do you

13   have anything else?

14             MR. STEGEBY:  I don't believe so, Your Honor.

15             THE COURT:  Okay.

16             All right.  Mr. Berlin.

17             MR. BERLIN:  If I may, obviously, I've not read

18   the *Mobley* decision in the time it's been given to me.

19             THE COURT:  Nor have I.

20             MR. BERLIN:  But the point I wanted to make on

21   this was sort of a common sense point, which is that when we

22   make a FOIA request, we are entitled to the records unless

23   they are exempt.

24             And what Mr. Shearn determines is relevant for

25   purposes of saving to the case investigative file for use in

1   the investigation is not, A, uploaded into the FOIA statute

2   and, B, is not necessarily what's relevant to the requester.

3          And, in fact, if that were the case, you could

4   imagine the Government and government agents making decisions

5   driven by the decision that someone might later request their

6   file and think this probably is something we should not keep

7   in there.  And that's not really what the statute requires.

8          So I do think that if it is the case, that only

9   some of Agent Shearn's e-mails, which are the ones that he

10  determined would be relevant for the potential prosecution of

11  Mr. Davidson are the ones that made it in there, that if you

12  are asking for the Government's records related to this

13  investigation, that not searching the e-mail of the lead

14  investigating agent -- and there are other people that we

15  have identified in our papers that were also involved.  But

16  let's just start with Agent Shearn.  If you don't search the

17  e-mail for the relevant terms, you are missing records.

18         And to come into court and claim that that isn't a

19  reasonable search, I think really is not well-taken.  So I

20  just wanted to make that point about the difference in

21  relevance and what the statute actually requires.  The

22  statute doesn't have a standard that says, we only produce

23  the records that the agent determines to be relevant.  That's

24  not the standard under the statute.  The standard says, come

25  up with a reasonable search and produce all the responsive

1    records that are not exempt.  And the reasonable search has

2    to include the materials that are actually in the e-mail

3    files of the lead investigative agent or you can't seriously

4    be contended that that is a reasonable search.

5              THE COURT:  And I haven't read the case either, so

6    I can't really comment.

7              All right.  I will -- in an effort to hopefully

8    let's conclude this case, I'm going to -- I'll try to give

9    you some guidance on the additional names.  And as a result

10   of the Tampa Police Department's report that was disclosed to

11   the media, and also with respect to Agent Shearn's e-mails

12   and the search that was made, and also a process to handle or

13   to work out how you've come up with additional documents that

14   you may find were not turned over that should have been

15   turned over, as well as the attorney fee issue, but

16   essentially as far as the attorney fee issue, I'm going to

17   ask that you try to work this out.  If you cannot work it

18   out, then I think referral to Judge Jenkins is a good idea.

19             She's the magistrate judge on the case.  The

20   magistrate judge really has had no involvement in the case.

21   So I think she would be fine to mediate it.  She is retiring,

22   but she will be here, I believe, the first four months of

23   2016.

24             MR. BERLIN:  I was sort of hoping that if we

25   couldn't resolve this in about 30 days' time, we might be in

1    front of her and well before retirement.

2              THE COURT:  Okay.  All right.  Thank you.

3              *(Proceedings adjourned at 12:23 p.m.)*

```
UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )
```

# C E R T I F I C A T E

I, Scott N. Gamertsfelder, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript from the stenographic notes taken in the above-entitled matter by the undersigned and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


/S/Scott Gamertsfelder, RMR, FCRR
Official Court Reporter          Date: December 14, 2015

                    - - -